### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

---

|  |  |  |
|---|---|---|
| | **:** | |
| **IN RE:** | **:** | **MASTER DOCKET NO.:** |
| **PAULSBORO DERAILMENT CASES** | **:** | **13-CV-784 (RBK/KMW)** |
| | **:** | |
| | **:** | 1:12-CV-07468-RBK-KMW (Breeman) |
| | **:** | 1:12-CV-07747-RBK-KMW (Lord) |
| | **:** | 1:13-CV-03350-RBK-KMW (Everingham) |
| | **:** | 1:13-cv-03244-RBK-KMW (Morris) |
| | **:** | 1-13-cv-04569-RBK-KMW (Johnson) |
| | **:** | 1:13-cv-05763-RBK-KMW (Truluck) |
| | **:** | 1:13-cv-07410-RBK-KMW (Smith) |

---

## MEMORANDUM IN SUPPORT OF DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF PLAINTIFFS' EXPERT STEPHEN M. TIMKO

# TABLE OF CONTENTS

**PAGE**

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   ii

Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

I.    Timko admits he is not qualified to offer many of the opinions   4
      he expresses

II.  Timko's opinions must be excluded because they do not result   6
      from reliable principles or methodologies

III.  Timko's opinions should be excluded because they lack a   18
      factual foundation

IV.  Timko's opinion should be excluded under Rule 403   27

V.    Defendants request a *Daubert* hearing   29

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

# TABLE OF AUTHORITIES

**PAGE**

## Cases

*Aloe Coal Co. v. Clark Equip. Co*.                                           4
816 F.2d 110 (3d Cir. 1987)

*Betterbox Commc'ns Ltd. v. BB Techs., Inc*.                                  4
300 F.3d 325 (3d Cir.2002)

*Calhoun v. Yamaha Motor Corp., U.S.A*.                                    3, 19, 20
350 F.3d 316 (3d Cir. 2003)

*Daubert v. Merrell Dow Pharms*.                                          1, 2, 3, 7,
509 U.S. 579 (1993)                                                       8, 9, 10,
                                                                        11, 13, 19,
                                                                        21, 27, 29
*Durkin v. Wabash Nat*.                                                       10
2013 WL 1314744, at *16 (D.N.J. Mar. 28, 2013)

*Elcock v. Kmart Corp*.                                                       19
233 F.3d 734 (3d Cir. 2000)

*General Electric Co. v. Joiner*                                               7
522 U.S. 136, 146 (1997)

*Globe Indemnity Co. v. Highland Tank and Manufacturing Co*.,                 4
345 F.Supp. 1290 (E.D.Pa.1972)

*Graves v. Mazda Motor Corp*.                                                10
675 F. Supp. 2d 1082 (W.D. Okla. 2009)

*Guile v. United States*                                                      8
 422 F.3d 221 (5th Cir. 2005)

*Gumbs v. International Harvester, Inc*.                                      19
718 F.2d 88 (3d Cir.1983)

*Heller v. Shaw Indus., Inc.*
167 F.3d 146 (3d Cir. 1999) ..................................................................... 7

*Higginbotham v. Volkswagenwerk Aktiengesellschaft*
551 F.Supp. 977 (M.D.Pa.1982) ............................................................... 4

*In re Paoli R.R. Yard PCB Litig.*
 35 F.3d 717, 741-43 (3d Cir. 1994) ........................................... 3, 7, 19, 27

*In re: TMI Litig.*
192 F.3d 613, 663 (3d Cir. 1999) ............................................................. 3

*Kumho Tire Co. v. Carmichael*
526 U.S. 137, 141 (1999) ....................................................................... 3, 7

*McClain v. Metabolife Int'l, Inc.*
401 F.3d 1233 (11th Cir. 2005) ............................................................ 8, 13

*Meadows v. Anchor Longwall & Rebuild, Inc.*
306 F. App'x 781 (3d Cir. 2009) ............................................................. 20

*Murray v. Marina Dist. Dev. Co.*
311 F. App'x 521 (3d Cir. 2008) ............................................................ 7, 9

*Oddi v. Ford Motor Co.*
234 F.3d 136 (3d Cir. 2000) .............................................................. 8, 9, 11

*Padillas v. Stork-Gamco, Inc.*
186 F.3d 412 (3d Cir. 1999) .................................................................... 29

*Pappas v. Sony Electronics, Inc.*
136 F. Supp. 2d 413 (W.D. Pa. 2000) ....................................................... 8

*Stecyk v. Bell Helicopter Textron, Inc.*
295 F.3d 408 (3d Cir. 2002) .................................................................... 19

U.S. v. Downing
753 F.2d 1224 (3d Cir. 1985) .................................................................. 19

*United States v. Frazier*                                                   13
387 F.3d 1244 (11th Cir. 2004)

*United States v. Schiff*                                                     7
 538 F. Supp. 2d 818 (D.N.J. 2008)

*Waldorf v. Shuta*                                                           4
142 F.3d 601 (3d Cir.1998)


**Statutes and Rules**

Fed. R. Evid. 403                                                        4, 27

Fed. R. Evid. 702                                                     2, 3, 4, 10,
                                                                       18, 21

Rule 241(d)
                                                                     6, 13, 14,
                                                                     15, 16, 18

49 C.F.R. 172.820                                                      26, 27

COME NOW Defendants, Consolidated Rail Corporation ("Conrail"), Norfolk Southern Railway Company ("NSRC") and CSX Transportation, Inc. ("CSXT") (collectively, "Defendants"), by and through their counsel, Burns White LLC, and submit this Memorandum of Law in Support of *Daubert* Motion to Exclude Expert Testimony of Plaintiffs' Liability Expert, Steve Timko.

## **INTRODUCTION**

These cases arise out of a release of vinyl chloride resulting from a train derailment over the Mantua Creek in Paulsboro, New Jersey.  In order to bolster their various allegations against the Railroad Defendants, Plaintiffs intend to offer expert testimony of Stephen M. Timko as an expert in the areas of railroad operations.

At deposition, in his expert report, and by way of declaration submitted in opposition to the Railroad Defendants prior motion for summary judgment, Timko has asserted numerous opinions regarding the actions of Conrail and its employees. A copy of Timko's Report is Attached as Exhibit A; Timko's Declaration is Attached as Exhibit B; Timko's Deposition is Attached as Exhibit C.  He sets forth a number of purported duties and alleges that Conrail violated those duties. However, Timko admits he is not qualified to give opinions with respect to many

of the subject matters addressed in his report and declaration.  Further, he provides

no objective support (e.g., federal regulations, or industry standards) to substantiate

several of his other opinions.   Instead, he has simply formed his own "Timko

rules" that he believes Conrail should have followed.  Finally, Timko's testimony

and opinions are disconnected from the facts of the case.  He bases many of his

opinions on facts that do not exist or assumptions that do not match the record

evidence. For these reasons, Timko's testimony must be excluded as it does not

meet the threshold requirements of reliable expert testimony under Fed. R. Evid.

702.

## <u>ARGUMENT</u>

Timko's opinions fail the standards for admissibility expressed by the

Supreme Court and articulated in Rule 702 of the Federal Rules of Evidence. Rule

702 provides:

> If scientific, technical, or other specialized knowledge will assist the
> trier of fact to understand the evidence or to determine a fact in issue,
> a witness qualified as an expert by knowledge, skill, experience,
> training, or education, may testify thereto in the form of an opinion or
> otherwise, if (1) the testimony is based upon sufficient facts or data,
> (2) the testimony is the product of reliable principles and methods,
> and (3) the witness has applied the principles and methods reliably to
> the facts of the case.

Fed. R. Evid. 702.  This rule incorporates the principles announced in *Daubert v.*

*Merrell Dow Pharms.,* 509 U.S. 579 (1993), and its progeny.  In *Daubert,* the

Court held that expert opinions regarding scientific knowledge "must be supported

2

by appropriate validation - i.e., 'good grounds,' based on what is known ... the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Id.* at 590.  In *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141 (1999), the Court clarified that *Daubert* applies not only to testimony based on scientific knowledge, but also to all testimony based on technical and other specialized knowledge.

As the Supreme Court has stated, the trial judge's role is that of a gatekeeper to exclude unreliable expert testimony. *Daubert,* 509 U.S. at 597.  The Third Circuit has distilled from Rule 702 and the *Daubert* line of cases three distinct, substantive restrictions on the admissibility of expert opinion testimony: qualifications, reliability, and fit. *See Calhoun v. Yamaha Motor Corp., U.S.A.,* 350 F.3d 316, 321 (3d Cir. 2003); *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 741-43 (3d Cir. 1994) ("*Paoli II* "). First, the witness must be qualified to testify as an expert. *Id.*  Second, "the testimony must be reliable." *Calhoun,* 350 F.3d at 321. "Third, the expert testimony must 'fit,' ... meaning 'the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact.'" *Id.* (quoting *Paoli II,* 35 F.3d at 742, and *Schneider,* 320 F.3d at 405).  The party offering the expert must prove each of these requirements by a preponderance of the evidence. *In re: TMI Litig.*, 192 F.3d 613, 663 (3d Cir. 1999).

## I.   Timko admits he is not qualified to offer many of the opinions he expresses.

To qualify as an expert, "Rule 702 requires the witness to have 'specialized knowledge' regarding the area of testimony." *Betterbox Commc'ns Ltd. v. BB Techs., Inc*., 300 F.3d 325, 335 (3d Cir.2002) (quoting *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir.1998)). The Third Circuit has instructed courts to interpret the qualification requirement "liberally" and not to insist on a certain kind of degree or background when evaluating the qualifications of an expert. *See Waldorf*, 142 F.3d at 625. However, even in light of this liberal policy, the expert must still possess some specialized skill or knowledge that is relevant to opinions he wishes to offer and will assist the trier of fact.   *See, e.g., Aloe Coal Co. v. Clark Equip. Co*., 816 F.2d 110, 114 (3d Cir. 1987)(tractor salesman who prepared damages estimates was not qualified to testify as to the cause of a tractor fire); *Higginbotham v. Volkswagenwerk Aktiengesellschaft*, 551 F.Supp. 977, 982-983 (M.D.Pa.1982) (investigating officer not qualified to offer opinion as to movement of body inside vehicle even though officer had experience as accident investigator, where officer had only minimal training in accident reconstruction, physics, and the movement of bodies), *aff'd mem*, 720 F.2d 669 (3d Cir.1983); *Globe Indemnity Co. v. Highland Tank and Manufacturing Co*., 345 F.Supp. 1290, 1291-1292 (E.D.Pa.1972) (neither electrical engineer nor industrial hygienist was qualified to testify as an expert on the design of molasses storage tank, where neither witness

had any prior experience or observational knowledge in the field of storage tank design), *aff'd mem*, 478 F.2d 1398 (3d Cir.1973).

Here, Timko issued several opinions regarding the maintenance and operation of the bridge even though he admits he has no expertise in this subject. Timko Dep. 17:23-17:14, 57:2-11, 71:21-24, 119:5-11, 125:16-24, 176:6-15. Timko's purported expertise is in the areas of railroad operations, operating rules, and hazmat. Timko Dep. 38:7-39:6.  He has no experience with movable bridges. He is not an engineer and has never been involved in the construction of a bridge. Timko Dep. 72:1-6.  He testified that during his career he knew that there were movable bridges, but that he had "no knowledge of them or how they worked." Timko Dep. 74:3-15.  He also has no knowledge of the automated system used to operate the bridge, the bridge mechanisms associated with that operation, or the signals associated with the bridge. Timko Dep. 74:16-75:6.

When asked why he has issued opinions dealing with the operation of the bridge when he admits he is not a bridge expert, Timko cavalierly replied that he doesn't have to be an expert to review the materials and reach conclusions by putting "two and two together." Timko Dep. 183:20-185:12.  In light of this admission, his opinions regarding the bridge maintenance and bridge operation should be excluded.  He is not applying any specialized knowledge.  He is doing nothing more than applying lay knowledge to reach certain conclusions.  That is

the province of the trier of fact.  As such, his opinions regarding maintenance and operation of the bridge must be excluded.

Similarly, while a number of Timko's opinions relate to Conrail's training of employees to inspect movable bridges, Timko admits he has no expertise in this area either.  Timko testified that he has never trained employees on how to inspect movable bridges or compliance with NORAC Rule 241(d) which governs movement past a stop signal at a movable bridge. Timko Dep. 128:17-20; 148:22-150:1.  He admitted he has no experience inspecting the locking mechanisms on movable bridges like the bridge at Paulsboro.  *Id.* at 130-131.    Moreover, he has never drafted training programs or lesson plans relating to inspection of movable bridges.  *Id.*    As a consequence of Timko's admitted lack of experience and expertise in this area, his multiple opinions regarding Conrail's training program and whether the employees who inspected the Paulsboro Bridge were "qualified employees", all should be excluded.[1]

## II.    Timko's opinions must be excluded because they do not result from reliable principles or methodologies.

Timko's proffered opinions are not the product of reliable principles or methodologies because he cites no regulations, rules, industry standards, literature, or studies for support.   The inquiry into reliability requires the trial court to ensure

---

[1] Timko also admitted he has no expertise in issues relating to signal systems or track.  Timko Dep. 138.  To the extent any of his opinions touch upon these issues, they must be excluded.

that an expert's opinion is not based on "subjective belief or unsupported speculation." *Paoli II*, 35 F.3d at 742 (citing *Daubert*, 509 U.S. at 590).  In making this reliability determination, the trial court must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known by the expert and the principals or methodology relied upon. *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999); *see also General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997).  An expert must have "good grounds" for his beliefs.  *Paoli II,* 35 F.3d at 742.

"While the reliability requirement may be adjusted depending on the content of the expert testimony (for example, it is applied more rigorously in instances where the expert testimony is "scientific" or "technical," and less so in cases where the expert testimony is "experience-based"), it does impose a minimum standard." *United States v. Schiff*, 538 F. Supp. 2d 818, 833 (D.N.J. 2008) *aff'd*, 602 F.3d 152 (3d Cir. 2010)(citing *Kumho*, 526 U.S. at 141–42).  Even a non-scientific opinion should be excluded as unreliable if the expert cannot provide any methodology used to reach his opinions and he cannot identify any industry standards, obligation, or other duties that support his opinions.  *Murray v. Marina Dist. Dev. Co.*, 311 F. App'x 521, 524 (3d Cir. 2008).  Such an unsupported opinion is merely the expert's *ipse dixit* in that it is "something asserted but not proved" or "he himself said it." Black's Law Dictionary (10th ed. 2014).

7

An expert opinion amounting to nothing more than *ipse dixit* is not admissible. *See Oddi v. Ford Motor Co.*, 234 F.3d 136, 158 (3d Cir. 2000)(holding that an expert's *ipse dixit* does not withstand *Daubert's* scrutiny). "If *Daubert* and its progeny require anything, it is that plaintiffs come forward with proof of a valid methodology based on more than just the *ipse dixit* of the expert." *Pappas v. Sony Electronics, Inc.*, 136 F. Supp. 2d 413, 426 (W.D. Pa. 2000). As the United States Supreme Court recognized in *Joiner*:

> Although an expert may extrapolate his opinions from existing data.... nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. The court may conclude that there is too great an analytical gap between the data and the opinion proffered.

522 U.S at 146. An expert cannot attempt to fill a large analytical gap with his own *ipse dixit* opinions, which are not substitutes for the scientific proof required by *Daubert*. *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005)(reversing decision to admit testimony of plaintiffs' expert, who "simply substituted his own *ipse dixit* for scientific proof"); *see also Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005)(rejecting expert testimony regarding breach of standard of care owed by a psychiatrist, stating that "[a] claim cannot stand or fall on the mere *ipse dixit* of a credentialed witness.").

In *Oddi*, the Third Circuit affirmed the exclusion of the testimony of a plaintiff's expert that it found to be little more than *ipse dixit*. 234 F.3d at 158.

*Oddi* involved expert testimony regarding whether a vehicle's design caused or contributed to the plaintiff's automobile accident.  In its analysis, the court noted:

> An expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation. Since [the expert] conducted no tests and failed to attempt to calculate any of the forces on Oddi or the truck during this accident, he used little, if any, methodology beyond his own intuition. There is nothing here to submit to peer review, and it is impossible to ascertain any rate of error for [the expert's] assumptions... Similarly, no standards control his analysis, and no "gatekeeper" can assess the relationship of [the expert's] method to other methods known to be reliable and the non-judicial uses to which it has been put.

*Id.* (internal citations and quotations omitted).   As such, the court found the expert's opinions to be *ipse dixit* that did not withstand *Daubert's* scrutiny.  Thus, the district court did not abuse its discretion in excluding the proffered expert opinion testimony. *Id*.

Again in *Murray*, the Third Circuit affirmed that the district court was justified in excluding an expert's *ipse dixit* opinions regarding the adequacy of the defendant's casino security system. 311 F. App'x at 524. The plaintiff's expert offered testimony that the defendant was negligent in failing to provide adequate security in the parking lot of one of its properties.  While the expert's report cited multiple deficiencies in the security system as contributing factors to an assault on the plaintiff, he did not identify any applicable industry standards for casino security or discuss any methodology employed in formulating his opinion.   In affirming, the court stated:

9

… we agree that [the expert's] report and deposition testimony fail to demonstrate any methodology, let alone peer-reviewed or generally accepted methodology, underlying his opinion that the [casino's] security system was inadequate and constituted a deviation from industry standards.  While [the expert's] report identifies purported security deficiencies, he fails to identify the source of any industry standards, obligations or duties allegedly applicable to [the defendant] or provide the methodology he used to arrive at his opinions. Furthermore, when questioned at his deposition regarding the existence of casino security industry standards, [the expert] responded that there were "very few" standards and he was writing the standards for the industry, but that it was a "work in progress." Accordingly, we agree that [the expert's] testimony would be no more than a "subjective belief or unsupported speculation," rather than "methods or procedures of science," and thus would not assist the jury in understanding or determining a fact in issue, as required under Fed.R.Evid. 702 and *Daubert*.

*Id*. at 524 (internal citations omitted).

Moreover, as this court has noted, non-scientific expert testimony that is "conveniently malleable" should invite close scrutiny to determine whether the expert's opinions are *ipse dixit*. *Durkin v. Wabash Nat*., 2013 WL 1314744, at *16 (D.N.J. Mar. 28, 2013)(citing *Graves v. Mazda Motor Corp*., 675 F. Supp. 2d 1082, 1103 (W.D. Okla. 2009) aff'd, 405 F. App'x 296 (10th Cir. 2010)).   In *Graves*, which was cited with approval in *Dirkin*, the court excluded the human factors testimony of plaintiff's expert because it was not grounded in any objective data or specifically applicable standards. 675 F. Supp. 2d at 1103.  At issue in that case was whether a vehicle's shifter was designed in a way that was confusing to

consumers.   In reaching its decision to exclude the expert testimony, the court

noted:

> …[the expert] did no testing to quantify—or even to confirm the
> existence of—any exceptional propensity of the gated shifter on the
> Mazda6 to cause driver confusion about the actual position of the shift
> lever.  He repeatedly criticizes the shifter on the Mazda6 because the
> depth of the shifter detents exceeds the diameter of the shift lever, but
> he cites no standards that would counsel against that design....
> [A]lthough he repeatedly cites "human factors" considerations in
> support of his conclusions, his human factors evaluation of the
> Mazda6 shifter is not founded on any analysis of objective data which
> would facilitate a determination that his proposed expert testimony is
> the product of reliable principles and methods applied reliably to the
> facts of the case.

*Id*. (internal citations omitted).  The court further stated:

> … [H]uman factors principles can be highly subjective and thus
> conveniently malleable.  Human factors testimony which is proffered
> without a showing of objective support (testing or, at least,
> independent support in relevant literature) invites close scrutiny to
> determine whether the expert's work is an exercise in facile advocacy
> (e.g. the "ipse dixit of the expert"). [This] proposed expert testimony
> fails the test.

*Id*.

Here, Timko's opinions are a classic case of *ipse dixits* and they cannot

survive *Daubert*.  Just as the expert in *Oddi*, Timko has engaged in a "haphazard,

intuitive inquiry" using "little, if any, methodology beyond his own intuition." 234

F.3d at 156-158.  He points to no federal regulations, operating rules, industry

standards, studies, or literature that supports his opinions. Simply put, Timko's

numerous conclusions are connected to the underlying evidence only through

Timko's "say so."  In fact, Timko's report is based on nothing more than his own

"Timko rules." Timko Dep. 179:10-180:12.  At deposition, he testified:

> Q:    Cite me to the Federal Regulation if one exists that says how many times you're supposed to [provide training to first responders].
>
> A.    I don't believe there is a federal regulation that details the number of times.  I'm just saying they didn't do enough public awareness.
>
> **Q.    So this is just your opinion not based on anything specific. You just -**
>
> **A.     This entire report is my opinion.**

Timko Dep. 157:1-12 (emphasis added).  He further testified:

> Q.    Is there a federal regulation that you can point me to that says that Conrail has to maintain a list of employees qualified to inspect movable bridges?
>
> A.    No, not by number no.
>
> Q .    Is there anything in the NORAC rules that you can point me to or I can go look at …
>
> A.    No, except now there is a bulletin order…
>
> Q.    I'm not asking about post derailment.  I'm asking about before this event occurred—
>
> A.    No.
> …
>
> **Q.    So this is another example of this is a Timko rule?**
>
> **A.    That's exactly right.**

Timko Dep. 179:10-180:12 (emphasis added).

Timko has simply made up his own set of rules for purposes of his report and he seeks to hold Conrail responsible for not following his rules.  Even with years of experience in the railroad industry he is unable to point to anything that substantiates his rules.   There is nothing to submit to peer review and no "gatekeeper" can assess the reliability of the "Timko rules."   The court's gatekeeping function requires more than simply "taking the expert's word for it." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1244 (11th Cir. 2005).  Timko's own intuition is not a substitute for reliable methodology.   As one court has aptly noted, if admissibility could be established merely by the *ipse dixit* of a qualified expert, *Daubert's* reliability prong would be subsumed by the qualification prong. *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004).

    a.    <u>Training Regarding Inspections and Rule 241(d)</u>

Timko offers a number of criticisms of what he considers to be deficiencies in Conrail's training program, specifically as it relates to inspection of movable bridges.  Of course, as noted above, Timko has no expertise himself in how to inspect a movable bridge and has never instructed on that subject.  He can point to no regulations, standards or instructions relating to the subject matter.  Indeed, he admits that all of Conrail's training programs have been submitted to the Federal Railroad Administration for approval as required by federal law. Timko Dep. 134-

135; 236:23-237-22.  He is not aware of the FRA ever taking exception to how Conrail reported it was conducting its rule testing program.  *Id.* at 135.  Although the FRA has authority to require the railroad to change its program if insufficient, the FRA has never done so with respect to Conrail's program. Timko Dep. 134:2-136:19.

The crux of Timko's claims regarding training and inspections under Rule 241(d) is his opinion that only a bridge inspector or maintenance employee was "qualified" to inspect the bridge for purposes of Rule 241(d). Timko Dep. 176:22-179:9, 224:15-227:8.   However, Timko repeatedly confessed that he cannot point to any actual regulation, rule, or standard that Conrail violated with respect to bridge inspections or training. Timko Dep. 174:19-176:21, 224:15-227:8. Specifically, when asked about the basis for his opinion on this issue, Timko testified:

Q.   Where can I find the proper inspection procedure that the train dispatchers and their supervisors should have been aware of?

A.   They should have called a qualified bridge inspector.

Q.   That wasn't my question. You said they failed to advise the train dispatcher and supervisors of the proper inspection procedure, and my question is where can I find that?

A.   I don't know.  It doesn't exist.

Q.   Okay.  So there is nothing in the Federal regulations that you can point me to?

A.    No.

Q.    There is nothing in the NORAC operating rules that you can point me to?

A.    No.  There is no regulation until after the accident.

Q.    Right. There is nothing that you have come up with in your 30 years of railroad experience that I could go look at that would show me the proper inspection procedure for complying with Rule 241(d); correct?

A.    Well there has got to be something in the Federal regulations about locking the bridge, but I'm not an expert on that.

Q.    Right.  And so that's my question …there is nothing you can point me to that I can go look at; right?

A.    No, there isn't.

Timko Dep. 174:19-176:21.

Timko also agreed that there is no federal regulation or other rule providing that train crew employees such as Den Ouden and Mather are not appropriate people to inspect a movable bridge.  Timko Dep. 195-196.  He admitted that there is nothing requiring that only bridge and building personnel or bridge inspectors can do movable bridge inspections.  *Id.* at 226-227.  Additionally, he admitted that there is no requirement in the federal regulations or the NORAC rules that says employees are supposed to be trained specifically on movable bridge lock inspections.  Timko Dep. 219-220.  Indeed, there is no definition of who is deemed to be a "qualified employee" for purposes of a Rule 241(d) inspection.  *Id.* at 220.

15

Timko also makes up additional procedures that he believes Conrail should have undertaken before the train crossed the bridge in accordance with Rule 241(d).  Timko Dep. 197:10-24.  For example, he claims that the bridge locks should have been inspected "a second time" prior to the train proceeding across the bridge. *Id*.  However, he admits that he cannot point to any regulations or other requirements for these additional procedures. Timko Dep. 197:20-24.  Any claim that Conrail had a duty to inspect the bridge a second time or undertake any other additional procedures he has outlined are merely Timko's *ipse dixit*.  As there is admittedly no basis for any of Timko's opinions on these issues regarding training and inspection of the bridge prior to crossing in accordance with Rule 241(d), the opinions must be excluded.

      b.    <u>Access to Shipping Papers</u>

Timko asserts that after the derailment the dispatcher should have had "instant access" to the shipping papers. Timko Dep. 150:2-19.  When pressed to clarify this opinion in light of the dispatcher's testimony that he immediately obtained the papers from the customer service office next door, Timko stated that the dispatcher should have had access to the shipping papers from the computer terminal at his desk. Timko 150:20-16.  Yet he cites no authority that would have required that the dispatcher have the shipping papers at his desk, let alone on a

computer terminal at his desk.   When asked for objective support of this requirement, Timko could provide none. Timko Dep. 151:7-21.

As importantly, he admitted he has no information regarding how long it took the dispatcher to retrieve the information from customer service.  He admitted all the dispatcher had to do was walk next door.  Timko Dep. 150-151.  He had no evidence how much quicker the information could have been retrieved if on the dispatcher's computer, *id.* at 153-154, and thus there is no basis to conclude it made any difference in what occurred.

    c.    <u>Education of First Responders and Local Community</u>

Timko opines that Conrail negligently failed to educate first responders, political officials, and local residents concerning the hazardous cargo transported on the Penns Grove Secondary Line. Timko Dep. 154:4-11.  Although he offers this opinion, he admitted he never asked for information that would have reflected what training Conrail provided.  *Id.* at 154-155.  Further, he could not point to one federal regulation or other objective basis to support his opinion that Conrail had a duty to provide such training or how often they were required to provide it. Timko Dep. 156:11-158:11.  Even though they had no duty to do so, Timko admits Conrail actually did offer hazmat response training to first responders. Timko Dep. 155:22-156:24.  Nevertheless, Timko claims that they didn't do enough training.

Timko Dep. 155:22-156:24.[2]  Of course given that he couldn't provide any support that such training was required, he obviously couldn't provide support as to the necessary frequency of such training. Timko Dep. 157:1-12.  He readily admitted that this purported duty to "do more" training is based on nothing more than his own beliefs. Timko Dep. 157:8-12.

      d.    <u>List of Qualified Bridge Employees</u>

Timko opines that Conrail failed to have a list of employees that were qualified to inspect the movable bridge prior to permitting a train dispatcher to issue authority under NORAC Rule 241(d). Timko Dep. 176:22-177:15.  However, he admitted there is nothing in the NORAC rules or federal regulations that require any such list. Timko Dep. 179:10-180:9. He agreed that this is just another example of a "Timko rule." Timko Dep. 180:10-12.

## III.    Timko's opinions should be excluded because they lack a factual foundation.

In addition to lacking reliable principals or methodologies to support his opinions, many of Timko's opinions must be excluded because they lack a factual connection to the case.  Under Rule 702's fit prong, "it is an abuse of discretion to admit expert testimony which is based on assumptions lacking any factual

---

[2] As discussed below, in addition to lacking a reliable basis, this opinion also lacks a factual foundation.  In fact, Conrail offered extensive training to first responders and the community. Ex D, Ferrone Dep. 256:22-260:23; Ex. E, Richter Dep. 66:8-69:24, 135:12-137:5.

foundation in the record." *Stecyk v. Bell Helicopter Textron, Inc*., 295 F.3d 408, 414 (3d Cir. 2002) (citing *Elcock v. Kmart Corp*., 233 F.3d 734, 756 n. 13 (3d Cir. 2000)); *see also Paoli II*, 35 F.3d at 743 ("[E]ven if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge for purposes of the case"). An expert's testimony must be accompanied by a sufficient factual foundation before it can be submitted to a jury. *See Elcock v. Kmart Corp.,* 233 F.3d 734, 754 (3d Cir.2000) (*citing Gumbs v. International Harvester, Inc*., 718 F.2d 88, 93 (3d Cir.1983)).   Admissibility, therefore, depends in part upon the proffered connection between the expert's opinions to be presented and particular disputed factual issues in the case. *Paoli II*, 35 F.3d at 743 (quoting U.S. v. Downing, 753 F.2d 1224, 1237 (3d Cir. 1985)).

In *Calhoun*, the Third Circuit applied the fit prong of the *Daubert* analysis to a case arising out of a jet-ski accident in which a 12-year-old girl suffered fatal injuries when the jet ski she was operating slammed into an anchored boat. 350 F.3d at 324.   After the jury rendered a verdict in favor of the defendants, the plaintiffs appealed claiming that the trial court had erred in entering *Daubert* rulings that severely limited their expert's opinions. *Id*.  The Third Circuit affirmed the district court's exclusion of plaintiffs' expert, who was otherwise qualified to render an opinion regarding alternate designs, finding that:

> At the time he wrote his expert report, [the expert] had never operated a jet ski and, by the time of trial, had only managed to ride a different

> model. Moreover, on voir dire, [the expert] admitted he had never examined diagrams of the different throttles used on jet skis. [The expert's] asserted knowledge of possible alternatives to the accelerating mechanism came from his familiarity with outboard motors, which employ a twist grip mechanism, and from his recollection of a friend's motorcycle, which used a thumb throttle.

*Id*.  The court concluded that the connection between this opinion and the facts was too tenuous, and affirmed the district court's exclusion of the proffered opinions because the expert had "failed to apply [his] expertise to the matter at hand." *Id*.

In *Meadows v. Anchor Longwall & Rebuild, Inc*., 306 F. App'x 781, 791 (3d Cir. 2009), the Third Circuit again found that the testimony of the plaintiff's expert "lacked a factual foundation in the record to satisfy the fit requirement and was properly excluded by the District Court."  The plaintiff attempted to present expert testimony that a malfunction of the base lift jack in a piece of construction equipment caused the accident at issue in that case.  However, the evidence showed the equipment did not actually contain a base lift jack.  Neither the plaintiff nor his expert presented any evidence to the contrary.  Thus the court concluded the expert's opinions lacked a factual foundation to satisfy the fit requirement because it relied upon the existence of a base lift jack. *Id*.

Like plaintiffs' experts in *Calhoun* and *Meadows*, Timko has failed to apply his purported expertise to the facts of this case.  He renders a number of opinions with regard to the actions of the Railroad Defendants that he readily admits are based on assumptions that are not supported by any factual evidence from this

case.  This shows just how unreliable Timko's opinions are.  He makes up his own unsupported "Timko rules" and alleges Conrail violated them, but he cannot even provide factual support to show that Conrail violated these made up rules.  This is exactly the kind of speculation and conjecture that *Daubert* and Rule 702 are meant to guard against. *See Daubert*, 509 U.S. at 590, ("[T]he word 'knowledge' connotes more than subjective belief or unsupported speculation.").

     a.    <u>Training of First Responders and Local Community</u>

Timko's opinion about training that should have been provided to the local community, including first responders, is disconnected from the facts of the case in addition to lacking reliability. Timko Dep. 154:4-11. Timko testified that there is "no documentation that [Conrail] did anything…"  to offer such training. Timko Dep. 154:12-155:14.   However, he admits that he never asked for any such documentation. While he concedes that Conrail did offer hazmat training to first responders, he claims they should have offered more training. 155:22-156:24.  Yet, Timko has no idea how often Conrail provided such training prior to the derailment or whether first responders availed themselves of the training. Timko Dep. 158:12-159:20.  He frankly admitted, "I don't know what they did as far as training." Timko Dep. 160:14-161:2.

A glaring example of Timko's lack of concern with the actual facts of these cases is illustrated by the following exchange:

Q.   And you don't know how many times [Conrail] actually [offered public education programs prior to the derailment]?

A.   No.

Q.   And you don't know where they did it?

A.   I don't.

….

Q.   Did you read [the Paulsboro Fire Chief's] deposition?

A.   I don't believe so.

…

Q.   How can you offer an opinion that Conrail failed to educate local first responders, political officials and others about hazardous materials if you don't know what in fact they did?

A.   I can't answer that.

Q.   All right. You don't know what programs they offered and you don't know who attended; fair to say?

A.   That's fair to say.

Timko Dep. 158:3-161:6.


b.   <u>Training Regarding 49 C.F.R. 217</u>

Timko claims that Conrail failed to comply with 49 C.F.R. Part 217 by not providing proper training to its employees. Timko Dep. 161:21-162:9. He makes this statement despite his admission, discussed above, that Conrail's training program was submitted to and approved by the FRA. Timko bases this opinion on nothing more than the fact that in 2008 the FRA determined that some of Conrail's

supervisors did not perform efficiency checks in accordance with Conrail's written program.   Timko Dep. 162:10-165:20.   He points to no evidence regarding deficiencies in the training that Conrail's employees actually received with respect to Part 217.  Timko makes a logical flaw in connecting violations to training.  The fact that an employee does not follow a rule does not mean that the employee did not receive proper training on the rule.  Timko himself admits that employees who are properly trained and supervised can take action that is contrary to their training. Timko Dep. 167:14-168:17.  As importantly, the fact that four years prior to the derailment, some Conrail supervisors were accused of not conducting all required efficiency checks, does not prove that Conrail's training program was deficient in 2012 when the derailment occurred.  As Timko admits, in response to this notice from the FRA, Conrail took proper action to remedy the situation and replaced some of the involved supervisors.   Timko has no evidence that the issues reoccurred. Timko Dep. 166:3-168:24.

     c.   Crew Training Regarding Bridge Inspection

Timko also claims that Conrail failed to properly train the conductor and engineer how to properly inspect the bridge in the event of a signal failure. Timko Dep. 169:1-8.  However, he does not contend that the conductor or engineer received no training.  In fact, he admits that they both received on the job training on how to inspect the bridge, and he admits that on the job training is a legitimate

method of training employees. Timko Dep. 169:9-172:2.  Instead, Timko opines that the crew did not receive proper training because the Conrail employees that provided the training were not properly qualified to do so. Timko Dep. 172:24-173:13.  This is nothing more than pure speculation by Timko.  He admitted that he has absolutely no information about the qualifications of the employees that trained the conductor or engineer. Timko Dep. 174:7-18.  Absent such information, he cannot possibly opine that the trainer was unqualified or incompetent.

     d.   <u>Prior Issues with the Bridge</u>

     Timko expresses several opinions regarding Conrail's efforts to deal with problems at the Paulsboro Bridge prior to the derailment.  In addition to the fact that he is unqualified to render any opinions regarding bridge issues, Timko also admitted that he has no factual basis for the opinions he expresses.  For example, he admitted that he did not investigate the trouble tickets regarding problems with the bridge, and has no opinions as to what issues led to generation of the various trouble tickets.  Timko Dep. 120; 180-181.  He admitted that with respect to what Conrail's long term plans were for trying to address any problems with the bridge, any opinions by him on that subject matter "would be speculation".  *Id.* at 142:10-16.  As he candidly admitted, Conrail's efforts to repair the bridge were not something within his area of expertise and is not something he analyzed in the case. *Id.* at 142:17-143:2.

Timko also expressed criticism of Conrail for not following a recommendation by Hans Heidenreich, the engineer who designed the automated system for the bridge, that the bridge be closed to water traffic prior to the derailment.  However, he candidly acknowledged that he never read Heidenreich's deposition, and does not know what specific advice Heidenreich gave to Conrail employees.  Timko Dep. 192.  When asked what Heidenreich said to Conrail and what Conrail did in response, Timko acknowledged that he did not investigate this issue, as it was not of "high importance" to him.  *Id.* at 193:6-13.  Accordingly, since he has no factual basis for any opinion on this subject, it should be excluded.

Relatedly, Timko also claimed that Conrail failed to enlist the help of qualified people to help resolve the problems with the bridge.  Of course, he acknowledged that contacting the system designer, Heidenreich, was an appropriate step.  Timko Dep. 144.  When pressed on what he knew about Heidenreich's qualifications and why he felt he was not qualified, Timko responded: "I don't know that.  I don't know the gentleman."  *Id.* at 186:13-17. This is simply another example of Timko expressing an opinion with no factual basis to support.

e.    <u>Prior Discipline of Den Ouden</u>

Timko also criticizes Conrail for not following what he characterizes as a "progressive discipline" system in connection with prior rule violations by

conductor Den Ouden.  However, when asked what factual information he had regarding the prior incidents concerning Den Ouden, Timko admitted that he had never reviewed the files concerning those incidents and had no details regarding what actually occurred beyond the limited testimony mentioned by Den Ouden in his deposition.  Timko Dep. 122:2-123:6.  He further conceded he has no evidence that any disciplinary action taken by Conrail was not in compliance with the collective bargaining agreement between Den Ouden's union and the railroad.  *Id.* at 206.  Absent any knowledge of the circumstances relating to the prior disciplinary events and Den Ouden's particular involvement in those events, there is no factual basis for Timko to express any opinions regarding Conrail's handling of them.  Thus, this opinion must be excluded.

     f.    <u>Risk Analysis of Penns Grove Secondary Line</u>

Timko also alleges that Conrail violated 49 C.F.R. 172.820, which requires Conrail to perform a security risk analysis to determine if there is a safer alternative route to move hazardous materials. Timko Dep. 267:21-24.  However, when asked whether he knew if Conrail performed a risk analysis as required by 172.820, he testified: "I don't know that. I don't have any documentation as to whether they did that." Timko Dep. 272:22-273:3.

## IV.    Timko's opinion should be excluded under Rule 403.

Finally, Timko offers a number of opinions that are irrelevant to this case and that should be excluded under Rule 403 of the Federal Rules of Evidence because any slight probative value these opinions may have is substantially outweighed by the potential for unfair prejudice, confusion of issues, and waste of time.  *See In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717, 782-783 (3d Circuit 1994)(when applying *Daubert* analysis, it is proper to utilize Fed. R. Evid. 403 to exclude proffered expert testimony on grounds that possibility of unfair prejudice outweighed evidence's probative value), *cert. denied*, 513 U.S. 1190 (1995).

For example, Timko offers the opinion that Den Ouden was confused about proper placement of hazardous materials cars in the train consist.  However, he admitted that he takes no exception to where the cars were placed in the derailed train and that car placement played no role in the derailment.  Timko Dep. 200.

Similarly, he claims that Conrail did not perform a proper route safety analysis.  However, he conceded the regulation he cites has no application to the Penns Grove Secondary Line where the derailment occurred since the Penns Grove is a cul-de-sac line that has no alternative routes.  Timko Dep. 273:9-19.  He conceded that 49 C.F.R. 172.820 is designed to address situations where there may be more than one route in order to be sure the safest route is being chosen. Timko

Dep. 273:20-24.  He acknowledged that Conrail "would have still had to come over that route".  Timko Dep. 274:19-21.  More importantly, he agreed that "it wasn't a violation in any way, shape or form for Conrail to be shipping over that route" at the time of the derailment.  *Id.* at 274:22-275:2.

Additionally, while Timko offered generalized opinions regarding what he referred to as dispatcher responsibility rules and conductor responsibility rules, he acknowledged that the actions he contended these employees should have taken under these rules were in fact done by the employees on the date of the derailment. Timko Dep. 223-224.  Specifically, the conductor walked the bridge to confirm it was locked, and the dispatcher confirmed this had been done and that the conductor had confirmed that the bridge was safe for movement before he gave permission to proceed.  *Id.* at 238-241.  There was nothing additional Timko could identify that should have been done.

Last, while Timko alleges Conrail failed to comply with federal regulations by not immediately surrendering the train consist to emergency responders, he admits that he has no information regarding what was actually done with the consist.  Timko Dep. 265-266.  When specifically asked what Conrail trainmaster Gary Fillingame did with the consist upon receiving it from the conductor, Timko admitted he had no idea.  He said he had not reviewed Fillingame's testimony and he "can't testify" about it because he had not seen it.  *Id.* at 267:17-19.

In sum, on each of these issues, Timko admitted his opinions had no causal connection to the derailment and no bearing upon any of the claims asserted by Plaintiffs.  Thus, Timko's opinions on these subject matters should be excluded.

## V.   Defendants request a *Daubert* hearing.

Before the Court rules on this Motion, Defendants request that the Court convene an in limine hearing to determine whether Timko's proffered opinions meet the requirements for admissibility under *Daubert*.   Such hearings are frequently granted in order in insure that the court makes its decision based on a complete record.  *See, e.g., Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999) (case remanded to district court to hold a Daubert hearing where admissibility turned on factual issues).  Given that Timko is being offered as a liability expert in multiple cases arising from the Paulsboro train derailment, Railroad Defendants submit that it is in the Court's interest, as well as the parties, to make as thorough a record as possible before deciding whether Timko's opinions are admissible.

## CONCLUSION

For the foregoing reasons, the Railroad Defendants respectfully submit that the court should exclude the expert testimony of Stephen Timko.

Respectfully Submitted,

*/s/ Brian D. Pagano*
Brian D. Pagano, Esquire

29

BURNS WHITE LLC
1800 Chapel Avenue West, Suite 250
Cherry Hill, NJ  08002-4803
(856) 382-6012
Email: bdpagano@burnswhite.com

*Attorney for Defendants,*
*Consolidated Rail Corporation, Norfolk*
*Southern Railway Company and CSX*
*Transportation, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 21st day of May, 2015, a copy of the within Memorandum in Support of Defendants Consolidated Rail Corporation, Norfolk Southern Railway Company and CSX Transportation Inc.'s Memorandum of Law in Support of Motion in Limine to Exclude the Expert Testimony of Stephen M. Timko, was served on all counsel of record via efile.

BURNS WHITE LLC


By:     */s/ Brian D. Pagano*
        Brian D. Pagano, Esquire
        1800 Chapel Avenue West, Suite 250
        Cherry Hill, NJ  08002-4803
        (856) 382-6012


*Attorneys for Defendants,*

*Consolidated Rail Corporation,*
*Norfolk Southern Railway Company,*
*and CSX Transportation, Inc.*