## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

_____

|  |  |  |
|---|---|---|
|  | : |  |
| **IN RE:** | : | **MASTER DOCKET NO.:** |
| **PAULSBORO DERAILMENT CASES** | : | **13-CV-784 (RBK/KMW)** |
|  | : |  |
|  | : | 1:12-CV-07468-RBK-KMW (Breeman) |
|  | : | 1:12-CV-07747-RBK-KMW (Lord) |
|  | : | 1:13-CV-03350-RBK-KMW (Everingham) |
|  | : | 1:13-cv-03244-RBK-KMW (Morris) |
|  | : | 1-13-cv-04569-RBK-KMW (Johnson) |
|  | : | 1:13-cv-05763-RBK-KMW (Truluck) |
|  | : | 1:13-cv-07410-RBK-KMW (Smith) |

_____

## DEFENDANTS CONSOLIDATED RAIL CORPORATION, NORFOLK SOUTHERN RAILWAY COMPANY AND CSX TRANSPORTATION, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE EXPERT REPORT AND <u>TESTIMONY OF PLAINTIFFS' LIABILITY EXPERT, CARL F. MOREY</u>

Filed on behalf of Defendants,
Consolidated Rail Corporation, Norfolk Southern Railway Company and CSX Transportation, Inc.

Counsel of Record for This Party:

Brian D. Pagano, Esquire

BURNS WHITE LLC
1800 Chapel Avenue West, Suite 250
Cherry Hill, NJ 08002
(856) 382-6006

**TABLE OF CONTENTS**

TABLE OF CONTENTS ...................................................................................... i

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION ............................................................................................... 1

SUMMARY OF EXPERT'S QUALIFICATIONS, OPINIONS AND
METHODOLOGY ............................................................................................... 4

    I.       Qualifications .................................................................................... 4

    II.      Morey's Conclusions and Methodology............................................ 5

            A.     *The Report Places Blame On CSXT And NSRC For "Stripping"
                  Conrail Of A "Crucial" Management Layer In Terms Of
                  Moveable Bridge Inspection And Maintenance*....................................... 5*

            B.     *The Paulsboro Bridge Was Defectively Designed Because It Did
                  Not Contain Span Locks Or End Wedges*................................... 8

            C.     *The Train Crew Was Not Qualified Or Trained To Inspect The
                  Bridge*........................................................................................ 10

ARGUMENT AND CITATIONS OF AUTHORITIES........................................ 11

    I.       Standards For Evaluation Of A Motion To Exclude Expert Testimony............ 11

    II.      Morey's Expert Opinions Are Not Admissible ................................. 14

            A.     *Morey's Conclusions Faulting CSXT And NSRC For "Stripping"
                  Conrail Of A "Crucial" Management Layer In Terms Of
                  Moveable Bridge Inspection And Maintenance*....................................... 14*

            B.     *Morey's Conclusion That The Paulsboro Bridge Was Defectively
                  Designed Because It Did Not Contain Span Locks Or End Wedges
                  Is Not Based On Sound Methodology*...................................................... 17*

            C.     *Morey Admittedly Is Not An Expert On Bridge Derailments,
                  Rendering Him Unqualified To Provide An Expert Opinion On
                  The Cause Of The Paulsboro Derailment*................................... 19

D.      *Morey's Opinion That the Train Crew Was Not Qualified Or Trained To Inspect The Bridge Is Likewise Not Based On Any Scientific Methodology*.............................................................. 21

III.    Defendants Request A *Daubert* Hearing ........................................... 22

CONCLUSION....................................................................................... 23

ADDENDUM:

Exhibit A:      Report of Carl F. Morey, a Licensed Professional Engineer, March 4, 2015.

Exhibit B:      Deposition Transcript of Carl F. Morey, *In re: Paulsboro Derailment Cars*, Master-Docket No. 13-CV-784 (RBK/KMW), April 21, 2015

Exhibit C:      Wikipedia Article (Conrail's Acquisition by CSXT and NSRC in 1999)

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Aloe Coal Co. v. Clark Equip. Co*.,
    816 F.2d 110 (3d Cir. 1987)..............................................................................19

*Betterbox Commc'ns Ltd. v. BB Techs., Inc.,*
    300 F.3d 325 (3d Cir. 2002) ......................................................................12, 19

*Curry v. Royal Oak Enterprises, LLC,*
    Civ. Action No. 11-5527, 2013 WL 3196390 (E.D. Pa. June 25, 2013) .........18

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
    113 S.Ct. 2786, 509 U.S. 579 (2003)...............................4, 11-15, 17, 22, 23

*Elcock v. Kmart Corp*.,
    233 F.3d 734 (3d Cir. 2000)............................................................................12

*Gen. Elec. Co. v. Joiner,*
    522 U.S. 136 (1997)........................................................................................11

*Globe Indemnity Co. v. Highland Tank and Manufacturing Co*.,
    345 F.Supp. 1290 (E.D.Pa. 1972), *aff'd mem,* 478 F.2d 1398 (3d Cir. 1973) .................19

*Higginbotham v. Volkswagenwerk Aktiengesellschaft,*
    551 F.Supp. 977 (M.D.Pa. 1982), *aff'd mem,* 720 F.2d 669 (3d Cir. 1983) .....................19

*In re "Agent Orange" Product Liab. Lit.*,
    611 F.Supp. 1223 (E.D.N.Y. 1985) ...............................................................15

*In re Paoli R.R. Yard PCB Litig., ("Paoli I"),*
    916 F.2d 829 (3d Cir. 1990) ..........................................................................12

*In re Paoli R.R. Yard PCB Litig*., *("Paoli II"),*
    35 F.3d 717 (3d Cir. 1994)..............................................................12, 13, 15, 18

*In re TMI Litig.,*
    193 F.3d 613 (3d Cir. 1999) ..........................................................................12

*Kannankeril v. Terminix Int'l Inc.*,
    128 F.3d 802 (3d Cir. 1997)............................................................................13

*Kumho Tire Co., Ltd. v. Carmichael,*
    526 U.S. 137 (1999) .................................................................................11, 12

*Oddi v. Ford Motor Co.*,
    234 F.3d 136 (3d Cir. 2000)................................................................................................18

*Padillas v. Stork-Gamco, Inc.*,
    186 F.3d 412 (3d Cir. 1999)................................................................................................22

*Pappas v. Sony Elecs., Inc*,
    136 F.Supp.2d 413 (W.D. Pa. 2000)..................................................................................18

*Ruiz–Troche v. Pepsi Cola of Puerto Rico Bottling Co.*,
    161 F.3d 77 (1st Cir. 1998)................................................................................................13

*Schneider v. Fried*,
    320 F.3d 396 (3d Cir. 2003)................................................................................................12

*United States v. Mitchell*,
    365 F.3d 215 (3d Cir. 2004)................................................................................................13

*Waldorf v. Shuta*,
    142 F.3d 601 (3d Cir. 1998)........................................................................................12, 19

## <u>RULES</u>

Fed. R. Evid. 403 ....................................................................................................................16

Fed. R. Evid. 702 ....................................................................................................11, 12, 13, 19

Fed. R. Evid. 703 ............................................................................................................15, 16

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

| | | |
|---|---|---|
| | : | |
| **IN RE:** | : | **MASTER DOCKET NO.:** |
| **PAULSBORO DERAILMENT CASES** | : | **13-CV-784 (RBK/KMW)** |
| | : | |
| | : | 1:12-CV-07468-RBK-KMW (Breeman) |
| | : | 1:12-CV-07747-RBK-KMW (Lord) |
| | : | 1:13-CV-03350-RBK-KMW (Everingham) |
| | : | 1:13-cv-03244-RBK-KMW (Morris) |
| | : | 1-13-cv-04569-RBK-KMW (Johnson) |
| | : | 1:13-cv-05763-RBK-KMW (Truluck) |
| | : | 1:13-cv-07410-RBK-KMW (Smith) |

**DEFENDANTS CONSOLIDATED RAIL CORPORATION, NORFOLK SOUTHERN RAILWAY COMPANY AND CSX TRANSPORTATION, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE EXPERT REPORT AND TESTIMONY OF PLAINTIFFS' LIABILITY EXPERT, CARL F. MOREY**

COME NOW Defendants, Consolidated Rail Corporation ("Conrail"), Norfolk Southern Railway Company ("NSRC") and CSX Transportation, Inc. ("CSXT") (collectively, "Defendants"), by and through their counsel, Burns White LLC, and submit this Memorandum of Law in Support of Motion to Exclude Expert Testimony of Plaintiffs' Liability Expert, Carl F. Morey.

## INTRODUCTION

Plaintiffs filed the instant suits seeking damages arising out of a release of vinyl chloride as a result of a train derailment over the Mantua Creek in Paulsboro, New Jersey, on November 30, 2012. Pertinent to this Motion, Plaintiffs allege that the Defendants were negligent because: (i) the Paulsboro Bridge had a significant history of failure prior to the November 2012 derailment; (ii) Defendants failed to adequately maintain and inspect the bridge; (iii) Defendants

1

failed to have adequately trained personnel to detect the condition of the bridge on the morning of the derailment (November 30, 2012); and (iv) a train crew negligently permitted the train to cross the bridge on the morning of the derailment despite the fact that a red signal was being displayed, indicating that the bridge was not properly aligned and locked.

In order to bolster these allegations, Plaintiffs have submitted the expert report of Carl F. Morey, a Licensed Professional Engineer (Attached as Exhibit "A"; hereinafter "Report").  In the introduction discussing the scope of his report, Mr. Morey states that his report "addresses movable bridge design and operations, safety issues:  bridge inspection training and qualification of railroad employees, train crews and bridge inspectors for moveable bridge inspection." Report, at 1.

However, as detailed below, many of the conclusions in Mr. Morey's report are based on broad, unsupported assumptions, all of which greatly call into question whether his opinions are based on legitimate and accepted scientific methods and are the proper subject of expert testimony.  First, as one of the factors he claims led to the derailment, he spends much time discussing the corporate history of Conrail, including its acquisition by Norfolk Southern Corporation and CSX Corporation in 1999.  In his report, Mr. Morey posits that the corporate restructuring of Conrail after 1999, along with shifting responsibilities for bridge inspection and maintenance, led to "a critical loss of experience and training, especially in the fields of movable bridges and complex track and signal systems."  *Id*. at 13.  The only support provided for this conclusion are three corporate organizational charts appended to his report displaying the organization of Conrail's Bridge Engineering Group and the Bridge Management Division (in

2

1995)[1], a more current chart (April 2013) displaying Conrail's Engineering Assets. (Report, Exhibit "C"), and some unreliable hearsay statements he obtained from former Conrail employees. (Morey Dep. Tr., April 21, 2015, at 109:1-19, 110:20-23) (Appended as Exhibit "B"). Thus, based on nothing more than speculation, and ignoring the fact that Conrail, NSRC and CSXT are separate corporate entities, Mr. Morey asserts that CSXT and NSRC, as Conrail's owners, "stripped Conrail of a critical management layer and failed to supplant it with support from their internal resources." (Report, at 13.) Mr. Morey, quite simply, is not an expert on corporate structures and divisions, and furthermore, has no knowledge of NSRC's and CSXT's involvement, if any, in the operation and maintenance of the Paulsboro bridge.

Although Mr. Morey himself admitted that he is not an expert in train derailments and had never testified or written a report discussing this topic, (Morey Tr., 144:6-17), he had no difficulty placing the blame squarely on Conrail, CSXT and NSRC for the Paulsboro derailment. Indeed, with respect to the actual causes of the derailment, Mr. Morey displayed an alarming lack of knowledge concerning the operation of the Paulsboro swing bridge. Mr. Morey also faults Conrail for not properly training the train crew on duty at the time of the derailment, particularly the conductor. Report, at 13. However, at his deposition, he acknowledged there was no evidence suggesting that the crew was not provided with the requisite, federally mandated classroom and on-the-job training. (Morey Tr. 256:17-23, 257:2-8).

Mr. Morey's opinions and conclusions are not admissible pursuant to Fed. R. Evid. 702, the Supreme Court's seminal decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (2003) and its progeny. Particularly with respect to his conclusions concerning CSXT

---

[1] Mr. Morey worked for Conrail from 1976 to 1990 in its Engineering Department. From 1980 to 1990, he was a Conrail System Bridge Engineer and as the Regional Engineer in charge of the former Conrail Eastern Region, which territory includes the Paulsboro Bridge involved in the derailment. Report, at 2.

and NSRC, Mr. Morey lacks the requisite background and qualifications to give opinions on how Conrail's corporate structure after 1999 was a contributing factor in a derailment that occurred in 2012.  Such opinions, based as they are on speculation and conjecture, are not helpful to a jury. Moreover, his opinions asto  the causes of the accident, and of whether the train crew received the proper training are not based on any type of independent investigation of the derailment. Thus there is nothing in Mr. Morey's methodology that would make his opinions helpful to a lay jury.  For all of these reasons, Mr. Morey's report and opinion must be excluded.

**SUMMARY OF EXPERT'S
QUALIFICATIONS, OPINIONS AND METHODOLOGY**

**I.**     **Qualifications**

Mr. Morey is a Licensed Professional Engineer (PE) and has a Bachelor of Science Degree in Civil Engineering.  (Report, at 3).  During his time in college he did not have any training or education with respect to moveable bridges.   (Morey Tr. 77:11-17).   For approximately 14 years (from 1976 to 1990), he worked for Conrail in various engineering positions, starting as an intern in Conrail's Engineering Management Program, then as an Assistant Supervisor of Structures for the New Jersey Division (Report, at 3) (Morey Tr. 77:18-22;  80:7-19).  At the time, the Paulsboro bridge was part of the Philadelphia Division, so that was not part of his responsibilities.  (Morey Tr. 84:10-16).  During his time at Conrail he subsequently worked as a Supervisor of Structures and as a Senior Structural Inspector.  (Report, at 3).   In terms of experience with moveable bridges while at Conrail, he participated in a Moveable Bridge Training Program administered by the United Coast Guard in 1978 and served as a Moveable Bridge Operator Trainer.  (*Id.*).  At his deposition, he testified that during his time at Conrail he was involved in the inspection for several moveable bridges; however, he also admitted that he never recommended or even considered the use of span locks or end wedges for

4

Conrail's moveable bridges in the time he worked there.  (Morey Tr. 86:1-21).  He admitted during his deposition that he was not an expert on train derailments, and had not previously given an opinion on the cause of a derailment before this case.  (Morey Tr. 144:6-17).

Since leaving Conrail in 1990 Mr. Morey has worked in a variety of engineering positions involving bridge maintenance and inspection for several different companies, though not for another railroad.  *Id.*

## II.   Morey's Conclusions And Methodology

Mr. Morey's report states that he reviewed several deposition transcripts, interviews conducted by the NTSB as part of its investigation of the derailment, photographs and factual reports made by the NTSB and the NTSB's final investigation report, along with a site inspection.  (Report, at 4).  Review of these materials led him to conclude that all of the Defendants, including Conrail, NSRC and CSXT, were at fault for the derailment of November 30, 2012.  His particular findings, along with the methodology employed, are summarized below.

> A.   *The Report Places Blame On CSXT And NSRC For "Stripping" Conrail Of A "Crucial" Management Layer In Terms Of Moveable Bridge Inspection And Maintenance*

Mr. Morey's report places a large amount of blame on Conrail's parents, NSRC and CSXT, for the Paulsboro derailment, concluding that:

> **In the opinion of the author, this management separation of Conrail and restructuring of engineering groups, including major buy-out of senior engineering staff (including Chief Engineer and Chief Engineer Structures positions in track, bridges, and signal system), became a critical loss of experience and training, especially in the fields of moveable bridges and complex track and signal systems.  Conrail[s'] owners stripped it of a critical management layer and failed to supplant it with support from their internal resources.**  (Report, at 13) (emphasis in original).

Additionally, as a sort of "catch-all" with respect to Conrail and its corporate parents, CSXT and NSRC, Mr. Morey concludes that "given the frequency and volume of hazmat travel over this bridge, known to be of antiquated design, as well as numerous failures leading up to the time of the incident in question, it would appear that there was an utter disregard, at an institutional level, of known risks of potentially catastrophic harm by Conrail as well as its corporate parents, CSX and NS."   Report, at 16.   To support these conclusions, Mr. Morey provides, among other things, a detailed history of the formation of Conrail, starting with its inception in 1976, and continuing through its acquisition by CSXT and NSRC in 1999, and on to the present day.  Report, at 4-5, 13.[2]

---

[2] It appears that a large amount of this history was taken from a Wikipedia article publically available on the internet, particularly with respect to Conrail's acquisition by CSXT and NSRC in 1999.  This is understandable, in some respect, because Mr. Morey did not work for Conrail after 1990 and, presumably, would not have personal knowledge of Conrail's corporate structure and operations following the 1999 transaction.  Thus, the following statement was apparently copied by Mr. Morey, word-for-word, from the Wikipedia article, without any citation or attribution:

> **The old company remains a jointly-owned subsidiary, with CSX and NS owning respectively 42 percent and 58 percent of its stock, corresponding to how much of Conrail's assets they acquired. Each parent, however, has an equal voting interest. The primary asset retained by Conrail is ownership of the three Shared Assets Areas in New Jersey, Philadelphia, and Detroit. Both CSX and NS have the right to serve all shippers in these areas, paying Conrail for the cost of maintaining and improving trackage. They also make use of Conrail to perform switching and terminal services within the areas, but not as a common carrier, since contracts are signed between shippers and CSX or NS. Conrail also retains various support facilities including maintenance-of-way and training, as well as a 51 percent share in the Indiana Harbor Belt Railroad.**

(Report, at 5) (emphasis in original).   A copy of the Wikipedia article is attached for the Court's convenience as Exhibit "C".

Mr. Morey apparently believes that since the 1999 transaction, there has been a drain in the engineering department that was neither filled by Conrail nor by the parent companies. (Morey Tr. 108:1-24, 110:1-22; 300:16-24, 301:1-18). In his report, Mr. Morey attempted to relate this depletion of the engineering department with the failure of Conrail to solve the issues at the bridges.

Mr. Morey's conclusions are based on two grounds. First, he cites to a change in the organizational charts for Conrail from 1995 to 2013 (appended to the report as Exhibits "C" and "D"). Second, he relies on anecdotal hearsay statements from employees who have since left Conrail, though he did not actually name any individuals who provided him with this information. (Morey Tr. 110:20-22, 304:1-9). These conclusions, though, are undercut by several admissions demonstrating his lack of foundation:

●Mr. Morey candidly acknowledged that he had never had given an opinion previously on railroad management. (Morey Tr. 303:7-10).

●Mr. Morey admittedly also has no knowledge of Conrail's capabilities to manage maintenance over its bridges in 2012, the year the derailment occurred. For example, he did not review Conrail's bridge management plan that was in place in 2012 at the time of the Paulsboro derailment. (Morey Tr., 160:11-22).

●The sole support he can offer for his conclusion that the 1999 transaction eliminated an entire level of capable bridge management is an experience he had when he worked as a consultant for CSX in 2004. (Morey Tr., 282:7-2 - 283:1-11). However, he acknowledged that he could not comment on CSX's effectiveness in at the time of the derailment in 2012, eight years later. (Morey Tr., 283:12-18).

●Mr. Morey acknowledged that, after the 1999 transaction, Conrail had responsibility for maintaining far fewer moveable bridges after the restructuring, the number going from approximately 50 down to, in his estimation, 15 or thereabouts. (Morey Tr., 302:11-21).

●When preparing his report he had not read the interviews that several Conrail employees who were involved in bridge management and maintenance had given to the NTSB, and further, that he did not know the experience levels or capabilities of these individuals. (Morey Tr. 133:10-137:8, 17-23; 285:20-24 - 286:1-6).

●He acknowledged that he would have had a better understanding of the maintenance and bridge inspections that occurred at the Paulsboro bridge in the months leading up to the derailment had he read those interviews, but stated only that he did not think his opinion would have changed because of the job titles those employees had.  (Morey Tr., 137:12-24 - 138:1-16).

●He was not aware of the inter-relationship between NSRC/CSXT and Conrail and was similarly unaware that NSRC and CSXT approved Capitol Budget plans provided to them by Conrail, specifically with respect to movable bridges (Morey Tr. 282:1-6).

B.      *The Paulsboro Bridge Was Defectively Designed Because It Did Not Contain Span Locks Or End Wedges*

Mr. Morey's report notes that the Paulsboro bridge, "[u]nlike most swing bridges that possess end wedges that when driven, prevent rotation of the span,"  was "a rare shear-pole swing span that had neither end wedges nor span locks."  As a result, he concludes, "[t]he slide rails that were part of the **movable bridge rail joints provided the only means of securing the span from rotating under a train.**"  (Report, at 6; emphasis supplied); (*see also* Morey Tr., 228:16-22).  Mr. Morey explained that the recommendation of the use of span locks/end wedges on movable bridges was made by the American Railway Engineering and Maintenance Way Association (AREMA) (Report, at 10-11).  This recommendation was in place at the time that Mr. Morey worked for Conrail.  (Morey Tr. 226:18-24-227:1-11).  Once again, however, his conclusions regarding this alleged negligence lack support:

●Mr. Morey conceded that, during the 14 years he was with Conrail in various engineering department provisions with oversight over railroad bridges, he never recommended that any of Conrail's moveable bridges be retrofitted with span locks or end wedges.  (Morey Tr., 86:1-21; 90:2-8; 98:14-20; 105:10-24-107:22; 227:24-228:1-15).[3]

---

[3]     Mr. Morey equivocated once on this subject.  He recalled that he did recommend that one bridge, which was destroyed in fire, be rebuilt with end wedges and span locks.  However, that bridge originally had already had those items; thus this particular bridge was being rebuilt exactly as before, which, of course, would include the wedges and span locks. (Morey Tr. 107:7-22).

●When asked whether he could himself be deemed "negligent" for failure to recommend span locks and end wedges during his time at Conrail, he attempted to justify his lack of recommendation by stating that that the Paulsboro bridge was different when he worked there, and that in 2012 there were more six-axle and heavier trains crossing that bridge. (Morey Tr., 228:23-229:6).   (Morey Tr., 229:20-24; 231:9-15).   However, he also testified that he did not think Conrail was negligent by having a 286,000 pd weight restriction on the Paulsboro bridge. (Morey Tr., 214:16-215:21).

● Conrail did not violate any federal regulation or standard by having a one-hundred car freight train (supposedly a high volume train) on the Paulsboro bridge. (Morey Tr., 226:3-15).

Despite opining that the bridge was defectively designed, Mr. Morey also displayed a lack of knowledge about how the Paulsboro bridge operated and did not conduct any type of scientific investigation or analysis:

●When showed pictures of proximity detectors that were included in his report, he could not say whether the proximity detectors in the pictures were from the north end or the south end. (Morey Tr. 168:1-16).

●He did not investigate any of the failure-to-operates (FTOs) that occurred during the month prior to the derailment, but only "looked at the pattern to see if I could come up with something that was – you know, that would just jump out at me." (Morey Tr., 179:10-15; 295:21-24 - 296:1-5).

●Although he believed there were repeated patterns of the FTOs, he could not give specific examples, as he is "not a specialist on that." (Morey Tr., 296:6-24 - 297:1-9). In essence, he stated that examining the FTOs was not part of his investigation, although he also that he actually wanted to look into the cause of these failures, but did not. (Morey Tr., 184:4-21).

●With regard to the specifics of how the bridge operated, he was unable to explain the function of the cam motors and/or the gears in said cam motors. (Morey Tr. 185:16:24 – 186:1-23).

●He did not actually inspect the locks that were used on the Paulsboro bridge while the component parts were available for inspection at Conrail's Ann Street location in Philadelphia. (Morey Tr., 166:7:24 - 167:1-13).

C.     *The Train Crew Was Not Qualified Or Trained To Inspect The Bridge*

Mr. Morey opined that the train crew, particularly the conductor, Wilbert Den Ouden, was not qualified or trained to inspect the bridge and request safe passage when the train is stopped at a signal, citing to the standards published by the Northeast Operating Rules Advisory Committee.  ("NORAC").  (Report, at 15).  Pursuant to NORAC Rule 241, only a "qualified employee" can "determine that the rails are properly lined and the bridge is safe for movement before verbal permission is given to pass the signal …"  *Id*. (quoting NORAC Rule 241d).

Although his report states "[t]here is no evidence to suggest Conrail train crews received movable bridge inspection training to become 'Qualified' under NORAC or FRA Rules and Regulations," (Report, at 13),  he acknowledged that there was no evidence suggesting that the crew was not provided with the requisite, federally mandated training.  (Morey Tr., 262:12-24- 263:1-21).  Mr. Morey admitted that Conrail complied with Federal rules/regulations in qualifying the conductor (Mr. Den Ouden).  (Morey Tr., 253:13-17; 263:17-22).  He agreed that the Federal regulations required classroom training, testing, and on-the-job training for a new conductor, and that there was no evidence that Conrail failed in this manner with the conductor. (Morey Tr., 261:12-24, 262:1-5; 263:17-22).  Thus, although he acknowledges that Mr. Den Oueden, in his interview with the NTSB, testified that he was trained to inspect the bridge to determine whether the locks were engaged (Morey Tr., 264:3-24 – 265:1-9), his opinion appears to be that no train conductor can ever be qualified to conduct such an inspection, pursuant to NORAC Rule 241.  (Morey Tr.  253:20-24).   Again, he offers no support for this opinion.

## ARGUMENT AND CITATION OF AUTHORITIES

### I.      Standards For Evaluation Of A Motion To Exclude Expert Testimony

The opinion of a qualified expert witness is admissible if (1) it is based on sufficient facts or data, (2) it is the product of reliable principles and methods, and (3) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702.  The expert's scientific, technical, or other specialized knowledge must also "help the trier of fact to understand the evidence or determine a fact in issue." *Id*.  The court here is thus vested with a gatekeeping function, ensuring that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786.  The Supreme Court identified in *Daubert* a number of factors that might assist the district court in determining the admissibility of expert evidence.  *Id*. at 593–94.  The Court instructed district courts to focus on "principles and methodology, not on the conclusions that they generate."  *Id*. at 595. Expert evidence may be excluded if "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Although *Daubert* was decided in the context of scientific knowledge (whether evidence established a connection between the defendant's drug and birth defects), *Daubert* has since been extended to the kind of "technical or other specialized knowledge," at issue here. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) ("We conclude that *Daubert's* general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."). The expert in *Kumho Tire* was an engineer and the Court there framed the issue before it as "how *Daubert* applies to the testimony of engineers and other experts who are not scientists." *Id*. at 141.

11

Under *Daubert* and its progeny, courts must address a "trilogy of restrictions" before permitting the admission of expert testimony: qualification, reliability and fit. *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003); *see also Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). The party offering the expert must prove each of these requirements by a preponderance of the evidence. *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999). First, to qualify as an expert, "Rule 702 requires the witness to have 'specialized knowledge' regarding the area of testimony." *Betterbox Commc'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 335 (3d Cir. 2002) (*quoting Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998)). The Third Circuit has instructed courts to interpret the qualification requirement "liberally" and not to insist on a certain kind of degree or background when evaluating the qualifications of an expert. *See Waldorf*, 142 F.3d at 625. "The language of Rule 702 and the accompanying advisory committee notes make clear that various kinds of 'knowledge, skill, experience, training, or education,' qualify an expert as such." *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 855 (3d Cir. 1990) (*quoting* Fed.R.Evid. 702) ("*Paoli I*").

Second, the reliability requirement of *Daubert* "means that the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994) ("*Paoli II*") (*quoting Daubert*, 509 U.S. at 590). In *Kumho Tire*, the Supreme Court held that the *Daubert* test of reliability is "flexible" and that "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." 526 U.S. at 141–42 (emphasis omitted). In determining whether the reliability requirement is met, courts examine the following factors where appropriate: (1) whether a method consists of a testable hypothesis;

(2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. *United States v. Mitchell*, 365 F.3d 215, 235 (3d Cir. 2004) (*citing Paoli II*, 35 F.3d at 742 n. 8)). These factors are neither exhaustive nor applicable in every case. *Kannankeril v. Terminix Int'l Inc.*, 128 F.3d 802, 806-07 (3d Cir. 1997). Under the *Daubert* "reliability" prong, parties "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." *Paoli II*, 35 F.3d at 744 (emphasis omitted). "The evidentiary requirement of reliability is lower than the merits standard of correctness." *Id.* "As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *Mitchell*, 365 F.3d at 244 (*quoting Ruiz–Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)).

For expert testimony to meet the *Daubert* "fit" requirement, it must "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. "This condition goes primarily to relevance. Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (citations and internal quotation marks omitted). "'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Id.*

**II.**     **Morey's Expert Opinions Are Not Admissible**

A.     *Morey's Conclusions Faulting CSXT And NSRC For "Stripping" Conrail Of A "Crucial" Management Layer In Terms Of Moveable Bridge Inspection And Maintenance*

As noted earlier, Mr. Morey seeks to place a great deal of responsibility for the derailment on Conrail's corporate parents, CSXT and NSRC.  In his opinion, the corporate restructuring of Conrail after 1999, along with shifting responsibilities for bridge inspection and maintenance, led to "a critical loss of experience and training, especially in the fields of movable bridges and complex track and signal systems."  Nothing in Mr. Morey's background, experience, or his methodology, supports such a conclusion.  As such, his opinions on this topic do not come close to satisfying the *Daubert* standards.

Mr. Morey arguably has some engineering expertise concerning railway bridges, and, to a very limited extent, the history of Conrail, given his former employment there. However, it is a stretch to say that this also qualifies him to opine on Conrail's current corporate makeup or how it staffs its engineering department.  Likewise, he has no basis to provide an opinion on the question of whether CSXT and NSRC bear any responsibility for the 2012 derailment, or indeed, the entire question of corporate management in general.  First, he left Conrail in 1990, nine years before its acquisition by NSRC and CSXT.  Second, Mr. Morey's information concerning CSXT's and NSRC's role in Conrail's bridge management, is, at best, nebulous.  He relies on three corporate organizational charts, two purportedly showing Conrail's corporate management structure for its Bridge Engineering and Design Groups prior to the 1999 transaction, and compares them to a Conrail organizational chart from April 2013 displaying its Engineering Assets.

14

However, as became clear during his deposition, Mr. Morey had no basis to conclude that post-1999, CSXT and NSRC had depleted Conrail's engineering department to such a degree that in 2012, thirteen years later, it would be systematically unable to have the manpower and procedures in place to prevent an accident such as the Paulsboro derailment.  This opinion does not take into account the fact, which he acknowledged, that Conrail had far fewer moveable bridges to maintain after 1999.  Other than the corporate organizational charts, the only evidence Mr. Morey relies upon are unspecified hearsay statements other employees, along with a general statement that he was personally aware of "dozens" of employees lost to Conrail's engineering department as a result of the 1999 acquisition, without actually naming anyone.  (Morey Tr., 301:15-18).  In response, Plaintiffs will likely argue that, pursuant to Fed. R. Evid. 703, "expert opinions 'based on otherwise inadmissible hearsay are to be admitted only if the facts and data 'are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences on upon the subject.'"  *Daubert*, 509 U.S. at 595 (*quoting* Fed. R. Evid. 703).  However, also pursuant to Rule 703, "[i]f the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely on them must be excluded."  *Paoli II*, 35 F.3d at 748 (*quoting In re "Agent Orange" Product Liab. Lit.*, 611 F.Supp. 1223, 1245 (E.D.N.Y. 1985)).  As the corporate organizational charts are not probative of any type of negligence, reliance on general word-of-mouth information regarding former Conrail engineering employees is simply not an adequate foundation for Mr. Morey's opinions.

Additionally, it cannot be said that Mr. Morey's conclusions with respect to CSXT and NSRC, resting as they do on the slimmest of reeds, would be at all helpful in assisting a jury to determine a fact in issue.  *Daubert*, 509 U.S. at 591.  As noted before, much of his information

concerning the restructuring of Conrail after 1999 has been lifted, word-for-word, from a Wikipedia article.  *See, supra,* at 6, n.2.  Given that this information is generally available to the public at large (and, of suspect accuracy), it is difficult to see how his opinions concerning the restructuring of Conrail are the proper subject for expert testimony.  Even more important, there is simply no discernable "fit" between the restructuring of Conrail and any claims of negligence against its corporate parents stemming from Conrail's alleged failure to maintain the Paulsboro bridge.

The same principles also work to exclude Mr. Morey's opinions faulting Conrail for purportedly not reaching out to its corporate owners for assistance, concluding that Conrail lacked the technical expertise in bridge maintenance after the 1999 acquisition.  (Morey Tr., 301:4-14).  This opinion is wholly unsupported, speculative, and is completely unhelpful to a jury.  As noted earlier, he had no knowledge of, and simply did not investigate, the technical experience of Conrail's engineers who were employed there at the time of the derailment in 2012.  He, therefore, is in no position to opine about Conrail's capabilities at the time of the derailment.  Finally, it is clear that whatever slight probative value that Mr. Morey's opinions on CSXT's and NSRC's involvement in Conrail's bridge management may have, its probative value is substantially outweighed by the potential for unfair prejudice, confusion of issues and waste of time.  Fed. R. Evid. 403.  Consideration of Mr. Morey's unsupported opinions with respect to CSXT's and NSRC's involvement (or lack thereof) in Conrail's bridge inspection and maintenance protocols, along with Conrail's corporate structure, will deflect the jury's attention from consideration of the crucial determinations of whether Conrail's negligence, if any, caused the train derailment of November 30, 2012.  Thus, for all of these reasons, Mr. Morey's opinions

and testimony on CSXT's and NSRC's relationship to Conrail's bridge management program should be excluded at trial.

> **B.**     *Morey's Conclusion That The Paulsboro Bridge Was Defectively Designed Because It Did Not Contain Span Locks Or End Wedges Is Not Based On Sound Methodology*

With respect to the immediate causes of the derailment, Mr. Morey concludes that the Defendants here are negligent because the Paulsboro Bridge was constructed without span locks or end wedges, which he claims would have prevented the derailment from occurring. However, from his deposition testimony, it seems that this conclusion was reached without reference to any of the facts in this case. First, he acknowledged that during his 14 years at Conrail he never recommended, with one possible exception, that any of Conrail's bridges be retrofitted with span locks or end wedges, saying this decision was simply "engineering judgment." (Morey Tr., 86:1-21; 90:2-8; 98:14-20; 105:10-24-107:22; 227:24-228:1-15; 229:20-24). He attempted to get around these admissions by stating that the Paulsboro bridge was "different," or that the circumstances were different, because had he known that the railroad was operating with all of the heavy toxic cars, and without a bridge tender, his judgment changes "completely." (Morey Tr., 231:9:15). In the same vein, however, he did not find that the length of the train (100 cars) or its weight violated any federal regulations. (Morey Tr., 214:16 – 215:21; 226:3-15).

Mr. Morey came to this conclusion with no scientific methodology employed, as if he came up with a conclusion first then sought to employ some type of support afterword. Simply stated, there is no support for his conclusion. He never recommended span locks and wedges while he was at Conrail, and while he states that he would have made such a recommendation if had had knowledge of the allegedly greater loads the Conrail trains were carrying in 2012, he also admitted that he could not say that Conrail was negligent in terms of the train length and

weight.  His conclusion, therefore, does not rest on "good grounds," or, indeed, any grounds that would be helpful to a jury.  "If *Daubert* and its progeny require anything, it is that plaintiffs come forward with proof of a valid methodology based more on just the *ipse dixit* of the expert." *Curry v. Royal Oak Enterprises, LLC*, Civ. Action No. 11-5527, 2013 WL 3196390, at *6 (E.D. Pa. June 25, 2013) (*quoting Pappas v. Sony Elecs., Inc*, 136 F.Supp.2d 413, 526 (W.D. Pa. 2000)).  In this case, the record suggests that Mr. Morey engaged in a "'haphazard, intuitive inquiry' using 'little, if any methodology beyond his own intuition.'"  *Curry*, *supra*, at *6 (*quoting Oddi v. Ford Motor Co.*, 234 F.3d 136, 156, 158 (3d Cir. 2000)).  In *Oddi*, the Third Circuit affirmed the district court's ruling to exclude expert engineering testimony that a bread truck was defectively designed.  The engineer in *Oddi* made no calculations, did not test his hypothesis, and failed to consider alternative explanations for the extensive damage the truck sustained.  *Id*. at 156-158.  The Third Circuit concluded that the engineering expert's proffered testimony was not based on the methods and procedures of science, but rather "speculative belief or unsupported speculation."  *Id*. at 158 (*quoting Paoli II*, at 742 (citations and internal quotations omitted).

Mr. Morey's opinion concerning the failure of the Paulsboro bridge to contain end wedges and end locks is similarly unreliable and not based on science.  Mr. Morey did not identify or use any scientific method in formulating his conclusion.  He admittedly did not inspect, let alone test, the rail locks that were in place on the Paulsboro bridge on the day of the derailment.  Also, as demonstrated earlier, he displays a striking lack of knowledge as to how the Paulsboro bridge actually operated.  His opinion testimony concerning defective design and construction of the bridge is unreliable and not helpful to the trier of fact.  Thus, Mr. Morey's opinions on this topic should be excluded.

      C.    *Morey Admittedly Is Not An Expert On Bridge Derailments, Rendering Him Unqualified To Provide An Expert Opinion On The Cause Of The Paulsboro Derailment*

To qualify as an expert, "Rule 702 requires the witness to have 'specialized knowledge' regarding the area of testimony." *Betterbox Commc'ns Ltd. v. BB Techs., Inc*., 300 F.3d 325, 335 (3d Cir. 2002) (*quoting Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998)).  The Third Circuit has instructed courts to interpret the qualification requirement "liberally" and not to insist on a certain kind of degree or background when evaluating the qualifications of an expert.  *See Waldorf*, 142 F.3d at 625.  However, even in light of this liberal policy, it is clear the expert must still possess some specialized skill or knowledge that is relevant to opinions he wishes to offer and will assist the trier of fact.  *See, e.g., Aloe Coal Co. v. Clark Equip. Co*., 816 F.2d 110, 114 (3d Cir. 1987) (tractor salesman who prepared damages estimates was not qualified to testify as to the cause of a tractor fire); *Higginbotham v. Volkswagenwerk Aktiengesellschaft*, 551 F.Supp. 977, 982-983 (M.D.Pa. 1982) (investigating officer not qualified to offer opinion as to movement of body inside vehicle even though officer had experience as accident investigator, where officer had only minimal training in accident reconstruction, physics, and the movement of bodies), *aff'd mem*, 720 F.2d 669 (3d Cir. 1983); *Globe Indemnity Co. v. Highland Tank and Manufacturing Co*., 345 F.Supp. 1290, 1291-1292 (E.D.Pa. 1972) (neither electrical engineer nor industrial hygienist was qualified to testify as an expert on the design of molasses storage tank, where neither witness had any prior experience or observational knowledge in the field of storage tank design), *aff'd mem*, 478 F.2d 1398 (3d Cir. 1973).

Here, Mr. Morey gave an opinion regarding the cause of the derailment even though he flatly admitted that he was not an expert on the causes of train derailments:

> Q:   Have you ever given any testimony in court or at a deposition about the causes of a derailment?
>
> A:   No.
>
> Q:   Have you ever authored any reports as to the cause of a derailment?
>
> A:   No.
>
> Q:   Do you consider yourself an expert in determining the cause of a derailment?
>
> A:   Not an expert.

(Morey Tr., 144:6-17).

This admission notwithstanding, Mr. Morey proceeded to opine that the derailment was the result a phenomenon known as "pumping," whereby the rails on the bridge were moving up and down as a result of the wheels going over them.  (Morey Tr., 207:3-10).  He further admitted that this phenomenon was not altogether unusual or unexpected, as "[e]very railroad, every track, Amtrak, it's just a normal vertical cyclic load from the --- from the wheels."  (Morey Tr., 207:7-10).  However, despite the fact that he acknowledged that there was nothing unusual or negligent about the weight of the loads going across the Paulsboro bridge on the morning of the derailment, or of the length of the train that crossed, he concludes that the derailment could have been prevented had there been something to hold the rails in place ("But, in fact – but it all comes back to the fact that there was nothing laterally to hold the bridge, *i.e.*, wedges.") (Morey Tr., 210:23-24 – 211:1-2).  In fact, it seems as though Mr. Morey was not interested in pinpointing any particular cause of the derailment, *i.e.*, "a wheel defect, which somehow broke, or whether there was a wide gauge, or whether the PLC system didn't work, or whether the rails were bouncing up and down, … (Morey Tr., 211:9-13).  In his view, none of these potential

causes actually mattered because without "any lateral support of the bridge at the toe, would lead to [the Paulsboro derailment] …" (Morey Tr., 211:9-20).

All of these "opinions" as to the causes of the derailment, however, must be viewed in light of his earlier admission that he was not an expert on derailments.  From his testimony, it is clear that he is not applying any specialized knowledge.  Indeed, if a railroad rail is pumping, any person can deduct, as Mr. Morey apparently did, that "pumping" is "not a "good thing."  ("And I deducted that [pumping is] not a good thing at the end of a moveable bridge.")  (Morey Tr., 208:1-3).  He is doing nothing more than applying lay knowledge to reach certain conclusions, which is solely the province of the trier of fact.  As such, Mr. Morey's opinions regarding the cause of the derailment must be excluded.

> D.    *Morey's Opinion That The Train Crew Was Not Qualified Or Trained To Inspect The Bridge Is Likewise Not Based On Any Scientific Methodology*

Mr. Morey's third main opinion concerning the Defendants' culpability concerns the train crew's (particularly the conductor's) alleged lack of qualifications to inspect the Paulsboro bridge on the morning of the derailment.  Again, this opinion is similarly lacking in any type of scientific methodology to support his position.  Mr. Morey makes a bald statement saying that no train crew or conductor could (or should) ever be qualified to determine whether a moveable bridge is safe for passage.  While he does opine that Conrail violated NORAC Rule 241d in its training and supervision of the crew, he can point to no regulations, standards or instructions relating to this topic.  In fact, Mr. Morey expressly testified that Conrail had a training program in place and that it complied with federal regulations with respect to having a conductor be qualified.  (Morey Tr., 253:8-17; 257:2-8).  Specifically, with respect to the conductor, Mr. Den Ouden, Mr. Morey admitted that Conrail did not violate any federal regulations with respect to qualifying him as a conductor.  (Morey Tr., 263:17-24 – 264:1-2).

21

Here, the conductor, Mr. Den Ouden, was qualified by virtue of his training to be a conductor for Conrail on the morning of November 30, 2012.  He also testified that he received training in terms of the type of bridge inspection that was done to determine if the rails were "locked" and safe for passage.  A jury can certainly determine whether Mr. Den Ouden was qualified to conduct such an inspection without resort to Mr. Morey's opinions, which again are based wholly on speculation and conjecture.  As such, his opinions on this topic are unreliable and unhelpful to the jury and should also be excluded at trial.

### III.     Defendants Request A *Daubert* Hearing

Before the Court rules on this Motion, Defendants request that the Court convene an *in limine* hearing to determine whether Mr. Morey's proffered opinions meet the requirements for admissibility under *Daubert*.  Such hearings are frequently granted in order in insure that the court makes its decision based on a complete record.  *See, e.g., Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999) (case remanded to district court to hold a *Daubert* hearing where admissibility turned on factual issues).  Given that Mr. Morey is being offered as a liability expert in numerous cases in the Paulsboro litigation, Defendants submit that it is in the Court's interest, as well as the parties, to make as thorough a record as possible before deciding whether Mr. Morey's opinions are admissible.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants, Consolidated Rail Corporation, Norfolk Southern Railway Company and CSX Transportation, Inc., respectfully request that this Honorable Court exclude the proffered expert report and testimony of Carl F. Morey, PE.  Defendants also request that the Court convene a *Daubert* evidentiary hearing on this Motion.

Respectfully Submitted,

*/s/ Brian D. Pagano*
Brian D. Pagano, Esquire
BURNS WHITE LLC
1800 Chapel Avenue West, Suite 250
Cherry Hill, NJ  08002
(856) 382-6006
Email: *bdpagano@burnswhite.com*

*Attorney for Defendants,*
*Consolidated Rail Corporation, Norfolk Southern*
*Railway Company and CSX Transportation, Inc.*

23

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 21st day of May, 2015, a copy of the within Memorandum in Support of Defendants Consolidated Rail Corporation, Norfolk Southern Railway Company and CSX Transportation Inc.'s Memorandum of Law in Support of Motion to Exclude Expert Testimony of Plaintiffs' Liability Expert, Carl F. Morey, was served on all counsel of record via efile.

BURNS WHITE LLC

By:     <u>*/s/ Brian D. Pagano*</u>
        Brian D. Pagano, Esquire
        1800 Chapel Avenue West, Suite 250
        Cherry Hill, NJ  08002
        (856) 382-6006

        *Attorneys for Defendants,*
        *Consolidated Rail Corporation, Norfolk*
        *Southern Railway Company, and CSX*
        *Transportation, Inc.*