**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

---

|  | : |  |
|---|---|---|
| **IN RE:** | : | **MASTER DOCKET NO.:** |
| **PAULSBORO DERAILMENT CASES** | : | **13-CV-784 (RBK/KMW)** |
|  | : |  |
|  | : | 1:12-CV-07468-RBK-KMW (Breeman) |
|  | : | 1:12-CV-07747-RBK-KMW (Lord) |
|  | : | 1:13-CV-03350-RBK-KMW (Everingham) |
|  | : | 1:13-cv-03244-RBK-KMW (Morris) |
|  | : | 1-13-cv-04569-RBK-KMW (Johnson) |
|  | : | 1:13-cv-05763-RBK-KMW (Truluck) |
|  | : | 1:13-cv-07410-RBK-KMW (Smith) |

---

# MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFFS' CLAIMS FOR PUNITIVE DAMAGES

# TABLE OF CONTENTS

**PAGE**

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   ii

Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

I.   General Principles Applicable to Plaintiffs' Punitive Damages   2
     Claims

     A.   Standards Under The New Jersey Punitive Damages Act   2
     B.   Punitive Damages May Not Be Based On Vicarious   3
          Liability
     C.   Plaintiffs Cannot Recover Punitive Damages On Any   6
          Preempted Claims

II. There Is No Factual Basis To Support An Award of Punitive   7
    Damages

     A.   Claims Based On Conduct Of Crew And Dispatcher   8
     B.   Claims Based On Conrail's Alleged Failure To Properly   14
          Train, Supervise, And Discipline Its Employees
     C.   Bridge Issues   24
     D.   Claims Regarding Hazardous Materials Response   30
     E.    Bridge Design Issues   37

Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

i

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

*Allendorf v. Kaiserman Enterprises*                              29, 30
630 A.2d 402 (N.J. Super 1993)

*Berg v. Reaction Motors Div., Thiokol Chem. Corp.*                 3
181 A.2d 487 (N.J. 1962)

*Bryant v. Muskin Company*                                        39
873 F.2d 714 (4th Cir. 1989)

*Di Giovanni v. Pessel*                                          3, 32
260 A.2d 510 (N.J. 1970)

*Dong v. Alape*                                                2, 3, 12
824 A.2d 251 (N.J. App. Div. 2003)

*Doralee Estates, Inc. v. Cities Serv. Oil Co.*                     6
569 F.2d 716 (2d Cir.1977)

*Drabik v. Stanley-Bostitch, Inc.*                                21
997 F.2d 496 (8th Cir. 1993)

*Edwards v. Our Lady of Lourdes Hosp.*                              3
526 A.2d 242 (N.J. App. Div. 1987)

*Enright v. Lubow*                                                 4
493 A.2d 1288 (N.J. 1986)

*Haines v. Schultz*                                                3
14 A. 488 (N.J. Sup. Ct. 1888)

*Haver v. Central R.R. Co. of N.J.*                                4
64 N.J.L. 312, 45 A. 593 (N.J. 1900)

*Hightower v. Kansas City S. Ry. Co*.                                    6
70 P.3d 835 (Okla. 2003)

*Kill v. CSX Transp*.                                                     7
923 N.E.2d 1199 (Ohio App. 2009)

*Lane v. Amsted Indus., Inc*.                                            22
779 S.W.2d 754 (Mo. Ct. App. 1989)

*Lightning Lube v. Witco Corp*.                                          5
802 F. Supp. 1180, (D.N.J. 1992)

*McAdam v. Dean Witter Reynolds, Inc*.                                  5,6
896 F.2d 750 (3d Cir.1990)

*McMahon v. Chryssikos*                                            3, 11, 12
528 A.2d 104 (N.J. Ch. Div. 1986)

*Nappe v. Anschelewitz, Barr, Ansell & Bonello*                          3
477 A.2d 1224 (N.J. 1984)

*Pancrazio v. Greyhound Lines, Inc*.                               11, 17, 24,
2008 U.S. Dist. LEXIS 34553 (D.N.J. Apr 25, 2008)                        32

*Parks v. Pep Boys*                                                      20
659 A.2d 471 (N.J. App. Div. 1995)

*Pavlova v. Mint Management Corporation*                                 10
868 A.2d 322 (N.J. App. Div. 2005)

*Richards v. Michelin Tire Corp*.                                        21
21 F.3d 1048 (11th Cir. 1994)

*Smith v. Whitaker*                                                       6
734 A.2d 243 (N.J. 1999)

*Taylor v. Mooney Aircraft Corp*.                                        22
464 F. Supp. 2d 439 (E.D. Pa. 2006)

*Viviano v. CBS, Inc.*                                                                6
597 A.2d 543 (N.J. App. Div. 1991)

*Wendelken v. New York, Susquehanna & Western R.R. Co.*                               4
88 N.J.L. 270, 86 A. 377 (N.J. 1913)

*West v. Goodyear Tire & Rubber Company*                                         1, 4, 38,
973 F. Supp. 385 (S.D.N.Y. 1997)                                                      40

*Winkler v. Hartford Accident & Indem. Co.*                                        4, 5
168 A.2d 418 (N.J. 1961)


**Statutes and Rules**

Rule 56(c), FRCP
                                                                                      1
33 C.F.R. § 117.729                                                                  28
49 C.F.R. § 172.820(d)                                                               34
49 C.F.R. § 217.4                                                                    19
49 C.F.R. § 240.7                                                                    18
49 C.F.R. § 242.7                                                                    19

N.J. Stat. Ann. § 2A:15-5.10                                                          2
N.J. Stat. Ann. § 2A:15-5.12                                                          2
N.J. Stat. Ann. § 2A:15-5.12.a                                                     3, 32
N.J. Stat. Ann. § 2A:15-5.13                                                       1, 6

Restatement (Second) of Torts                                                         5

## INTRODUCTION

This memorandum is submitted in support of the motion for summary judgment filed by Defendants, Consolidated Rail Corporation ("Conrail"), Norfolk Southern Railway Company ("Norfolk Southern"), and CSX Transportation, Inc. ("CSXT") (collectively "Railroad Defendants") regarding the Plaintiffs' claims for punitive damages.  Plaintiffs have failed to produce any evidence that the Railroad Defendants acted with actual malice or that they acted with a wanton and willful disregard of persons who foreseeably might be harmed by their acts or omissions, as required under New Jersey law.  Additionally, except in rare circumstances not alleged or evidenced here, New Jersey law does not permit imposition of punitive damages on corporations based upon theories of vicarious liability.  Because there is no genuine issue as to any material fact regarding these claims, summary judgment is appropriate.  Rule 56(c), FRCP.[1]

## FACTUAL BACKROUND

These cases arise out of the November 30, 2012 train derailment at Paulsboro, New Jersey.  A detailed statement of the facts pertinent to Plaintiffs'

---

[1] CSXT and NS have filed separate motions for summary judgment.  As set forth in those motions, the employees whose alleged negligence forms the basis of Plaintiffs' claims were Conrail employees and were not employees of CSXT or NS.  Plaintiffs have identified no conduct by CSXT or NS that proximately caused their injuries and alleged damages.  Because Plaintiffs cannot recover actual damages against CSXT or NS, their claims for punitive damages likewise fail.  N.J. Stat. Ann. § 2A:15-5.13 (West) ("Punitive damages may be awarded only if compensatory damages have been awarded in the first stage of the trial").

claims is set forth in the Railroad Defendants' Statement of Undisputed Material Facts filed pursuant to Local Rule 56.1. Because of space limitations, these facts will not be recited in detail in this document, but will be referenced as appropriate in demonstrating why the myriad claims asserted by Plaintiffs will not support an award of punitive damages.

## ARGUMENT

### I.  General Principles Applicable To Plaintiffs' Punitive Damages Claims

A. Standards Under The New Jersey Punitive Damages Act

The award of punitive damages under New Jersey law is governed by the Punitive Damages Act. N.J. Stat. Ann. § 2A:15-5.10, *et. seq*.[2] To support a claim for punitive damages, a plaintiff must prove "by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions." N.J. Stat. Ann. § 2A:15-5.12. "Actual malice" means "intentional wrongdoing in the sense of an evil-minded act." N.J. Stat. Ann. § 2A:15-5.10. "Wanton and willful disregard" means a "deliberate act or omission with knowledge of a high degree of probability of harm to another and reckless indifference to the consequence of such act or omission." *Id*.

---

[2] The Punitive Damage Act codified existing common law principles. *Dong v. Alape*, 824 A.2d 251, 257 (N.J. App. Div. 2003).

Punitive damages may not be founded merely upon gross negligence or recklessness. N.J. Stat. Ann. § 2A:15-5.12.a.  Further, a plaintiff cannot recover punitive damages by "recasting negligent conduct as 'willful and wanton'…" *Edwards v. Our Lady of Lourdes Hosp*., 526 A.2d 242, 249 (N.J. App. Div. 1987). Rather, there must be a "positive element of conscious wrongdoing",  *Berg v. Reaction Motors Div., Thiokol Chem. Corp*., 181 A.2d 487, 496 (N.J. 1962), and there must be a finding that the offender is guilty of a conscious and deliberate disregard for the safety of others.  *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 477 A.2d 1224, 1230 (N.J. 1984); *Di Giovanni v. Pessel*, 260 A.2d 510, 511 (N.J. 1970).  The difference between negligence and wanton and willful conduct is not merely in degree, but in kind. *McMahon v. Chryssikos*, 528 A.2d 104, 109 (N.J. Ch. Div. 1986).  A defendant's conduct must be "particularly egregious to support an award of punitive damages."  *Dong v. Alape*, 824 A.2d 251, 257 (N.J. App. Div. 2003).

B.    <u>Punitive Damages May Not Be Based On Vicarious Liability</u>

To the extent Plaintiffs premise their punitive damages claims upon alleged vicarious liability for employees of the Railroad Defendants, such claims fail and must be dismissed.  New Jersey courts have rejected vicarious imposition of punitive damages since at least 1888. *See Haines v. Schultz*, 14 A. 488, 488 (N.J. Sup. Ct. 1888) (no recovery because the evidence failed to demonstrate

participation in, or ratification by, the employer in the allegedly punitive conduct). Numerous subsequent cases have reiterated this position. *See e.g., Haver v. Central R.R. Co. of N.J.*, 45 A. 593, 593 (N.J. 1900) ("Exemplary damages . . . can only be assessed against one who has taken part in the wrongful act.  A master, therefore . . . cannot be held liable for exemplary or punitive damages merely by reason of wanton, oppressive or malicious intent on the part of the servant"); *Wendelken v. New York, Susquehanna & Western R.R. Co.*, 86 A. 377, 377 (N.J. 1913) (the cases "seem to distinguish between the act of a subordinate servant, for which exemplary damages may not be recovered unless express or implied authority or ratification can be brought home to the corporation itself" and those of a corporate executive whose acts may be said to be those of the corporation); *Winkler v. Hartford Accident & Indem. Co.*, 168 A.2d 418, 422 (N.J. App. Div. 1961), *certif. denied*, 34 N.J. 581 (N.J. 1961) ("Exemplary damages may not be recovered against an employer for the wrongful act of an employee, unless the act was specifically authorized, participated in, or ratified by the master").

More recently, the Appellate Division reiterated this rule, stating that "generally, punitive damages may not be assessed vicariously against a principal for acts of an agent." *Enright v. Lubow*, 493 A.2d 1288, 1301 (N.J. App. Div. 1985), *certif. denied*, 517 A.2d 386 (N.J. 1986).  In *Enright*, the Appellate Division

adopted Section 909 of the Restatement (Second) of Torts, which prohibits imposition of punitive damages against a master or other principal unless the principal (a) authorized the doing and the manner of the act; (b) was reckless in employing or retaining an unfit agent; (c) employed the agent in a managerial capacity and the agent then acted within the scope of employment; or (d) ratified or approved the act. *Id.* The court noted that this rule is based upon the notion that it would be unfair to award punitive damages vicariously against someone who is personally innocent. *Id*.

The Third Circuit has consistently applied similar principles when reviewing an award of punitive damages under New Jersey law. In *Lightning Lube v. Witco Corp.*, 802 F. Supp. 1180, 1196 (D.N.J. 1992), *aff'd*, 4 F.3d 1153 (3d Cir. 1993), for example, the trial court overturned the jury's award of punitive damages because there was no evidence that the defendant corporation "had knowledge of or ratified any alleged evil-minded or egregious acts committed by its employees." The Third Circuit affirmed, explaining:

> [P]unitive damages generally may not be assessed against a corporate employer for the wrongful acts of its employees unless someone "so high in authority as to be fairly considered executive in character" participated in the wrongful conduct or "specifically authorized" or "ratified" it. *Winkler v. Hartford Accident & Indem. Co.*, 66 N.J.Super. 22, 168 A.2d 418, 422 (App.Div.1961); see also *McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 768 (3d Cir.1990). The company official committing, approving or ratifying the act need not be the highest officer in the corporate hierarchy, but only must be "a person of such responsibility as to arouse the 'institutional

> conscience.' " *Doralee Estates, Inc. v. Cities Serv. Oil Co*., 569 F.2d
> 716, 722 (2d Cir.1977); see also *Viviano v. CBS, Inc*., 597 A.2d at 552

*Id.. See also*, *McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 768 (3d Cir.

1990) (noting that standards in Section 909 governed claim for punitive damages

against corporation, but affirming due to failure to request jury charge on the issue

or to object to the charge that was given).  Based upon these decisions, Plaintiffs

may not recover punitive damages vicariously.

C. <u>Plaintiffs Cannot Recover Punitive Damages On Any Preempted Claims.</u>

New Jersey law also forbids an award of punitive damages to the extent

Plaintiffs' claims are preempted by federal law.  New Jersey's Punitive Damages

Act provides that:

> Punitive damages may be awarded only if compensatory damages
> have been awarded in the first stage of the trial. An award of nominal
> damages cannot support an award of punitive damages.

N.J. Stat. Ann. § 2A:15-5.13; s*ee also Smith v. Whitaker*, 734 A.2d 243, 253 (N.J.

1999).  Because preempted claims cannot provide the basis for an actual damages

award, punitive damages are likewise unavailable on such claims.  *See, e.g.,*

*Hightower v. Kansas City S. Ry. Co*., 70 P.3d 835, 851-54 (Okla. 2003) ("The

same underlying acts or omissions complained of in the preempted negligence

action cannot be offered to prove that such identical acts or omissions amount to a

more egregious level of misconduct, i.e., reckless disregard, warranting an award

for punitive damages"); *see also Kill v. CSX Transp*., 923 N.E.2d 1199, 1212 (Ohio App. 2009) (holding that punitive damages claim could not survive dismissal of preempted underlying claim).

## II.   There Is No Factual Basis To Support An Award Of Punitive Damages

Applying the standards for awarding punitive damages to the facts of these cases, Plaintiffs' punitive damages claims cannot survive.   Plaintiffs' claims seeking punitive damages can generally be grouped into one of five categories:

1. Alleged negligence by the train crew in failing to properly inspect the bridge locks and by the dispatcher in permitting operation over the Paulsboro Bridge on November 30, 2012 despite the presence of a red signal;

2. Alleged negligence by Conrail in failing to properly train or supervise the train crew and/or dispatcher as to the appropriate actions for ensuring that the bridge was locked before making the decision to authorize the train to proceed;

3. Alleged negligence by Conrail in failing to take appropriate action to repair the bridge and allowing transportation of hazardous materials across the bridge despite notice of issues with the bridge;

4. Alleged negligence in responding to the hazardous materials release and failure to take proper actions in connection with the post-incident response; and

5. Alleged negligence in not designing or constructing the bridge with safety features (end wedges and span locks) to prevent the bridge from rotating under movement.

Even if Plaintiffs could establish liability for compensatory damages on one of these theories, the undisputed facts of these cases and admissions by Plaintiffs'

experts establish that Plaintiffs cannot meet their burden of proving by clear and convincing evidence that they are entitled to punitive damages.[3]

A.  Claims Based On Conduct Of Crew And Dispatcher

As noted above, Plaintiffs allege that the train crew was negligent in failing to properly inspect the bridge locks to determine whether the bridge was properly locked prior to operating their train across the bridge. They further contend that the dispatcher was negligent in authorizing the movement despite the presence of a red signal.  Plaintiffs claim that both the train crew and the dispatcher violated Conrail operating rules in connection with their conduct on the morning of the derailment. However, neither theory will support a punitive damages claim against the Railroad Defendants.

1.  No Vicarious Liability

First, as noted *supra* at pp. 3-6, under New Jersey law punitive damages may not be awarded based on a theory of vicarious liability.  Thus, even assuming for purposes of argument that the conduct by Mather, Den Ouden, and Havlicek could be considered negligent, their alleged conduct would not support a punitive damages award against the Railroad Defendants.

---

[3] Plaintiffs' claims relating to transportation of hazardous materials over the bridge, response to the hazardous materials release, design and construction of the bridge, and training/supervision/discipline are the subject of separate motions for partial summary judgment filed by the Railroad Defendants on the basis of federal preemption.  Preemption provides an additional reason why punitive recovery is precluded.

2. <u>Plaintiffs' Own Expert Admits That The Crew Did Not Act With The Required Level Of Culpability To Support Punitive Damages</u>

Second, even if vicarious liability were a viable theory for imposing punitive damages liability, Plaintiffs' own expert, Steven Timko, has admitted that the conduct of Conrail employees did not rise to the level necessary to support a punitive award.  At deposition, Mr. Timko testified as follows:

Q.     Would you agree with me that basically your opinion in this matter is that Mr. Den Ouden looked at the locks and perhaps was mistaken about whether they were properly secured?

A.     I think that's probably the case.

Q.     You don't contend or argue in this case that he intentionally or consciously did anything to cause this derailment, do you?

A.     ***Absolutely not***.

Q.     And that same would be true for Mr. Havlicek, Mr. Mather, or any of the other Conrail employees that were involved in this incident?

A.     Well as far as I'm concerned, there were only the three.

Q.     But as to those three that you say are the only ones you're concerned with, you don't believe any of them consciously or deliberately did anything to cause this derailment?

A.     ***There was no intent to do anything wrong.***

Timko Dep. 233:5-234:5 (emphasis added).   Based upon these admissions, the alleged actions by the crew and dispatcher could not provide the basis for a punitive damages award.   *See supra* pp. 2-3.

        3.   <u>The Evidence Fails To Establish Actionable Conduct To Support A Punitive Damages Award</u>

Last, even without the admission by Plaintiffs' expert, there simply is no evidence that any actions of the train crew or the dispatcher were done with conscious and deliberate disregard for the safety of others.   Courts applying New Jersey's high threshold requirement for punitive damages have repeatedly granted summary judgment for a lack of evidence that the defendant's conduct was wanton and willful.   In *Pavlova v. Mint Management Corporation*, 868 A.2d 322, 329 (N.J. App. Div. 2005), for example, the New Jersey appellate court held that punitive damages should not have been awarded in a wrongful death action for the death of the plaintiff's mother in a fire at an assisted living facility. The fire was caused by the close proximity of a bathroom towel rack to an electric heater, which caused a towel to catch fire.   There had been two previous bathroom fires at the facility resulting from the proximity of the towel rack to an electric heater. As a result of the earlier incidents, the fire department had recommended that the facility either relocate towel racks away from electric heaters, or do more to inform residents about fire risks.   The facility held information sessions and posted warnings, but did not do this for the plaintiff's mother when she became a resident.

Despite the facility's failure to warn the plaintiff's mother, the court held that there was no basis for punitive liability for the mother's death, reasoning that the conduct was not deliberate and "***practically certain***" to cause serious harm. *Id.* at 328 (emphasis added).  Thus, while the facility may have been negligent or grossly negligent in failing to warn the mother, its conduct did not rise to the level of wanton and willful. *Id.*

Similarly, in *Pancrazio v. Greyhound Lines, Inc.*, 2008 U.S. Dist. LEXIS 34553 (D.N.J. Apr 25, 2008), the court granted summary judgment on plaintiff's punitive damages claims for failure to provide sufficient evidence to meet the punitive damages standard.   In that case, the plaintiff was injured on the defendant's bus because the bus driver was driving 70-80 mph on a wet road and lost control of the bus and crashed.  The court held that punitive damages could not be awarded because "although this conduct is demonstrative of negligence, and perhaps gross negligence, speeding on a wet road is not willful and wanton conduct." *Id.*

Perhaps the best example of the extremely high burden Plaintiffs face in trying to recover punitive damages is *McMahon v. Chryssikos*, 218 N.J. Super. 571 (Law Div. 1986).  There, a drunk driver with a 0.22 blood-alcohol level crashed into the back of the plaintiff's car, forcing the car forward onto railroad tracks; the plaintiff managed to escape from the car mere seconds before it was destroyed by

11

an oncoming train. *Id.* at 572. Despite the defendant's high blood-alcohol level and the plaintiff's near-death experience, the New Jersey court granted the defendant's motion for summary judgment on the plaintiff's punitive damages claim. *Id.* at 580. The court held that, while the defendant's 0.22 blood-alcohol level "may be considered gross intoxication supporting a finding of gross negligence (assuming causation), it is no more." *Id.* The court emphasized that "negligence, albeit gross, is distinct from willful and wanton misconduct" and that "[i]n New Jersey that distinction is critical, for wantonness has always been considered different from negligence, even gross negligence," and "[t]he difference is not merely in degree, but in kind." *Id.* at 579. The Appellate Division later called the *McMahon* decision "well-reasoned" and noted that "*McMahon* gains added support from the provisions of [New Jersey's Punitive Damages Act, which] evinces a pervasive legislative intent to curb, rather than expand, the availability of punitive damages." *Dong v. Alape*, 361 N.J. Super. 106, 118 (App. Div. 2003).

In the present case, the alleged conduct by the conductor, engineer, and dispatcher does not remotely approach the conduct of the employees in the cases cited above in which the courts granted summary judgment on punitive damages claims.  Here, it is undisputed that the employees were all operating under the belief that the bridge was locked and lined and that the train was authorized to proceed across the bridge. Den Ouden testified that he inspected the locks on both

ends of the bridge and visually verified that the locks were fully engaged. Den Ouden Dep. 37:2-18. Mather further testified that Den Ouden walked the bridge to inspect the locks and informed him that the bridge was locked. Mather Dep. 84:1-85:7. Mather also testified that from the cab of the locomotive he could see that the bridge was locked as the train proceeded across it and to this day there is no doubt in his mind that the bridge was locked. *Id*. at 97:19-98:14, 152:20-25, 162:23-163:15.

Based on their inspection and determination that the bridge was locked, Mather and Den Ouden had no reason to think that a derailment was likely, let alone reasonably certain to occur. Moreover, it is non-sensical that the crew would have proceeded across the bridge with knowledge that the bridge was not locked. As Mather testified at deposition, he and Den Ouden were the two individuals most likely to be harmed if the train derailed. Mather Dep. 163:16-164:4. According to Mather, they were "front and center" on the train and would not have put their lives at risk by going over the bridge without being sure that it was locked. *Id.*

With respect to Dispatcher Havlicek, there is no question that he believed that Den Ouden was knowledgeable and qualified to inspect the bridge. Havlicek Dep. 121:24-122:20. Moreover, Havlicek also knew that Mather was an experienced engineer who was very familiar with the bridge and he considered Mather to be qualified to inspect the bridge under Conrail Operating Rules. *Id*. at

13

109:25-110:23. Based on these beliefs regarding the crew's knowledge and qualifications, as well as the crew's confirmation that Den Ouden inspected the bridge and found that it was locked, Havlicek authorized the train to proceed. *Id.* at 61:23-64:4; 121:24-122:10. As the evidence outlined above establishes, his decision cannot support a finding that he deliberately ignored a high risk of danger to others.

Simply put, there is no evidence of a "positive element of conscious wrongdoing" by the conductor, engineer, or dispatcher or that any of them were substantially certain that an accident would occur in light of their actions. Absent such evidence, there is no basis for an award of punitive damages based on the alleged conduct by the crew or dispatcher.

B. Claims Based On Conrail's Alleged Failure To Properly Train, Supervise, And Discipline Its Employees

Plaintiffs also allege that Conrail failed to properly train its employees on how to inspect the bridge locks and permitted the bridge locks to be inspected on the morning of the derailment by employees who Plaintiffs' experts contend were not "qualified employees" to conduct such an inspection. Further, Plaintiffs' allege that Conrail failed to follow a progressive discipline policy in permitting Conductor Den Ouden to remain on the job despite prior rule violations. Although the Railroad Defendants contend that all these claims are preempted, even if not preempted they will not support a punitive damages award.

1.  <u>Training And Supervision Claims</u>

Conrail has an extensive training program for its engineers and conductors in compliance with the comprehensive federal regulations that set forth the requirements for railroad training programs.  Conrail's training program consists of both formal training and on-the-job training, including a minimum of 4 weeks of classroom training and 50 weeks of on-the-job training upon hiring. Ferrone Dep. 218:17-222:3.  As Plaintiffs' expert concedes, there is no dispute that Conrail's training and testing programs are submitted to the FRA for approval as required by federal law. Timko Dep. 134:2-11.

 Despite this concession, Plaintiffs contend that Mather and Den Ouden were not properly trained or qualified to inspect the bridge locks.  However, it is undisputed that both Mather and Den Ouden had received specific on-the-job training regarding inspection of the locks on the Paulsboro movable bridge. Mather testified that in 2004 as part of his on-the-job training as a conductor, another experienced conductor took him onto the bridge and showed him how to determine if the bridge is properly locked.  Mather Dep. 30:18-32:1; 145:3-18.  In fact, Mather was so knowledgeable about the bridge locks that he felt comfortable instructing other employees in what to look for when inspecting the bridge locks. *Id.* at 64:12-66:11.  Mather's testimony on this point was telling:

> A.   The locks themselves, the way I was taught by a conductor
> that's been around for 30 plus years pointed out specifically

that they do one of two things.  If they are retracted, they can only extend.  If they're extended, they can only retract.  So that's why there wasn't a whole lot of training because when you went out there, you could see these locks whether they're engaged or they're not engaged.  They're highly visible and they are large enough that you can tell that they're extended when they're supposed to be.

Q.   Well, there are degrees of extensions; would you agree with that?

A.   No.  No, I wouldn't.  I wouldn't agree with that at all.  It's either going to be extended or it's going to be retracted and there's going to be no varying degrees of one or the other.  When we come into a room like this one, there's one switch on the wall that controls the lights.  They're either going to be on, at that point we can only turn them off, or they're going to be off and we can only turn them on.  The Paulsboro Bridge, if they are retracted, they can only extend.  If they're extended, they can only retract.  They can do one of two things.

*Id.* at 35:19-36:19.

Similarly, as part of his on-the-job conductor training in 2009, Den Ouden was trained by an experienced conductor on inspecting the locking mechanism on the bridge.  Den Ouden Dep. 21:2-21.  The conductor training Den Ouden took him onto the bridge and showed him what to look for to ensure that the bridge was properly lined and locked.  *Id.* at 22:2-23:24.  While Plaintiffs' expert Timko criticized the sufficiency of this training, he acknowledged that there are no federal rules or regulations requiring additional training, and he admitted that he had no knowledge regarding the qualifications of the employees who trained Mather and

16

Den Ouden.  Timko Dep. 172:24-173:13, 174:19-176:21.[4]  Thus, there is no factual basis to support Timko's opinions, and there certainly is no evidence of a training failure amounting to the kind of wantonness warranting an award of punitive damages.

Additionally, even if Plaintiffs' could show that Mather and Den Ouden were not properly trained, their punitive damages claims still fail because they cannot establish the requisite causal connection between any alleged failure to train on how to inspect the bridge locks and the derailment.  Mather and Den Ouden both testified that they are absolutely certain that the locks were engaged when they inspected them. Even Plaintiffs' own bridge expert, Carl Morey, concedes that at the time the crew inspected the locks, the locks were extended.  Morey Dep. 298:16-24.  This failure to establish a causal connection is fatal to Plaintiffs' punitive damages training claim.  *See Pancrazio,* 2008 U.S. Dist. Lexis 34553 (inability to establish a causal connection defeats a punitive damages claim "because the punitive damage statute requires plaintiff to prove by clear and convincing evidence that the harm plaintiff suffered *was the result* of defendant's acts or omissions"; "in the absence of evidence of causation," the "argument is irrelevant") (emphasis added).

---

[4] The inability to cite any regulations or other basis for his opinions is one of the reasons, among others, that the Railroad Defendants have filed a *Daubert* motion to exclude Timko's opinions.

### 2.  Qualified Employees

Plaintiffs' claim that Den Ouden and Mather were not "qualified employees" to perform the lock inspection likewise fails due to inability to establish a causal connection as well as the absence of any legal or factual support. NORAC Rule 241(d) provides as follows:

**Stopped at a Signal Protecting Movable Bridge**

Under the following conditions, a qualified employee must determine that the rails are properly lined and the bridge is safe for movement before verbal permission is given to pass the signal:

1. When the signal cannot be displayed for the first movement over a bridge after the bridge has been closed, regardless of bridge lock indication.

or

2. At any time a bridge unlock indication is received.

Plaintiffs' own expert agrees that this rule permitted the dispatcher to authorize a train crew to proceed past a stop signal at a movable bridge if a "qualified employee" inspected the bridge and confirmed to the dispatcher that the bridge was lined and safe for movement.  Timko Dep. 195:1-15.  The evidence and applicable law establish that Den Ouden and Mather were such "qualified employees".

49 C.F.R. § 240.7, relating to engineers, defines "qualified" as "a person who has passed all appropriate training and testing programs required by the railroad and this part and who, therefore, has actual knowledge or may reasonably

be expected to have knowledge of the subject on which the person is qualified." Similarly, 49 C.F.R. § 242.7, relating to conductors, defines "qualified" as "a person who has successfully completed all instructions, training, and examination programs required by the employer, and the applicable parts of this chapter and that the person therefore may reasonably be expected to be proficient on all safety related tasks the person is assigned to perform." *See also* 49 C.F.R. § 217.4 (providing almost identical definition of "qualified"). Plaintiffs' expert conceded that he is unaware of any other definition of "qualified" in the federal regulations, and none appears in the NORAC rules. Timko Dep. 218:20-220:9. As importantly, he conceded that Mather and Den Ouden had completed all instructions, training and examination programs required by Conrail and by Part 217 of the federal regulations. *Id*. at 217:6-218:22. Thus, by definition, they were "qualified".

Moreover, Den Ouden and Mather were considered qualified employees under the NORAC rules. The Conrail lesson plan for training dispatchers and operators specifically notes that train and engine personnel are considered "qualified employees" to inspect movable bridges under Rule 241(d) "as long as [they] will accept the responsibility." *See* Ferrone Aff. at Ex 4. Unquestionably, Den Ouden and Mather were willing to accept the responsibility here, and felt fully confident and capable of performing the required inspection. As importantly, there is no evidence that the inspection they performed was inadequate or incorrect, as

the crew's undisputed testimony is that the locks were engaged when they inspected them.[5]

### 3. Alleged Rule Violations

Even if Plaintiffs were correct that Den Ouden and Mather were not qualified and that Havlicek's granting of permission to cross the bridge violated Conrail's operating rules, this would still not support a claim for punitive damages. The court in *Parks v. Pep Boys*, 659 A.2d 471, 478-479 (N.J. App. Div. 1995) considered whether evidence of violation of a party's internal rules/procedure is sufficient for submission of a punitive damages issue to the jury. The evidence in that case showed that the defendant violated a store policy to not sell freon to anyone under the age of 16 and to seek identification for anyone who might appear to be younger than 16. The defendant's store manager knew of the policy and there was a written notice of this policy, although it was unclear on the facts whether that notice was given to all employees and whether the notice was posted in the store. The appellate court held that this evidence was insufficient to allow punitive damages to go to the jury. *Id.* at 479. Specifically, the appellate court held that the evidence did not show that the store knew that the purchaser was underage or would use the freon for an illicit purpose. *Id.* The court noted that while the

---

[5]   In this regard, it is critical to understand that Den Ouden and Mather were not performing a structural inspection of the bridge. The only task the rule imposed on them was confirming that the rails were "properly lined" and the bridge was "safe for movement". There is no question that the crew was qualified for that task.

defendant's act of selling the freon and failing to check identification prior to making the sale violated internal policy, the plaintiff did not present proof that the violation was malicious or willful conduct by the defendant's employee. *Id.*

The same is true in this case. Even if Conrail's employees violated Conrail's operating rules, there is no evidence that they did so maliciously or willfully. Indeed, as noted above, even Plaintiffs' own expert agrees that the employees did not act consciously or willfully. Therefore, any alleged violation of Conrail's rules would not provide the basis for a punitive damages award.

### 4. Industry Standards

Punitive damages cannot be used to punish Conrail for operating in a manner consistent with industry standards. Courts have recognized that compliance with federal regulations and industry practice is evidence of due care that may preclude imposition of punitive damages. *See*, *e.g.*, *Richards v. Michelin Tire Corp.*, 21 F.3d 1048, 1059 (11th Cir. 1994) ("Furthermore, Appellant's compliance with both federal regulations and industry practices is some evidence of due care"). The Eighth Circuit has stated that "compliance with industry standard and custom serves to negate conscious disregard and to show that the defendant acted with a nonculpable state of mind with no knowledge of a dangerous design defect." *Drabik v. Stanley-Bostitch, Inc.*, 997 F.2d 496, 510 (8th

Cir. 1993)(citing *Lane v. Amsted Indus., Inc*., 779 S.W.2d 754, 759 (Mo. Ct. App.

1989)).  In *Lane v. Amsted Indus., Inc*., a Missouri appellate court stated:

> Compliance with industry standard and custom impinges to prove that
> the defendant acted with a nonculpable state of mind—without
> knowledge of a dangerous design defect—and hence to negate any
> inference of complete indifference or conscious disregard for the
> safety of others the proof of punitive damages entails.

779 S.W.2d 754, 759 (Mo. Ct. App. 1989).

In *Taylor v. Mooney Aircraft Corp*., 464 F. Supp. 2d 439, 448-49 (E.D. Pa.

2006), an airplane allegedly crashed due to a defective air pump and lack of a

warning light.  The court held that evidence that the defendant acted in accordance

with industry standards and in compliance with federal regulations precluded the

imposition of punitive damages, explaining:

> This evidence does not demonstrate conduct by Mooney that shows
> willful, reckless, or wanton disregard for life.  Using a vacuum pump
> that a majority in the industry use is not clear and convincing evidence
> that Mooney acted with spite or malice.  Building an airplane with a
> product that has been available for three decades, in an industry that is
> heavily scrutinized by a federal agency, cannot be reasonably
> considered to be an action in conscious or deliberate disregard of the
> safety of others.  Moreover, the facts that the FAA scrutinizes airplane
> builders and that the FAA approved the [airplane] design, using a dry
> vacuum pump, appear more likely to demonstrate that Mooney did not
> act in a manner justifying the imposition of punitive damages.

*Id*. (internal citation omitted).

Just as the aviation industry is heavily regulated by the FAA, the railroad industry is heavily scrutinized by the FRA.  The FRA allows railroads to adopt their own operating procedures, provided that those rules are submitted to the FRA for review. The NORAC rules used by Conrail and over 70 other railroads have been submitted to the FRA, Ferrone Aff. ¶ 3, and Conrail was operating in accordance with NORAC Rule 241(d) at the time of the derailment.  It is undisputed that the FRA has never required railroads operating under NORAC to alter Rule 241(d).  Timko Dep. at 132:1-24.

The actions of Conrail and its employees in complying with Rule 241(d) prior to crossing the bridge on the day of the derailment serve to negate any allegations of indifference or conscious disregard for the safety of others.  Any claims that Conrail should have used different or more strenuous operating procedures is insufficient to show a wanton and willful disregard for the safety of others.

### 5.  Alleged Failure To Discipline

Similarly, Den Ouden's prior rule violations cannot support a punitive finding.  While Den Oden was disciplined for rules violations prior to the derailment, none of the prior rule violations were related to the bridge at issue, any other movable railroad bridge, or NORAC Operating Rule 241(d).  Bolton Aff. ¶ 6. Further, while Timko criticizes Conrail for allegedly not following a progressive

discipline system in connection with these prior incidents, he admits that discipline involving railroad employees is subject to the collective bargaining agreement between the railroad and the employee's union, and he knows none of the details relating to these incidents or how they were handled by Conrail under the CBA. Timko Dep. at 202:1-203:16, 206:6-12.

In *Pancrazio*, *supra,* the plaintiff's punitive damages claim was based in part on the fact that Greyhound continued to employ the bus driver involved in the accident despite knowledge of prior driving violations and a prior accident. The court rejected that claim, noting that two prior citations and one prior accident were not enough to put the defendant on notice of a "high degree of probability" that the driver would be involved in a bus accident. 2008 U.S. Dist. Lexis 34553.

This Court should likewise reject Plaintiffs' claim based upon a similar theory in this case. Plaintiffs have no evidence regarding Den Ouden's prior incidents, Den Ouden's involvement, or how those incidents were handled. Absent such a showing, they cannot meet their burden of showing a "high degree of probability" that Conrail knew that Den Ouden would not perform a proper bridge lock inspection and as a result cause a derailment.

C. <u>Bridge Issues</u>

A primary focus of Plaintiffs' punitive damages claims relates to their contention that because of a recent history of problems with the bridge, Conrail

should not have been transporting hazardous materials over the bridge at the time of the derailment.  To the extent this claim is based upon routing of hazardous materials over the bridge, it is preempted as noted in Conrail's prior motion.  To the extent it is based upon alleged negligence in conducting inspections and repairs at the bridge, it is insufficient to support a punitive damages claim.

Conrail has a bridge inspection program as required by federal law. Conrail's program requires quarterly bridge inspections of the Paulsboro Bridge by a diverse team including bridge and building, communication and signal, electrical, and track department personnel. Hill Dep. 119:13-121:17.  In addition, two "Level One" structural inspections are done annually by the bridge inspector assigned to the Paulsboro Bridge.  *Id*. at 18:15-19:7, 49:21-50:17.

Following Super Storm Sandy in October, 2012, Conrail began to experience increasing problems with the bridge.  These problems were intermittent, as many trains traveled across the bridge with no issues, while others encountered difficulties that required follow up and inspection by various Conrail personnel.  As Assistant Chief Engineer of Maintenance of Way and Structures Tom Bilson testified: "There's a lot of trains that go across this bridge.  It's not like it's failing every day every time a train goes over.  It was a lot of – it was intermittent. . . ." Bilson Dep. 118:5-10. *see also id.* at 152:21-153:1 ("quite a few

25

trains went across the bridge and it didn't fail all the time . . .lot of trains went across . . . [and the bridge] worked as intended").

Problems with movable bridges are not uncommon or unexpected. As acknowledged by Plaintiffs' own bridge expert, Carl Morey, when he worked at Conrail and had responsibility for bridges, problems with movable bridges occurred "weekly." Morey Dep. 286:7-12. Further, Morey agreed that there is a lot of troubleshooting involved with movable bridges, and that it sometimes takes time to figure out the issue. *Id.* at 286:13-287:1.

Ryan Hill was the supervisor of structures for Conrail in the fall of 2012. Hill Dep. 8:4-14. During that time, Hill was responsible for, among other things, supervising the maintenance and inspection of the bridge. *Id*. at 15:13-23. Conrail was focused on solving the issues it was having with the bridge, and was diligently trying to determine the root cause of the problems. Hill Dep. 79:7-80:4; Bilson Dep. 114:6-24. Conrail personnel were at the bridge on multiple occasions during the month prior to the derailment. As Bilson testified, Conrail employees "spent a lot of time out there troubleshooting and trying to figure it out," and "methodically" worked through "the electrical, hydraulics [and] the signal side." Bilson Dep. 114:17-115:16. Each time, the team was able to address the issue and allow train traffic to continue. Bilson Dep. 114:1-118:15, 119:17-128:22; Hill Dep. 60:4-79:6. However, determining the root cause of the problems was difficult

due to the varying or intermittent nature of the issues. Hill Dep. 132:3-18; Bilson Dep. 113:25-114:16. Nevertheless, Hill did not believe that the intermittent problems with the bridge presented any safety concerns. Hill Dep. 132:22-137:7.

Conrail even went so far as to contact two outside consultants, one of whom was Hans Heidenreich, the engineer who designed the PLC system used to operate the bridge, to seek assistance.[6] On November 13 and 20, 2012, Heidenreich visited the bridge and attempted to find a solution for the intermittent issues. Heidenreich Dep. 70:1-11; Hill Dep. 123:8-20, 124:8-14. Heidenreich, however, was not able to identify the problem with the bridge, which he believed to be mechanical. Heidenreich Dep. 84:1-20. He used his laptop to look at the bridge programming, and checked the CAM operation on the locking mechanism. *Id.* at 85:16-86:1. Ultimately, Heidenreich entered a programming modification into the PLC in an effort to identify the source of the intermittent problem. *Id.* at 86:2-87:9.

While Plaintiffs make much of the fact that Heidenreich recommended to Hill that the bridge be closed early to allow for troubleshooting, they misunderstand the recommendation made by Heidenreich. Heidenreich never suggested that the bridge be closed in a fashion that would prohibit rail traffic. Rather, he understood that rail traffic would continue to proceed across the bridge,

---

[6] The other consulting firm was Advanced Fluid Systems, which was contacted to inspect the hydraulic system at the bridge. Hill Dep. 93:6-94:19.

and that the bridge would simply be closed to marine traffic on Mantua Creek a few days earlier than normal.[7]   Heidenreich Dep. 97:6-101:5.   Thus, even had Conrail followed Heidenreich's recommendation, the bridge still would have been in operation for rail traffic on the morning of the derailment.

Moreover, Heidenrich made clear at his deposition that his recommendation was not due to any safety concerns with the bridge.  He was not concerned about the structural stability or functionality of the bridge.  Heidenreich Dep. 103:11-15. Likewise, he was not concerned about the bridge controls.  *Id.* at 103:16-22. Heidenreich testified that his recommendation to close the bridge was not made because he thought there might be a derailment or because he thought that the bridge was a safety hazard.  *Id.* at 180:17-181:24.  For his part, Hill believed that Heidenreich's recommendation to close the bridge early had to do with troubleshooting rather than safety.  Hill Dep. 131:5-12.  Hill did not follow this recommendation because he believed that it would be easier to identify the problem if the bridge remained in normal operation.  Hill testified that it was his belief that the "only way we were going to find [the intermittent problem with the bridge] was to have the bridge in service." *Id*. at 132:8-18.  Because Conrail could not duplicate the issue, "closing the bridge would have really only just pushed the

---

[7] Pursuant to federal regulation, the bridge was normally closed to marine traffic from December 1 through March 31 unless at least four hours' notice to open the bridge was provided to Conrail. *See,* 33 C.F.R. § 117.729.

problem down the road," and continuing with normal operation would allow Conrail to continue trouble-shooting. *Id.* at 132:8-18. Plaintiffs' bridge expert, Carl Morey, agrees that it is easier to troubleshoot an issue at a bridge if the bridge is in operation as opposed to being closed. Morey Dep. 287:10-23.

Given all the efforts made by Conrail to try to solve the issue with the bridge, including calling on outside experts for assistance, the fact that Conrail was having issues with the bridge and could not solve the problem does not support a claim for punitive damages. In *Allendorf v. Kaiserman Enterprises*, 630 A.2d 402, 409 (N.J. Super 1993), the plaintiff was injured when she was struck by an automatic elevator door while trying to board the elevator on the defendant's premises. In the month prior to the accident, an elevator service mechanic discovered a problem with the elevator's safety feature designed to prevent the elevator door from closing on users. The service mechanic remedied the problem "as best he could." The defendant was, however, aware of another accident that occurred just days later in that elevator. Moreover, on the day of the accident, the elevator service mechanic was again called to service the elevator door because the door kept getting stuck. Although the mechanic reported no issues with the safety systems, the plaintiff was injured a few hours later when the door closed on her.

Despite this evidence, the court held that although the defendant had been aware of the prior accidents and problems with the door, that was not enough for a

jury to find that the defendant was aware of a high probability of injury. *Id.* Of note, the court recognized that when there was a problem with the elevator, the owner did not ignore the issue but instead called its service mechanic. *Id.*

Similarly, in these cases, Conrail did not ignore the issues with the bridge or fail to do anything about it. Conrail sent personnel to the bridge on numerous occasions and performed multiple repairs. Conrail called outside experts for assistance, including the man who designed the automated system for the bridge. Although these efforts ultimately proved unsuccessful, they do not demonstrate the willful and wanton conduct required to support a punitive damages claim. Rather, as in *Allendorf*, Conrail did not consciously ignore the problem knowing that there was a high likelihood that a derailment would occur. Therefore, punitive damages cannot be supported based upon issues with the bridge.[8]

D. Claims Regarding Hazardous Materials Response

Like many other claims asserted by Plaintiffs, their attempt to pursue a punitive damages claim based upon Conrail's response to the hazardous materials

---

[8] Plaintiffs also contend that Conrail failed to perform a quarterly bridge inspection prior to the derailment. While there was one missed quarterly inspection in September 2012, Plaintiffs overlook that a subsequent inspection was done in November 2012 shortly before the derailment. This was a "detailed and scheduled inspection." Billson Dep. 86. Further, the bridge had to be fully inspected and cleared for operation after Super Storm Sandy in October, 2012. *Id.* at 85. Accordingly, there can be no causal connection between the missed inspection and the derailment.

release is preempted.  Even if not preempted, the evidence in these cases does not support a punitive damages award.

Plaintiffs' expert, Timko, has identified two issues relating to transportation of hazardous materials that he contends demonstrate negligence and/or non-compliance with federal regulations by Conrail.  First, he contends that Conrail failed to comply with federal law when its employees failed to "surrender" the train consist to emergency responders immediately following the derailment.  Second, he contends that Conrail did not perform an appropriate security risk analysis for the route over which hazardous materials were being transported.[9]

1.   Emergency Response Information

Plaintiffs' claim that Conrail violated federal law by not immediately "surrendering" the consist cannot provide a basis for punitive damages because, even if true, this failure had no causal connection to the derailment or any alleged

---

[9] Timko also opined that Conrail failed to "educate" first responders and local residents, among others, regarding cargo carried across the bridge, that the train conductor was confused about what federal regulations require concerning placement of hazardous materials cars in the train consist, and that Ryan Hill did not fully appreciate what materials were being carried across the bridge.  At his deposition, Timko conceded that he had no knowledge about what educational programs Conrail had provided to first responders, Timko Dep. 158:3-161:6., and that the placement of hazardous materials cars had no causal relation to the derailment. *Id.* at 200:3-8.  Further, he acknowledged that his claims about Hill's knowledge were contradicted by Hill's sworn testimony. *Id.* at 229:5-230:22.

damages claimed by Plaintiffs.[10]  *See* N.J.S.A. § 2A:15-5.12a (requiring that a plaintiff prove that the "harm suffered was the result of the defendant's acts or omissions"); *Pancrazio*, 2008 U.S. Dist. LEXIS 34553 (D.N.J. Apr. 25, 2008) (declining to allow punitive damages claim to proceed based on failure to discover worn tire tread because there was no evidence that the condition of the tires caused the accident and the Punitive Damages Act requires proof of such causation); *Di Giovanni v. Pessel*, 260 A.2d 510, 512 (N.J. 1970) (because the failure to comply with the New Jersey statutes did not cause the harm to the plaintiff, there were no grounds for awarding punitive damages.)

Here, it is undisputed that by 7:05 a.m., approximately five minutes after the derailment, Paulsboro Assistant Fire Chief Gary Stevenson, whose home was adjacent to the derailment site, called the Paulsboro dispatcher and reported that four tank cars were in the water and that one of them was "pierced and had leaked out all [its] contents into the creek."  Giampola Dep. 41:1-10.  At 7:09 a.m., Stevenson reported that he could see with binoculars a placard number 1086, which is the symbol for vinyl chloride.  *Id.* at 48:5-10.

Within minutes of the derailment, Den Ouden spoke with the first emergency responders who had arrived at the scene.  He had the paperwork from

---

[10] Conrail does not concede that it violated federal law.  However, resolution of this issue is irrelevant given that the alleged violation claimed by Plaintiffs cannot be shown to have any causal relationship to any claim asserted in these cases.

the train in his possession when he did so.  As Paulsboro Fire Chief Giampola acknowledged, by 7:29 a.m. Den Ouden had confirmed that the leaking car contained vinyl chloride. Giampola Dep. 108:13-109:21.  Conrail Trainmaster Gary Fillingame also testified that when he arrived approximately 15 minutes after the derailment, he took possession of the paperwork and spoke with Stevenson and others who had gathered in Stevenson's yard.  Fillingame testified that he went down the list of cars in the consist at that time.  Fillingame Dep. 91:2-93:7.

By 7:30 a.m., Conrail Risk Manager Neil Ferrone had arrived at the scene. Ferrone informed the Paulsboro Fire Chief, Assistant Fire Chief, and other first responders which cars had derailed and what the Emergency Response Guidebook stated with respect to an evacuation.  Fillingame Dep. 92:18-93:24.

More importantly, even before Ferrone ever arrived at the scene, emergency responders had already determined that vinyl chloride was the chemical that had been released and were already in the process of gathering information and handling the response based upon this knowledge.  By approximately 7:29 a.m., the Paulsboro Fire Department suspected that vinyl chloride had been released from one of the derailed cars based on the railcar's placard numbers. Giampola Dep. 48:13-50:4.  At that time, the Paulsboro dispatcher gave the Fire Department a synopsis on the qualities of vinyl chloride.  *Id.*  By 7:30 to 7:35, Ferrone had verified to the Fire Chief that the material was vinyl chloride.  *Id*. at 50:23-51:14.

33

Thus, the alleged failure by Conrail to "surrender" the consist to first responders could in no way be considered causal in terms of any injuries claimed by Plaintiffs.   Within a half hour of the derailment the first responders knew exactly what the chemical was and had been informed by Conrail personnel what the emergency response guidebook recommended be done.   Although Chief Giampola rejected this advice due to his belief that resources were not sufficient to evacuate, this provides no basis for imposing punitive liability on the Railroad Defendants.

### 2. Security Risk Analysis

With respect to Timko's opinion regarding the security risk analysis required by federal law, Timko failed to have a factual basis for his opinion, and like his opinion regarding "surrender" of the train consist, he is misinterpreting the applicable regulations.   Timko acknowledges that there is no evidence that Conrail failed to perform the risk assessment called for by federal regulation.   This assessment is done using a software tool developed by the FRA and other federal agencies.   As the regulation sets forth, the purpose of the regulation is to select the most appropriate route for the transportation of hazardous materials ***when multiple routes are available***.   *See* 49 C.F.R. § 172.820(d) ("a rail carrier must identify practical alternative routes over which it has authority to operate, if an alternative exists.")   In this case, however, the Penns Grove secondary line is a cul-de-sac

route, meaning that there are no alternate routes. Thus, the regulation Timko cites is inapplicable here.

### 3. Post-Incident Response

Although Plaintiffs' experts offered no specific opinions regarding the handling of the emergency response, because there are allegations in some of the complaints raising this issue, the Railroad Defendants will briefly address it.  It is undisputed that Conrail provided prompt notice to emergency responders of the hazardous material release and that the incident commander, and not Conrail, had responsibility for making decisions regarding the handling of the response. Following the derailment, Mather immediately notified the dispatcher, Havlicek, of the emergency. Mather Dep. 104:11-23.  Havlicek then notified the Conrail trouble desk, which relayed that information to local authorities in Paulsboro. Havlicek Dep. 139:14-140:20. After notifying the dispatcher of the situation, the train crew retrieved the consist and other paperwork from the cab of the locomotive, got off the locomotive, and headed to nearby roads to warn travelers not to come into the area. Mather Dep. 106:16-107:12.

Just minutes after the derailment, the Paulsboro Police Department and Paulsboro Fire Department responded to the accident scene. Giampola Dep. 35:18-36:13.   Chief Giampola of the Paulsboro Fire Department then assumed responsibilities as the incident commander, coordinating the response to the

derailment.  *Id*. at 76:18-24.  Only Chief Giampola had the authority to evacuate residents.  *See, e.g.*, N.J.A.C. 5:75-2.7(d) ("The evacuation order shall only be conducted upon the order of the incident commander or his or her designee."). Although Paulsboro Police had begun evacuating residents shortly after the derailment, Chief Giampola decided to discontinue the evacuation order and change it to a shelter-in-place order. *Id*. at 74:1-23.  Chief Giampola's decision not to order a half-mile radius evacuation of residents was due to resource constraints. Ferrone Dep. 59:5-16; Giampola Dep. 74:24-76:15.  According to Chief Giampola, "[w]e don't have the resources to be able to move that amount of people in a timely manner." Giampola Dep. 76:11-13.  He believed that it was safer for people to shelter-in-place than to attempt an evacuation. *Id*. at 74:24-76:15.

Later that day, the United States Coast Guard arrived and Captain Moore of the Coast Guard took over as leader of the unified incident command. Giampola Dep. 76:18-24, 117:12-118:20.  While the unified command attempted to make joint decisions, the Coast Guard had the final decision-making authority and "nothing was done unless they approved it." Ferrone Dep. 102:17-103:3, 235:22-236:21.

It is undisputed that Conrail had no authority for establishing evacuation zones, requiring use of personal protective equipment, or making any other decisions in response to the accident. That authority initially rested with the

incident commander, Chief Giampola, and later with the Coast Guard as the decision-making authority for the unified command. Giampola Dep. 76:18-24, 117:12-118:4.   The Railroad Defendants did assist first responders by relaying hazardous material information and providing other support such as air monitoring. However, even assuming *arguendo* that Plaintiffs could show that the Railroad Defendants were negligent in this regard, there is no evidence that any actions taken by the Railroad Defendants in assisting first responders were deliberately taken in disregard of a reasonably certain likelihood that residents or first responders would be harmed.

In short, there is no evidence that the Railroad Defendants violated any aspect of federal law in connection with the post-derailment response.   Even if there was such evidence, none of the alleged conduct rises to the level of actual malice or willful and wanton conduct necessary to support a punitive damages claim.   Accordingly, summary judgment should be entered on this claim.

E.   Bridge Design Issues

The last issue raised by Plaintiffs as a basis for their punitive damages claim is based on an opinion offered by Plaintiffs' expert, Carl Morey.   Morey opines that the bridge should have been equipped with span locks and wedges to prevent it from rotating under movement.   As discussed in the Railroad Defendants' prior

motion for summary judgment, this claim is preempted.  Even if not preempted, it will not support an award of punitive damages.

There are no federal laws or regulations requiring that a movable bridge like Paulsboro be designed or constructed using span locks and wedges.  Interestingly, Morey, himself a former bridge inspector at Conrail, never recommended that such devices be installed at any time during his career at Conrail.  Morey Dep. 105:7-107:22.

Moreover, Morey's claim that such devices are necessary in order to permit safe train movement across the bridge is belied by the evidence.   The Paulsboro bridge had been in place and supporting rail traffic for over 100 years.  The only evidence in the record of any prior derailment is a one-wheel derailment that happened in 2009 due to underwater corrosion of the bridge piers.  Bilson Dep. 25:2-26:7.  There is no evidence of any prior derailment due to rotation of the bridge under movement, which is what Morey claims span locks and wedges would have prevented.

The relationship of a small number of incidents to a large number of possibilities for incidents has been held to preclude the recovery of punitive damages.  In *West v. Goodyear Tire & Rubber Company*, 973 F. Supp. 385 (S.D.N.Y. 1997), the plaintiff was injured when he mounted a 16'' tire on a 16.5'' wheel.  The court dismissed the plaintiff's punitive damages claim.  The court

found that the defendants took measures to correct the mismatch issue, precluding

a finding of recklessness.  The court then stated:

> Finally, I address the issue of the severity of the mismatch problem…
> the approximately 167 alleged incidents of tire explosion resulting
> from 16''/16.5'' mismatches over the more than twenty-five years
> since the first defendant mismatch incident occurred in 1971 must be
> placed in the context of the millions and millions of uneventful tire
> mountings.  ***I conclude that the relationship of the number of
> incidents of explosion to the number of tires mounted in any given
> year is so minor as to fail to justify punitive damages***.

*Id*. at 390 (emphasis added); s*ee also Bryant v. Muskin Co.*, 873 F.2d 714, 715-716

(4th Cir. 1989) (directing a verdict in favor of the defendants on punitive damages

because evidence showed Defendant sold 70,000 ladders per year and had only

been presented with one other claim for injury).

The fact that there have been no similar train accidents at the bridge

precludes imposition of the punitive damages Plaintiffs demand.  The Paulsboro

movable bridge was constructed more than 100 years ago and was renovated in

2005. Bilson Dep. 31:2-10. Approximately 10 trains travel across the bridge per

day, which means that prior to the accident at issue approximately 25,000 trains

had crossed the bridge just since it was renovated in 2005.  *Id*. at 153:2-9.  If one

considers the 100 year history of the bridge, the numbers are even more staggering.

Yet there is no evidence of any prior accidents or derailments occurring under

circumstances similar to the derailment at issue here.  This is truly a situation

where, to paraphrase *West*, "the relationship of the number of incidents [of derailment]... to the number of [trains operating over mainline track] in any given year is so minor as to fail to justify punitive damages," and the issue of punitive damages should be removed from the province of the jury. *West*, 973 F. Supp. at 390.

## CONCLUSION

The Court should grant the Railroad Defendants summary judgment on Plaintiffs' claims for punitive damages.

Respectfully Submitted,


*/s/ Brian D. Pagano*
Brian D. Pagano, Esquire
BURNS WHITE LLC
1800 Chapel Avenue West, Suite 250
Cherry Hill, NJ  08002
(856) 382-6006
Email: *bdpagano@burnswhite.com*
*Attorney for Defendants,*
*Consolidated Rail Corporation, Norfolk*
*Southern Railway Company and CSX*
*Transportation, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 22nd day of May, 2015, a copy of the within Defendants Consolidated Rail Corporation, Norfolk Southern Railway Company and CSX Transportation Inc.'s Memorandum of Law in Support of its Motion for Summary Judgment as to Plaintiffs' Claims for Punitive Damages was served on all counsel of record via efile.

BURNS WHITE LLC

By:     */s/ Brian D. Pagano*
        Brian D. Pagano, Esquire
        1800 Chapel Avenue West, Suite 250
        Cherry Hill, NJ  08002-4803
        (856) 382-6012

        *Attorneys for Defendants,*

        *Consolidated Rail Corporation,*
        *Norfolk Southern Railway Company,*
        *and CSX Transportation, Inc.*