# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

_____

|  |  |  |
|---|---|---|
|  | : |  |
| **IN RE:** | : | **MASTER DOCKET NO.:** |
| **PAULSBORO DERAILMENT CASES** | : | **13-CV-784 (RBK/KMW)** |
|  | : |  |
|  | : | 1:12-CV-07468-RBK-KMW (Breeman) |
|  | : | 1:12-CV-07747-RBK-KMW (Lord) |
|  | : | 1:13-CV-03350-RBK-KMW (Everingham) |
|  | : | 1:13-cv-03244-RBK-KMW (Morris) |
|  | : | 1-13-cv-04569-RBK-KMW (Johnson) |
|  | : | 1:13-cv-05763-RBK-KMW (Truluck) |
|  | : | 1:13-cv-07410-RBK-KMW (Smith) |

_____

**DEFENDANTS CONSOLIDATED RAIL CORPORATION, NORFOLK SOUTHERN RAILWAY COMPANY AND CSX TRANSPORTATION, INC.'S REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE EXPERT REPORT AND TESTIMONY OF PLAINTIFFS' LIABILITY EXPERT, CARL F. MOREY**

Filed on behalf of Defendants,
Consolidated Rail Corporation, Norfolk Southern Railway Company and CSX Transportation, Inc.

Counsel of Record for This Party:

Brian D. Pagano, Esquire

BURNS WHITE LLC
1800 Chapel Avenue West, Suite 250
Cherry Hill, NJ 08002
(856) 382-6006

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION ...................................................................................................... 1

ARGUMENT AND CITATIONS OF AUTHORITIES............................................ 2

    I.     Morey's Supplemental Declaration Improperly Seeks To Correct Errors Of Omission In His Initial Report And Should be Stricken .............................. 2

    II.    Even With His Supplemental Report, Morey's Expert Opinions Are Still Not Admissible ..................................................................................................... 6

              A.     *Morey's Conclusions Faulting CSXT And NSRC* ................................. 6

              B.     *Morey's Conclusion That The Paulsboro Bridge Was Defectively Designed Is Not Admissible* ..................................................................... 9

              C.     *Morey Admittedly Is Not An Expert On Bridge Derailments* ................ 10

              D.     *Morey's Opinion That The Crew Was Not Qualified To Inspect The Bridge* .............................................................................................. 11

CONCLUSION ........................................................................................................ 12

i

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Beller v. United States*,
    221 F.R.D. 696 (D.N.M.) .......................................................................................5

*Cook v. Rockwell International Corp.*,
    580 F.Supp.2d 1071 (D. Colo.2006) .....................................................................6

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) ...........................................................................................2, 9

*In re Asbestos Liability Lit.*,
    289 F.R.D. 424 (E.D. Pa. 2013) ............................................................................5

*In re TMI Litig.*,
    193 F.3d 613 (3d Cir. 1999) ..................................................................................8

*Oddi v. Ford Motor Co.*,
    234 F.3d 136 (3d Cir. 2000) ..................................................................................9

*Sancom, Inc. v. Quest Comm. Corp.*,
    683 F.Supp.2d 1043 (D.S.D. 2010) .......................................................................5

*Strauss v. Credit Lyonnais*,
    925 F.Supp.2d 414 (E.D.N.Y. 2013) ..................................................................8, 9

## <u>RULES</u>

Fed. R. Civ. P. 26(e) ....................................................................................................1, 5, 6

Fed. R. Civ. P. 37(c) ..........................................................................................................6

Fed. R. Evid. 703 ...............................................................................................................8

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

|  |  |  |
|---|---|---|
| **IN RE:**<br>**PAULSBORO DERAILMENT CASES** | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | **MASTER DOCKET NO.:**<br>**13-CV-784 (RBK/KMW)**<br><br>1:12-CV-07468-RBK-KMW (Breeman)<br>1:12-CV-07747-RBK-KMW (Lord)<br>1:13-CV-03350-RBK-KMW (Everingham)<br>1:13-cv-03244-RBK-KMW (Morris)<br>1-13-cv-04569-RBK-KMW (Johnson)<br>1:13-cv-05763-RBK-KMW (Truluck)<br>1:13-cv-07410-RBK-KMW (Smith) |

**DEFENDANTS CONSOLIDATED RAIL CORPORATION, NORFOLK SOUTHERN RAILWAY COMPANY AND CSX TRANSPORTATION, INC.'S REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE EXPERT REPORT AND TESTIMONY OF PLAINTIFFS' LIABILITY EXPERT, CARL F. MOREY**

## INTRODUCTION

Three months after Plaintiffs' liability expert, Carl F. Morey, submitted his expert report in this case, and two months after his deposition, Morey has now offered something that he calls a "declaration," appended to Plaintiffs' response in opposition to Defendants' motion to exclude Morey's opinions. What he has submitted is, in reality a supplemental expert report, in blatant violation of Rule 26(e) of the Federal Rules of Civil Procedure and this Court's scheduling orders. The "declaration" (and Plaintiffs' Response) utilizes available evidence that was not cited to or relied upon in Morey's initial report. As such, Morey's "declaration" should be stricken and not be taken into account by the Court when evaluating Defendants' Motion to Exclude. In any event, even with their improper supplementation, Plaintiffs have still failed to

1

meet their burden for the admissibility of Morey's expert opinions pursuant to the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny.

<u>ARGUMENT AND CITATION OF AUTHORITIES</u>

I.      **Morey's Supplemental Declaration Improperly Seeks To Correct Errors Of Omission In His Initial Report And Should Be Stricken**

In this Court's Scheduling Order of November 13, 2013, the Court directed that all expert reports and disclosures on behalf of the plaintiffs shall be served upon counsel for Defendants no later than March 4, 2015, and that expert depositions shall be completed by May 1, 2015.  Order, November 13, 2014, at ¶ 8.  (Doc. No. 545).  The initial Morey expert report was served on February 27, 2015, and an amended report was served on March 6, 2015.  Mr. Morey's report contains a detailed chart listing 34 items he claimed to have reviewed in conjunction with the preparation of his report.  *See* Exhibit "1."   In this chart Mr. Morey did not list any of the fact witness depositions that were taken of the train crew and other individuals, though he did include quotes from Ryan Hill's and Thomas Bilson's depositions on one page of his report (Morey Report, at p. 9).  Morey's deposition was held on April 21, 2015.   Morey testified that he reviewed the deposition testimony of Hill, Bilson and Hans Heidenreich, but neglected to include those references in his index of items reviewed.  (Morey Tr., 15:13-24 – 1-7).  On May 21, 2015, Defendants filed their Motion to Exclude Mr. Morey's Expert Report.

Plaintiffs' Response in Opposition to the Motion to Exclude Mr. Morey's opinions (hereinafter, "Plaintiffs' Response"), filed on June 19, 2015, almost two months after his deposition, contains, as Exhibit "A," a declaration from Mr. Morey, dated June 11, 2015, that is some 11 pages long and consists of 40 single-spaced, numbered paragraphs. (Doc. No 128-3) (hereinafter "Morey Dec.").  This supplemental declaration is actually a supplemental expert <u>report</u>, submitted without leave of court, rehashing his qualifications and conclusions and which

2

also seeks to improperly inject new grounds supporting his conclusion after his deposition revealed significant flaws with his methodology.  The supplemental report relies on evidentiary materials that were undisputedly available to him when he prepared and served his report, some of which he claimed to have already reviewed. Thus, his supplemental declaration extensively references the deposition testimony of fact witnesses, such as Thomas Bilson, Ryan Hill, Mark Mather and Hans Heidenreich.  *See Plaintiffs' Response to Motion to Exclude Morey*, Exhibit "B" (Bilson Dep. Transcript); Exhibit "E" (Hill Dep. Transcript), Exhibit "J" (Heidenreich Dep. Tr.); Exhibit L, (Mather Dep. Tr.).[1]  In addition, Morey's "new" report (and, not coincidently, Plaintiffs' Memorandum of Law in Opposition to the Motion to Exclude), is littered with references to documentary evidence such as emails between several Conrail employees around the time of the accident (Exhibits "C" and "D") that were likewise not listed in the items he purportedly reviewed when he prepared his report.[2]

Plaintiffs' submission of a new, detailed report from Mr. Morey is clearly a desperation maneuver designed to plug the gaping holes in his methodology that were exposed in his deposition. As stated in Defendants' initial Motion to Exclude, Defendants challenged Mr. Morey's methodology and conclusions with respect to three crucial areas:  (1) Plaintiffs' efforts to cast blame on Conrail's corporate parents, CSXT and NSRC, for the Paulsboro derailment due to the parents' alleged "stripping" of a crucial management layer in terms of moveable bridge inspection and maintenance following their acquisition of Conrail in 1999; (2) the alleged

---

[1]  Morey testified that he reviewed deposition transcripts of Messrs.  Hill, Bilson and Heidenreich, but "probably just omitted them" from his index.  (Morey Tr., 15:13-24 – 16:1-2).

[2]  In his report Morey referenced two emails between Timothy Tierney and David Ohr, dated April 16 and 17, 2012, that purportedly discuss failures at the Paulsboro bridge.  (Morey Report, at p. 14).  However, in their Response to the Motion to Exclude Morey's opinions, they reference two entirely <u>different</u> emails, from November. 2012 (Exhibits "C" and "D" to Plaintiffs' Opposition), shortly before the derailment).  (Plaintiffs' Response, at 11).

defective design of the Paulsboro bridge; and (3) the purported lack of training and/or qualifications of the train crew.

Mr. Morey's lack of support for these conclusions was exposed during his deposition. For example, with respect to his efforts to foist blame on CSXT and NSRC, he readily acknowledged that he had no knowledge of Conrail's capabilities to manage maintenance over its bridges in 2012 when the derailment occurred. (Morey Tr., 160:11-22). Undaunted, he cites to conversations he had with former, unnamed, Conrail employees concerning Conrail's engineering capabilities. He also references a project that he had with CSXT as a consultant in 2004, 14 years after he left Conrail (and 8 years before the derailment). (*Id.*, at 110:20-22; 282:1-24 – 283:1-18). In his new report, submitted on June 19, 2015, he contends that he has "maintained contact with a number of former colleagues since [his] exit from the company," and they have "confirmed that the railroad has all but eliminated P.E. resources for the region." (Morey Dec. ¶ 5). In a similar vein, he also maintains, for the first time in his supplemental declaration that, while doing his consulting work for CSXT in 2004, "the Chief Engineer of Structures for CSXT shared that the corporation (CSXT) did not provide enough funding for the CSXT Bridge Capital Program (estimated in his view[s] at $60M." (*Id.*, at ¶ 15). This was not disclosed in his initial report, and certainly would have been the subject of questioning at his deposition.

Plaintiffs employ the same tactic with respect to their theory that Conrail lacked qualified professional engineering personnel to inspect the Paulsboro bridge. In his initial report, however, Morey offered no specific criticism of the qualifications of any particular person or persons (other than the train conductor, Wilbert Den Ouden). In his supplemental declaration, however, for the first time he takes aim at Thomas Bilson, Conrail's Assistant Chief Engineer of

4

Maintenance of Way and Structures, as not being an engineer, but rather a plumber, thereby lacking the requisite qualifications. (Morey Dec., ¶ 7, *see also* Plaintiffs' Response, at 11). This additional conclusion was based on Bilson's deposition testimony, which Morey said he had reviewed and which was certainly available to him when he prepared his report.[3]

While Fed. R. Civ. P. 26(e) recognizes that parties have an obligation to supplement expert reports in a timely manner if the party learns that in some material respect the report is incomplete or incorrect, supplemental disclosures are "only for the narrow purpose of correcting inaccuracies or adding information that was not available at the time of the initial report. …" *Sancom, Inc. v. Quest Comm. Corp.*, 683 F.Supp.2d 1043, 1062-63 (D.S.D. 2010). A supplemental report may be rejected where it is offered to rebut an argument raised in a summary judgment motion, or was served merely because a party simply wished to supplement." *In re Asbestos Liability Lit.*, 289 F.R.D. 424, 425-26 (E.D. Pa. 2013). In addition, "it is not sufficient that opposing parties have the supplemental report in hand now before trial. The intent of the rule is to ensure that deposition testimony can proceed with parties already armed with the expert's report, so as to be able to evaluate the opinions to be offered." *Beller v. United States*, 221 F.R.D. 696, 700 (D.N.M.). To permit such unfettered supplementation "would create a system where preliminary reports could be followed by supplementary reports and there would be no finality to expert reports, as each side, in order to buttress its case or position, could

---

[3] Of course, Bilson's testimony regarding his experience is taken out of context. Mr. Bilson spent some 35 years with the railroad until his retirement in 2013. As Assistant Chief Engineer for Conrail from 2006-2013, his job was to formulate capital and maintenance programs and safety training programs. He was not, and never claimed to be, an engineer, and did not do engineering work, but hired outside consultants and contractors for these projects (Bilson Tr., Aug. 13, 2014, 19:15-25 – 21:15; 31:2-10; 32:12-14) (attached as Exhibit "2"). Morey also conveniently ignored Bilson's testimony where he flatly denied that he had encountered any budgetary constraints preventing him from planning or executing any projects that were needed in order to maintain the bridges in his territory. (149:8-13).

'supplement' existing reports and modify opinions previously given." *Id.*, at 701. All of this would also interfere with the Court's ability to set case management deadlines, "because new reports and opinions would warrant a new round of consultation with one's own expert and virtually require new rounds of depositions." *Id.*, at 701-02.

Mr. Morey's declaration is not an attempt to remedy inadvertent factual errors or amend his report based on information not previously available to him. Rather, he is specifically trying to fill the numerous gaps in his March 6 report that were exposed during his deposition. "A supplemental expert report that states additional opinions or seeks to 'strengthen' or 'deepen' opinions expressed in the original expert report exceeds the bounds of permissible supplementation and is subject to exclusion under [Fed. R. Civ. P.] Rule 37(c)." *Cook v. Rockwell International Corp.*, 580 F.Supp.2d 1071, 1169 (D. Colo.2006). His supplemental declaration was based entirely on items that were easily available to him at the time he prepared his report but, for whatever reason, chose not to use. As a result, his Declaration should be stricken from the record pursuant to Rule 26(e) and this Court's Scheduling Order of November 13, 2014.

## II. Even With His Supplemental Report, Morey's Expert Opinions Are Still Not Admissible

### A. *Morey's Conclusions Faulting CSXT And NSRC*

Putting aside Plaintiffs' gambit of filing a supplemental expert report long after the deadline for doing so has passed, it is clear that nothing has changed: Morey's opinions still are hampered by the same lack of any scientific methodology. Nowhere is this more plain than Plaintiffs' discussion of the allegation that CSXT and NSRC "stripped" Conrail of a "crucial" management layer in terms of moveable bridge inspection and maintenance" following its acquisition in 1999. As noted earlier, most of Plaintiffs' discussion of this topic is focused on

Mr. Morey's alleged supplemental review of items that were <u>not</u> referenced in his March 6, 2015 report.  *See* Plaintiffs' Response, at pp. 11-15 (Doc. No. 128).  And, that discussion, in turn, pertains only to Conrail's purported lack of engineering resources, but does not speak at all to any involvement by NSCS or CXST.  With respect to the corporate parents, he still only relies on three dubious sources for his conclusion:  (1) the outdated Conrail corporate organizational charts; (2) generalized hearsay statements from former employees of Conrail; and (3) his one-time project as a consultant for CSXT in 2004, eight years before the Paulsboro derailment occurred.  Moreover, Mr. Morey is not an expert on railroad management, and has no basis for providing an opinion about Conrail's management, particularly since he left Conrail in 1990.  Not coincidently, Plaintiffs point to no discovery related to the question of "corporate management."   As a result, they have resorted to improperly referencing hearsay statements allegedly provided by unnamed Conrail employees.

The Conrail corporate organizational charts prove nothing.  Even if it could be said that Conrail did not have the "multiple layers" of engineering divisions, this fact in no way proves that Conrail bridge maintenance efforts were inadequate, or that NSRC or CSXT had anything to do any perceived inadequacies.  Morey instead resorts to casting groundless *ad hominum* aspersions on Conrail's corporate parents.  For example, he states in his declaration that "[a]t the time I left Conrail, it was still a government-owned railroad, although it seemed apparent at the time that it would be purchased, and whoever the purchaser was would likely reduce staff to increase profitability."  (Morey Dec., ¶ 5).  Given that he left Conrail in 1990, and the sale of Conrail did not occur until 1999, he has no basis for making this contention other than rampant speculation.  He also states, as noted earlier, that he recalled a conversation with a CSXT employee in 2004 (purportedly the Chief Engineer of Structures for CSXT), where it was

"shared" with him that CSXT "did not provide enough funding for the CSXT Bridge Capital Program (estimated in his view[s] at $60M." (Morey Dec., ¶ 5).

Even if these out-of-court statements were made, they are probative of nothing. The Chief Engineer of Structures for CSXT purportedly told Morey in 2004 that CSXT slashed capital funding for bridge projects. This allegedly occurred 8 years before the Paulsboro derailment. Second, the person allegedly making this statement was apparently referring to CSXT's Bridge Capital Program, not Conrail's. It is therefore readily apparent that in their eagerness to have a jury place blame for the derailment on Conrail's corporate parents, they ignore the fact that Conrail is a completely separate corporate entity from both CSXT and NSRC.

Plaintiffs acknowledge that the statements of these unidentified witnesses "may be considered inadmissible hearsay" and make no attempt to argue that this type of information is of the type that would normally be relied upon by experts. Instead, they sheepishly contend that "Defendants do not claim that any information from their own personnel is unreliable." Plaintiffs' Memorandum, at 10 n.2. It is their obligation, however, to prove all the requirements of admissibility (qualification, reliability and fit). *See, e.g., In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999) (party offering expert opinion must prove all three requirements by a preponderance of the evidence). In any event, Morey cannot use these out-of-court statements to circumvent the hearsay rule. Although Fed. R. Evid. 703 permits an expert to rely on inadmissible hearsay, the expert "'must form his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials. Otherwise, the expert is simply repeating hearsay evidence without applying any expertise whatsoever, a practice that allows the [party] to circumvent the rules prohibiting hearsay.'" *Strauss v. Credit Lyonnais,* 925 F.Supp.2d 414, 438 (E.D.N.Y. 2013) (citation omitted). Plaintiffs are doing what the district

court in *Strauss* cautioned against, and are impermissibly using Morey's "expert" status to permit a jury to hear third-party statements of unidentified individuals who will likely never be able to be cross-examined as to their veracity and accuracy.  As neither of Morey's expert reports (the March 6 version and the June 11 version) come close to meeting the *Daubert* standards for admissibility concerning NSRC's and CSXT's purported culpability, he should not be permitted to testify at trial regarding his opinions and conclusions.

> B.   *Morey's Conclusion That The Paulsboro Bridge Was Defectively Designed Is Not Admissible*

In discussing Morey's conclusions with respect to the Defendants' alleged negligence in not including span locks or end wedges on the Paulsboro Bridge, Plaintiffs ignore the fact that he did not use any scientific or engineering analysis in reaching these conclusions.  It is undisputed that Morey did not inspect the locks that were used on the bridge and made only a single, non-contemporaneous inspection of the accident site in August 2014, almost 2 years after the accident.  (Morey Tr., 166:7-24 -167: 1-13; Morey Report, at 4).  He also acknowledges that the Federal Railroad Administration ("FRA") has not to this point required the installation of end wedges and span locks on moveable bridges.  (Morey Dec., ¶ 25).  Given the fact that he acknowledged that he has never recommended in past that older bridges, such as the one in Paulsboro, be retrofitted with span locks and end wedges, there is no basis for his conclusion.  As was the case in the Third Circuit's opinion in *Oddi v. Ford Motor Co.*, 234 F.3d 136 (3d Cir. 2000), Morey is relying on *ipse dixit*, rather than a scientific analysis of the bridge and the circumstances of the accident.  Basically, all Morey does is parrot the suggestions of the American Railway Engineering and Maintenance of Way Association (AREMA) for span locks and end wedges.   (Morey Dec., ¶ 25).  As such, any opinions Mr. Morey has on this subject are not likely to be helpful to a jury in understanding the causes of the derailment.

C.     *Morey Admittedly Is Not An Expert On Bridge Derailments*

At his deposition, Morey candidly admitted that that he did not consider himself an expert on the cause of bridge derailments:

> Q:     Do you consider yourself an expert in determining the cause of a derailment?
>
> A:     Not an expert.

(Morey Tr., 144:14-17).

In his supplemental declaration Morey belatedly tries to play down this admission by recounting an instance where his former employer, Bergmann Associates, was selected to examine the failure of a moveable bridge in Washington State which, apparently, according to Mr. Morey, had some characteristics similar to the Paulsboro derailment.  (Morey Dec.¶ 17). Again, none of this was disclosed in Morey's March 6 report, or at his deposition.  However, the main tactic they utilize to avoid the import of this admission is to play word games. Thus, Plaintiffs attempt to shift the focus on Mr. Morey's statement during his deposition that he had not testified as to certain topics as an expert before (with respect to railroad management in particular, see Plaintiffs' Response, at 16).  However, that is not what is at issue here.  What Mr. Morey said during his depositions went beyond his admission that he had never <u>testified</u> as a railroad derailment expert; he testified that he was not an expert on derailments, period.

Mr. Morey's supplemental report, while it is intended to bolster his credentials, only serves to create more questions as to his qualifications to opine on the cause of the derailment. He claims now to be an "expert" on derailments due to the fact that "he has reviewed and witnessed train derailments in [his] past experience."  (Morey Dec., ¶ 38).  It is readily apparent, though, that he lacks even the most basic knowledge of what occurred at the Paulsboro bridge on November 30, 2012, since he states that while "derailments on bridges is not uncommon …,

10

rarely does the  bridge <u>collapse</u> in such cases."  (Morey Dec., ¶ 38) (emphasis added).  Quite simply, the Paulsboro bridge did not "collapse."  What happened is that, while traveling across the bridge on the morning November 30, 2012, seven railcars derailed.  (Morey Report, at 6). The bridge itself was still intact following the derailment.  Morey's inability to acknowledge this most basic fact amply demonstrates his lack of methodology, and shows him to be simply parroting the same inaccurate accusations made by the Plaintiffs.

        D.        <u>*Morey's Opinion That The Crew Was Not Qualified To Inspect The Bridge*</u>

It must be noted again that, in seeking to bolster his flawed methodologies with respect to the qualifications of the train crew on the day of the derailment, Mr. Morey's supplemental declaration (and Plaintiffs' Response to the Motion to Exclude) adds numerous references to testimony and evidence that were not cited in his initial report.  For example, in their Response, Plaintiffs' specifically reference the deposition testimony of the train conductor, Wilbert den Oueden, which was not previously referenced in Mr. Morey's intial report (or his own subsequent deposition).  (*See* Plaintiffs' Response, at 27 (citing to Den Ouden deposition testimony)).  This deposition testimony specifically references his purported lack of classroom training on inspecting moveable bridge locks, not referenced in his initial report.  However, this does not change the fact that Morey's testimony will not be helpful to a jury.  Mr. Den Ouden testified concerning his training, and a jury is well-equipped to determine whether he was qualified to inspect the locks on the bridge on the morning of the derailment.

## <u>CONCLUSION</u>

Defendants, Consolidated Rail Corporation, Norfolk Southern Railway Company and CSX Transportation, Inc., respectfully request that this Honorable Court exclude the proffered expert report and testimony of Carl F. Morey, PE.

Respectfully Submitted,

*/s/ Brian D. Pagano*
Brian D. Pagano, Esquire
BURNS WHITE LLC
1800 Chapel Avenue West, Suite 250
Cherry Hill, NJ  08002
(856) 382-6006
Email: *bdpagano@burnswhite.com*

*Attorney for Defendants,*
*Consolidated Rail Corporation, Norfolk Southern*
*Railway Company and CSX Transportation, Inc.*

12

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 2nd day of July, 2015, a copy of the within Reply Memorandum in Support of Defendants Consolidated Rail Corporation, Norfolk Southern Railway Company and CSX Transportation Inc.'s Memorandum of Law in Support of Motion to Exclude Expert Testimony of Plaintiffs' Liability Expert, Carl F. Morey, was served on all counsel of record via efile.

BURNS WHITE LLC

By:    /s/ Brian D. Pagano
       Brian D. Pagano, Esquire
       1800 Chapel Avenue West, Suite 250
       Cherry Hill, NJ  08002
       (856) 382-6006

       *Attorneys for Defendants,*
       *Consolidated Rail Corporation, Norfolk*
       *Southern Railway Company, and CSX*
       *Transportation, Inc.*