**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

| | | |
|---|---|---|
| **IN RE PAULSBORO DERAILMENT CASES** | : | **MASTER DOCKET NO.: 13-CV-784 (RBK/KMW)** |
| **ALICE BREEMAN *et al.*,** <br> **Plaintiff,** <br> **vs.** <br> **CONSOLIDATED RAIL CORPORATION, *et al.*,** <br> **Defendants.** | : | **CASE NO. 1:12-cv-7468 (RBK/KMW)** |

**DEFENDANTS CONSOLIDATED RAIL CORPORATION, NORFOLK SOUTHERN RAILWAY COMPANY AND CSX TRANSPORTATION, INC.'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF GREG YARWOOD, PH.D.**

Filed on behalf of Defendants,
Consolidated Rail Corporation,
Norfolk Southern Railway Company,
and CSX Transportation, Inc.

Counsel of Record for This Party:

Brian D. Pagano, Esquire

BURNS WHITE LLC
1800 Chapel Avenue West, Suite 250
Cherry Hill, NJ 08002
(856) 382-6006

**TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT .......... 1
II. STATEMENT OF FACTS .......... 3
III. LAW AND ARGUMENT .......... 4

A. Standards for Admission of Expert Testimony .......... 4
B. Plaintiff's Critique of Dr. Yarwood's Modeling Inputs is A Red Herring, as the Purpose of a Rebuttal Report is to Refute the Methodology of the Adverse Party .......... 5
C. Dr. Yarwood's Opinions on the Rate of Decomposition of Vinyl Chloride are Reliable and Fit the Facts of the Case .......... 7
D. The Decomposition Products of Vinyl Chloride in the Atmosphere are Scientific Fact, not the *Ipse Dixit* of Dr. Yarwood .......... 10
E. Dr. Georgopolous' Declaration Improperly Seeks to Supplement His Initial Report and Should be Stricken .......... 12

IV. CONCLUSION .......... 14

# TABLE OF AUTHORITIES

## Cases

*Beller v. United States*, 221 F.R.D. 696 (D.N.M.) ........ 13, 14

*Breidor v. Sears, Roebuck and Co.*, 722 F.2d 1134 (3d Cir. 1983) ........ 10

*Callahan v. A.E.V. Inc.*, 182 F.3d 237 (3rd Cir. 1999)........ 5

*Crowley v. Chait*, 322 F. Supp. 2d 530 (D.N.J. 2004) ........ 6

*Eclipse Electronics v. Chubb Corp.*, 176 F. Supp. 2d 406 (E.D. Pa. 2001)........ 5

*1st Source Bank v. First Resource Bank Fed. Credit Union*, 167 F.R.D. 61 (N.D. Ind. 1996) ........ 6

*Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777 (3d Cir. 1996) ........ 4

*Kannankeril v. Terminix Int'l Inc.*, 128 F.3d 802 (3d Cir. 1997)........ 4, 10

*Maloney v. Microsoft Corp.*, 2011 U.S. Dist. LEXIS 127870 (D.N.J. Nov. 4, 2011) ........ 4

*Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 401 F.3d 901 (8th Cir. 2005) ........ 10

*Pineda v. Ford Motor Co.*, 520 F.3d 237 (3d Cir. 2008) ........ 4

*Sancom, Inc. vs. Quest Comm. Corp.*, 683 F. Supp. 2d 1043 (D.S.D. 2010)........ 13

*Schneider v. Fried*, 320 F.3d 396 (3d Cir. 2003) ........ 5

*United States v. Velasquez*, 64 F.3d 844 (3d Cir. 1995) ........ 6

*Voilas v. Gen. Motors Corp.*, 73 F. Supp. 2d 452 (D.N.J. 1999)........ 6

## Rules

Fed. R. Evid. 402........ 4

Fed. R. Civ. P. 26(e)........ 13

*In Re: Asbestos Liability Lit.*, 289 F.R.D. 424 (E.D. Pa. 2013) ........ 13

Paoli R.R. Yard PCB Litig. 35 F.3d 717 (3rd Cir. 1994)........ 10

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

| | | |
|---|---|---|
| **IN RE PAULSBORO DERAILMENT CASES** | : | **MASTER DOCKET NO.: 13-CV-784 (RBK/KMW)** |
| **ALICE BREEMAN *et al.*,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**CONSOLIDATED RAIL CORPORATION, *et al.*,**<br><br>**Defendants.** | : | **CASE NO. 1:12-cv-7468 (RBK/KMW)** |

**DEFENDANTS CONSOLIDATED RAIL CORPORATION, NORFOLK SOUTHERN RAILWAY COMPANY AND CSX TRANSPORTATION, INC.'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF GREG YARWOOD, PH.D.**

NOW COME Defendants, Consolidated Rail Corporation, Norfolk Southern Railway Company and CSX Transportation, Inc. ("Defendants"), by and through their counsel, Burns White LLC, and submit this Memorandum of Law in Opposition to Plaintiff's Motion to Exclude the Expert Report and Testimony of Greg Yarwood, Ph.D.

## I. PRELIMINARY STATEMENT

Recognizing the significant reliability problems with her own modeling expert, Panos Georgopoulos, Ph.D., Plaintiff's obvious strategy is to muddy the waters with a challenge to Defendant's rebuttal expert in the hopes that the Court will simply call a draw between the sides and

not exclude either. However, Defendants have asserted a significant and well-documented challenge to Dr. Georgopoulos' methodology and the reliability of his opinions under *Daubert*. In contrast, Plaintiff's shotgun objections to Dr. Yarwood's opinions are wholly devoid of substance.

Plaintiff contends that Dr. Yarwood should not be permitted to provide the jury with his evaluation of the scientific accuracy of Dr. Georgopoulos' opinions concerning the photodecomposition of vinyl chloride released from a railcar as the result of the November 30, 2012 train derailment in Paulsboro, New Jersey. Under the Federal Rules and the controlling case law, if Dr. Georgopoulos is allowed to present his deeply flawed model and resultant data to the jury, then Defendants' must be permitted to present Dr. Yarwood's opinions which rebut Dr. Georgopoulos' approach and calculations.

Plaintiff's obvious pretext behind this specious *Daubert* challenge is to cure the deficiencies in Dr. Georgopoulos' opinions, as evidenced by the fact that in her motion papers, Plaintiff includes a declaration of Dr. Georgopoulos, which improperly injects new grounds to support his opinions in this matter. However, because Dr. Georgopoulos' declaration is essentially a supplemental expert report that has been submitted in contravention of the rules, it must be disregarded.

Ultimately, there can be no question that Dr. Yarwood's opinions are proper rebuttal on Dr. Georgopoulos' methodology to determine the amount and content of decomposition products that Plaintiff may have been exposed to following the derailment - which Plaintiff has the burden to prove at trial. Dr. Yarwood's opinions are not only reliable, but they amply fit the claim to be tried here, and will be manifestly helpful to the jury. Plaintiff's discontentment with Dr. Yarwood's opinion represents, at best, grounds for cross-examination, not wholesale exclusion of his entire opinion. Accordingly, Plaintiff's motion should be denied in its entirety.

## II. STATEMENT OF FACTS

Greg Yarwood, Ph.D. is a highly regarded chemist with over twenty-five (25) years of experience in air-related research. His primary areas of expertise are atmospheric chemistry and photochemical modeling, including the evaluation of photochemical reactions, like those at issue in this case. He has authored more than one hundred (100) scientific papers and presentations related to atmospheric chemistry, photochemical modeling and related subjects. He has substantial experience in developing photochemical modeling systems that simulate atmospheric chemistry and air quality, including developing and evaluating photochemical reaction mechanisms and implementing them into the models. A copy of Dr. Yarwood's curriculum vitiate is attached hereto as Exhibit A.[1]

As Plaintiff has recognized, Defendants retained Dr. Yarwood to review and critique the March 20, 2015 report prepared by Plaintiff's expert, Panos Georgopoulos, Ph.D. In sum, Dr. Georgopoulos suggests that vinyl chloride would have quickly decomposed in the atmosphere in the hours following the derailment. He further suggests that formyl chloride, one of the decomposition products of vinyl chloride, would have rapidly decomposed to hydrochloric acid, thereby creating additional harmful exposures to Plaintiff.

Based on his review of the Georgopoulos' report and its supporting materials, Dr. Yarwood prepared a report critiquing Dr. Georgopoulos' methodology in estimating the rate of decomposition of vinyl chloride, as well as the potential products of decomposition. *See* April 20, 2015 Yarwood Report, attached hereto as Exhibit B. Specifically, Dr. Yarwood opines as follows:

- Dr. Georgopolous overestimates the rate of decomposition of vinyl chloride during the hours immediately following the train derailment because he does not consider that the intensity of sunlight changes through the day. Atmospheric decomposition of vinyl chloride would have

[1] Notably, Plaintiff does not challenge Dr. Yarwood's qualifications in their motion.

been very slow at the time of the derailment and therefore nearly all of the material released at the time of the derailment would have remained as vinyl chloride for hours.

- Dr. Georgopolous miss-identifies several chemical compounds as potential products of the decomposition of vinyl chloride during the hours immediately following the train derailment.[2] In some laboratory experiments, formyl chloride decomposes in minutes to hydrochloric acid (HCl) and carbon monoxide (CO), but the conditions of these experiments are not relevant to the atmosphere in the vicinity of Paulsboro. To the small extent that vinyl chloride decomposed in the atmosphere in the vicinity of Paulsboro, the primary chemicals formed in the atmosphere by decomposition were formaldehyde (HCHO) and formyl chloride (ClHCO).

## III. LAW AND ARGUMENT

### A. Standards For Admission Of Expert Testimony.

"The Rules of Evidence embody a strong and undeniable preference for admitting any evidence which has the potential for assisting the trier of fact." *Kannankeril v. Terminix Int'l Inc.*, 128 F.3d 802, 806 (3d Cir. 1997) (citing *Holbrook v. Lykes Bros. S.S. Co*., 80 F.3d 777, 780 (3d Cir. 1996)); *see also* Fed. R. Evid. 402 ("Relevant evidence is admissible."). If expert evidence is admissible, the trier of fact will determine the proper weight to give it. *Maloney v. Microsoft Corp*., 2011 U.S. Dist. LEXIS 127870, at *6-7 (D.N.J. Nov. 4, 2011).

Accordingly, "Rule 702, which governs the admissibility of expert testimony, has a liberal policy of admissibility." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008). Expert testimony is admissible under Rule 702 if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id*. The Third Circuit has recognized this "trilogy of restrictions on expert testimony" under Rule 702: "qualification, reliability, and fit,"

---

[2] Dr. Georgopolous identified the decomposition products of vinyl chloride as "hydrochloric acid, formaldehyde, formyl chloride, acetylene, chloroacetaldehyde, chloroacetylchloranil, and chloroethylene epoxide." However, Plaintiff's motion does not refute Dr. Yarwood's opinion that acetylene, chloroacetaldehyde, chloroacetylchloranil, and chloroethylene epoxide would not be formed from vinyl chloride reacting with hydroxyl radical. *See* Yarwood Rep. at 4. Presumably, Plaintiff has conceded this point.

along with several non-exclusive factors. *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). The Third Circuit has cautioned that 'the evidentiary requirement of reliability is lower than the merits standard of correctness."' *Pineda*, 520 F.3d at 247 (citation omitted); *Eclipse Electronics v. Chubb Corp*., 176 F. Supp. 2d 406, 413 (E.D. Pa. 2001) ("In determining the reliability of expert testimony, the standard is lower than one of correctness, and need not be right, only based on good grounds").

**B. Plaintiff's Critique of Dr. Yarwood's Modeling Inputs is A Red Herring, As The Purpose Of A Rebuttal Report Is To Refute The Methodology Of The Adverse Party.**

Plaintiff's argument that Dr. Yarwood should be excluded because his opinion is based on a "novel methodology" that has never been used before, suffers from a fundamental misunderstanding of Dr. Yarwood's role as a rebuttal witness. Pl. Mem. at 1. Fed. R. 26(a)(2)(C)(ii) explicitly acknowledges that some expert testimony "is intended solely to contradict or rebut evidence on the same subject matter identified by another [expert]." As the Third Circuit has acknowledged, the Federal Rules "make no distinction between the permissible uses of 'regular' experts and 'rebuttal' experts." *Callahan v. A.E.V. Inc*., 182 F.3d 237, 259 (3rd Cir. 1999) (allowing use of rebuttal expert's report in the case-in-chief at trial).

As his report outlines, it is undisputed that Dr. Yarwood's role was to conduct a "review and evaluation of the scientific accuracy of the reports, methodologies, and calculations of Plaintiff's expert[], Dr. Panos Georgopoulos."[3] Yarwood Rep. at 2. Indeed, the first sentence of Plaintiff's motion *in limine* concedes this point. Pl. Mem. at 1 ("Defendants seek to offer Greg Yarwood Ph.D., as an expert witness to attack the opinion of Plaintiff's expert, Professor Panos

[3] As noted in his report, Dr. Yarwood was also retained to review the report of Plaintiff's expert, Dr. Robert Laumbach. However, because Dr. Laumbach is not listed as an expert in this case, his rebuttal opinions are not discussed in Plaintiff's motion, or herein.

Georgopoulos"). Accordingly, Dr. Yarwood's critique of Dr. Georgopoulos' report is just that - an identification of its flaws.

As a rebuttal expert retained solely to opine as to the reliability of Dr. Georgopoulos' methodology, Dr. Yarwood was not required to prepare his own model, but he did so to illustrate the effect of diurnal variation of solar radiation (i.e. that the intensity of sunlight changes throughout the day), a factor that Dr. Georgopoulos wholly failed to consider. Accordingly, any critique of his purported model, or the baseline hydroxyl radical he selected, is not fatal to the admission of his opinion. "All that is required [of an expert rebuttal report] is for the information to repel other expert testimony." *Crowley v. Chait*, 322 F. Supp. 2d 530. 551 (D.N.J. 2004); *see also Voilas v. Gen. Motors Corp.*, 73 F. Supp. 2d 452, 461 (D.N.J. 1999) (admitting expert testimony over objection that expert "employed no particular methodology but simply reviewed [defendant's] own analyses"); *United States v. Velasquez*, 64 F.3d 844, 848 (3d Cir. 1995) (trial court erred by excluding defense expert whose "testimony as a critic of [the methodology employed by the government's expert] would have assisted the jury in evaluating the Government's expert witness"). Rebuttal expert witnesses are permitted to "criticize ... [another expert's theory] without offering alternatives." *1st Source Bank v. First Resource Bank Fed. Credit Union*, 167 F.R.D. 61, 65 (N.D. Ind. 1996).

As he was retained to do, Dr. Yarwood clearly pointed out numerous errors in Dr. Georgopoulos' report that serve to highlight the deficiencies, and hence reliability, of Dr. Georgopoulos' opinions in this matter. Accordingly, any arguments regarding Dr. Yarwood's "novel methodology" are misguided.

**C. Dr. Yarwood's Opinions on the Rate of Decomposition of Vinyl Chloride are Reliable and Fit The Facts Of The Case.**

Plaintiff attacks the reliability of Dr. Yarwood's rebuttal opinion on two bases: (1) the baseline he chose for the concentration of hydroxyl radical in the atmosphere (1 x $10^6$ molecules/$cm^3$) is an obsolete number based on a 1999 text book; and (2) his methodology of using UV-A concentrations to estimate the hydroxyl radical (OH) concentration in the atmosphere is unproven. Pl. Opp. at 5. Both of these critiques are erroneous.

One of the primary flaws that Dr. Yarwood noted in Dr. Georgopoulos' methodology is that in estimating the rate of decomposition of vinyl chloride due to hydroxyl radicals, Dr. Georgopolous assumes a *constant* hydroxyl radical concentration of 1.5x$10^6$ molecules/$cm^3$. Yarwood Rep. at 7. However, the hydroxyl radical concentration is not constant during daylight hours because formation of hydroxyl radical in the atmosphere depends upon the presence and strength of ultraviolet light from the sun. *Id.* Solar radiation is much weaker just after sunrise than at noon because the sun is low in the sky. *Id.*

Failing to acknowledge the fact that Dr. Georgopoulos' model does not account for diurnal variations in solar radiation, Plaintiff instead attempts to criticize the "obsolete" 1 x 106 molecules/cm3 baseline hydroxyl radical concentrations used by Dr. Yarwood, noting that Dr. Georgopolous' instead references the ATSDR for his baseline of 1.5x106 molecules/cm3. However, Plaintiff's argument misses the mark. Dr. Yarwood acknowledges that the ATSDR figure is not unreasonable as a daily average concentration, but instead explains that it is inappropriate in this scenario where the key exposures were limited to a number of hours:

Q: Do you think it would be unreasonable for someone doing this kind of work to use a daytime average OH concentration of 1.5 times 10 to the 6th?

A: I think it depends upon the time horizon of your interest. If you're interested in what's going to happen over several days, then assuming a daily average

> concentration may provide you with a serviceable answer. But if you're interested in what's going to happen in a matter of hours, ***using a daytime average . . . could have serious limitations as a method.***

Yarwood Dep. at 65-66 (emphasis added).

Likewise, while Defendants do not dispute that other studies reference higher concentrations, Plaintiff has wholly failed to show how studies in China, Colorado, or Houston, Texas are analogous to the atmosphere in Paulsboro, New Jersey (i.e. location, time of year, etc.). In fact, a closer look at the studies demonstrates that the higher concentrations cited by Plaintiff are completely non-comparable. For example, Dr. Georgopoulos' declaration states that Houston, Texas is similar to Paulsboro because they both have refineries, and that a 2009 study in Houston found levels of hydroxyl radical that were ten times higher than the concentration proposed by Dr. Yarwood. Geo. Dec. at ¶17. However, Plaintiff fails to either recognize or acknowledge that Houston has large numbers of both petrochemical plants and oil refineries that create significant ozone air pollution problems in the Houston area. In fact, a review of the EPA website demonstrates that the major constituents of HRVOC in Harris County, Texas in 2012 was 3,427,987 pounds/year, over 300 times more than the major constituents of HRVOC in Gloucester County, New Jersey (10,195 pounds/year) in 2012. *See* EPA printouts at Exhibit C. Indeed, because of the increased levels of Highly-Reactive Volatile Organic Compounds (HRVOC) from petrochemical plants in Houston, Texas has introduced regulations to limit the HRVOCs, because they are powerful precursors to ozone and hydroxyl radical. *See* 30 TAC Chapter 115, Subchapter H. Because Paulsboro does not have such high levels of HRVOCs, any comparison between Paulsboro and Houston is unwarranted.

Additionally, the studies cited by Dr. Georgopoulos in his declaration actually provide further support for Dr. Yarwood's position that there is variation in hydroxyl radical concentrations

depending on the amount of sunlight. For example, Kim *et al.* clearly demonstrates that hydroxyl radical concentrations are highly variable depending on the time of day, and that Dr. Georgopoulos was in error to use a constant concentration. *See* Kim *et al.* at Figure 1(c), as cited in Geo. Dec. at ¶18.




**Figure 1.** Average diurnal variations of measurements made between 17 February and 28 February 2011 of (a) $O_3$ and HONO, (b) OH reactivity with different classes of VOCs, (c) OH and $J_{O3}(O^1D)$, and (d) NO and $NO_2$.

Likewise, the Kim study provides support for the fact that Dr. Yarwood's methodology was not as novel as Plaintiff would have this court believe. Indeed, Kim's Figure 1(c) compares hydroxyl concentration to JO3 (O1D) which is a measure of UV intensity that atmospheric scientists use. Furthermore, Kim used an air chemistry model called UWCM, originally created by Wolfe and Thornton (2011), to calculate hydroxyl concentrations. An input parameter to UCWM was JO3 (O1D) which Kim obtained from the TUV model, which is that *exact* model that Dr. Yarwood utilized in his report. Kim demonstrates that Dr. Yarwood is not the first to use a measure

of sunlight to calculate hydroxyl radical concentrations that depend upon the intensity of sunlight. Indeed, JO3 (O1D), which was used by Kim, has similar variation with time of day as UV-A.

Nevertheless, as already established, Dr. Yarwood's methodology and the results of his model, are not required for his critique of Dr. Georgopoulos. The ultimate purpose of Dr. Yarwood's testing was to see if adjusting the hydroxyl radical concentration in accordance with the solar radiation on the morning of the derailment would alter the estimated atmospheric decomposition rate of vinyl chloride, and there is no question this was accomplished. Dr. Yarwood concluded that Dr. Georgopolous overestimated the rate of decomposition of vinyl chloride during the hours immediately following the train derailment because he did not consider that the intensity of sunlight changes through the day. Further, he testified that had Dr. Georgopoulos used the most recent version of the SCIPUFF model, it would have included the capability to model the variation of solar radiation and its effect on hydroxyl concentration – an indication that his methodology was indeed missing a key component. Yarwood Dep. at 107-108. Undoubtedly, such testimony fits the facts of the case and would be helpful to a jury. Nevertheless, which side's version of the facts should be credited addresses the weight to be credited to Dr. Yarwood's opinion, not its threshold admissibility. *Breidor v. Sears, Roebuck and Co.*, 722 F.2d 1134, 1139 (3d Cir. 1983).

**D. The Decomposition Products of Vinyl Chloride in the Atmosphere are Scientific Fact, Not the *Ipse Dixit* of Dr. Yarwood.**

Plaintiff incorrectly contends that "Dr. Yarwood appears to be the only atmospheric chemist in the world who believes formyl chloride would remain stable in the atmosphere." Pl. Mem. at 11. However, alternative explanations "go[] not to the admissibility of the evidence, but to its weight." *See Kannankeril*, 128 F.3d at 808; *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3rd Cir. 1994); *Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 401 F.3d 901, 916 (8th Cir. 2005)

(complaints that studies and other factual bases for expert opinion are not well-founded go to the weight accorded to the opinions by the jury, not the admissibility).

Undoubtedly, Dr. Yarwood clearly has peer-reviewed scientific support for his theory in the Tuazon article, which demonstrates how long formyl chloride lasts as a gas. Indeed, Tuazon is important because it shows that formyl chloride has a lifetime of more than an hour as a gas. Indeed, if formyl chloride spontaneously decomposed, as Dr. Georgeopoulos contends, then Tuazon could not have kept it in that container for as long as he did. Dr. Georgopoulos' model, which has formyl chloride very rapidly decomposing in the atmosphere, is clearly contrary to the most relevant scientific evidence.

Likewise, Plaintiff distorts the findings in Hisatsune and Heicklen (1973). While Plaintiff goes to great lengths to demonstrate that only Dr. Yarwood believes that the rapid decomposition of formyl chloride in this study is the result of the glass container, Dr. Georgopoulos failed to provide any alternative theory, or attempt to distinguish these results from Tuazon.

Moreover, Dr. Yarwood does not have a "glass-container theory", as Plaintiff purports. Pl. Mem. at 8. Indeed, Dr. Yarwood agrees that formyl chloride could decay on other surfaces besides glass. *See* Yarwood Deposition, attached hereto as Exhibit D at 90, 99. In fact, in his deposition, he clearly states:

> Think about this, we have before us evidence that formyl chloride decomposition on surfaces depends on the nature of the surface. The difference between the glass reactors and the Teflon reactor; that suggests that you need to know something about how formyl chloride reacts with particular surfaces.

*Id.* at 98-99. Further, he goes on to say that the reason that the Hisatsune and Heicklen study and the study that he performed had similar results was not just because of the glass containers, but also because of the movement of the gas inside the container as the result of convention currents:

> I think it is because they both use glass in combination with the gas inside. The 200-liter reactor that we were using was not still – there was movement…[that] brought the formyl chloride into contact with the glass surfaces. And the reason I think that there was movement of the gas is that we had UV lights surrounding the glass vessel, which would cause some warming of the glass when you turn them on. And it only takes a very small temperature difference to start convection currents, mixing of the gas inside the chamber.

*Id.* at 103.

Finally, also without merit is Plaintiff's contention that Dr. Yarwood is "completely unfamiliar with authoritative texts in his field." Pl. Mem. at 1. Dr. Yarwood correctly did not rely on the organic chemistry texts referenced by Plaintiff because such texts are in the wrong field. Those texts are for the field of organic chemistry and there is a completely different set of texts for the field of atmospheric chemistry.[4]

**E. Dr. Georgopolous' Declaration Improperly Seeks To Supplement His Initial Report And Should Be Stricken.**

In the guise of exposing purported flaws in the critique expressed in Dr. Yarwood's rebuttal report, Plaintiff has submitted a declaration of Dr. Georgeopoulos which attempts to cure the deficiencies of his initial report. Specifically, paragraphs 11-20 of Dr. Georgopolous' declaration reference numerous citations to scientific articles that Dr. Georgopolous neither cited to, nor arguably considered, in preparing his initial report. This "declaration", when fairly read, is in actuality a supplemental expert report by Dr. Georgopolous, improperly submitted by Plaintiffs without leave of court, which rehashes his methodology and conclusions and criticizes Defendants' experts. It seeks to improperly inject new grounds supporting Dr. Georgopolous' Report and opinions after both his deposition and Defendants' Motion to Exclude revealed significant flaws in

[4] A list of the authority relied upon by Dr. Yarwood are included in Section V of his report. *See* Exhibit B.

his methodology. Such a tactic unfairly prejudices Defendants and violates both the letter and spirit of this Court's November 13, 2014 Scheduling Order and Fed. R. Civ. P. 26(e).

This Court should strike the declaration of Dr. Georgopoulos filed with Plaintiff's Motion to Exclude Dr. Yarwood on the basis that it constitutes an unauthorized and impermissible supplemental expert report stating new opinions and explanations in response to Defendants' rebuttal disclosure. This new expert report was filed in violation of Rule 26 and this Court's case management order, after the close of discovery, and after Dr. Yarwood's deposition was completed. Filed without leave of the Court, Dr. Georgopoulos' declaration improperly attempts to cure glaring deficiencies in his original report by setting forth for the first time assertions that could have, and should have been included in the initial disclosure. Plaintiff's failure to include this required material in its disclosure is neither substantially justified nor harmless.

While Fed. R. Civ. P. 26(e) recognizes that parties have an obligation to supplement expert reports in a timely manner if the party learns that in some material respect the report is incomplete or incorrect, such supplemental disclosures are "only for the narrow purpose of correcting inaccuracies or adding information that was not available at the time of the initial report. …" *Sancom, Inc. v. Quest Comm. Corp.*, 683 F.Supp.2d 1043, 1062-63 (D.S.D. 2010). A supplemental report may be rejected where it is offered to rebut an argument raised in a summary judgment motion, or was served merely because a party simply wished to supplement." *In re Asbestos Liability Lit.*, 289 F.R.D. 424, 425-26 (E.D. Pa. 2013). In addition, "it is not sufficient that opposing parties have the supplemental report in hand now before trial. The intent of the rule is to ensure that deposition testimony can proceed with parties already armed with the expert's report, so as to be able to evaluate the opinions to be offered." *Beller v. United States*, 221 F.R.D. 696, 700 (D.N.M.). To permit such unfettered supplementation "would create a system where preliminary reports could

be followed by supplementary reports and there would be no finality to expert reports, as each side, in order to buttress its case or position, could 'supplement' existing reports and modify opinions previously given." *Id.*, at 701. All of this would also interfere with the Court's ability to set case management deadlines, "because new reports and opinions would warrant a new round of consultation with one's own expert and virtually require new rounds of depositions." *Id.*, at 701-02.

Dr. Georgopolous' declaration is not an attempt to remedy inadvertent factual errors or amend his report based on information not previously available to him. Rather, he is specifically trying to wholesale supplement his opinions as well as fill the numerous gaps in his March 20, 2015 report that were brought to light during his deposition and in Defendants' motion to exclude him. As a result, his declaration should be stricken from the record pursuant to Rule 26(e) and this Court's Scheduling Order of November 13, 2014.

## IV. CONCLUSION

For the reasons set forth above, Plaintiff's motion to exclude the report and testimony of Greg Yarwood should be denied.

Respectfully Submitted,

*/s/ Brian D. Pagano*
Brian D. Pagano, Esquire
BURNS WHITE LLC
1800 Chapel Avenue West, Suite 250
Cherry Hill, NJ 08002
(856) 382-6012
Email: bdpagano@burnswhite.com

*Attorney for Defendants,*
*Consolidated Rail Corporation, Norfolk Southern Railway Company and CSX Transportation, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of July, 2015, a copy of the within Memorandum of Law in Opposition to Plaintiff's Motion to Exclude the Expert Report and Testimony of Greg Yarwood, Ph.D. was served on all counsel of record via e-file.

BURNS WHITE LLC

By: */s Brian D. Pagano*

Brian D. Pagano, Esquire
1800 Chapel Avenue West, Suite 250
Cherry Hill, NJ 08002
(856) 382-6012

*Attorneys for Defendants, Consolidated Rail Corporation, Norfolk Southern Railway Company, and CSX Transportation, Inc.*