# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

| | | |
|---|---|---|
| **IN RE**<br>**PAULSBORO DERAILMENT CASES** | : <br> : <br> : <br> : <br> : | **MASTER DOCKET NO.:**<br>**1:13-CV-784 (RBK/KMW)** |

| | | |
|---|---|---|
| **BRYAN EVERINGHAM, RYAN**<br>**RAGONE, MARLO JOHNSON, AND**<br>**ROBERT VAN FOSSEN**<br>　　　　　　　**Plaintiffs,**<br><br>**v.**<br><br>**CONSOLIDATED RAIL**<br>**CORPORATION,** *et al.,*<br><br>　　　　　**Defendants.** | :<br>:<br>:<br>: **CIV NO.**<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | **1:13-CV-3350**<br>**1:13-CV-7410**<br>**1:13-CV-4569** |

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF ROBERT LAUMBACH, M.D., M.PH., C.I.H

## TABLE OF AUTHORITIES

**Cases**

*Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171 (6th Cir. 2009) .......................... 11-12

*BP Amoco v. Flint Hills Res.*, 2009 U.S. Dist. LEXIS 131282, at \*16 (N.D. Ill. June 3, 2009) .................................................................................................... 9

*Cavallo v. Star Enter.*, 892 F. Supp. 756, 774 (E.D. Va. 1995) ............................. 8

*Creanga v. Jardal*, 185 N.J. 345, 360 (2005) ...................................................... 15

*CSX Transp., Inc. v. Moody*, 2007 Ky. App. LEXIS 208, at \*18-19 (Ky. Ct. App. July 13, 2007) ...................................................................................................... 6

*Ellis v. Int'l Playtex, Inc.*, 745 F.2d 292, 303 (4th Cir. 1984) .......................... 10-11

Fed. R. Evid. 402 ..................................................................................................... 1

*Feit v. Great W. Life & Annuity Ins. Co.*, 271 Fed. App'x 246, 254 (3d Cir. 2008) ............................................................................................................................. 15

*Giordano v. Market Am., Inc.*, 289 Fed. App'x 467, 469 (2d Cir. 2008) ................. 7

*Harris v. Peridot*, 313 N.J. Super 257, 298 (N.J. Super. Ct. - App. Div. 1998) ....... 7

*Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 157 (3d Cir. 1999) ............ 5-6, 11, 14, 15

*In re Ephedra Prods. Liab. Litig.*, 2007 U.S. Dist. LEXIS 74914, at \*7 (S.D.N.Y. Oct. 5, 2007) ......................................................................................................... 7

*In re Nautilus Motor Tanker Co.*, 85 F.3d 105, 113 (3d Cir. 1996) ....................... 10

*In re Stand 'N Seal Prods. Liab. Litig.*, 623 F. Supp. 2d. 1355, 1371-72 (N.D. Ga 2009) ...................................................................................................................... 7

*Kannankeril v. Terminix Int'l Inc.*, 128 F.3d 802, 806 (3d Cir. 1997) .......... 1, 2-4, 5

*Kudabeck v. Kroger Co.*, 338 F.3d 856, 862 (8th Cir. 2003) ................................ 11

*Lewis v. Airco*, 2011 NJ Unpublished LEXIS 191400 at \*20 (App. Div.) .............. 10

*Louderback v. Orkin Exterminating Company*, 26 F. Supp. 2d 1298, 1306-07 (D. Kan. Oct. 14, 1998) ................................................................................................ 6

*Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 614 (D.N.J. 2002) ......................................................................................................... 9

*Maloney v. Microsoft Corp.*, 2011 U.S. Dist. LEXIS 127870, at \*6-7 (D.N.J. Nov. 4, 2011) .................................................................................................................. 1

*Milward v. Acuity Specialty Prods. Group*, 639 F.3d 11, 17 (1st Cir. 2011) ........... 8

*Nagle v. Alspach,* 8 F.3d 141, 143 (3d Cir. 1993) ................................................ 16

*Nat'l Bank of Commerce v. Dow Chemical Co.*, 965 F. Supp. 1490, 1525 (E.D. Ark. 1996) ............................................................................................................. 8

*Paoli III*, 35 F.3d 717, 742, n.8 (3rd Cir. 1994) ................................ 13, 14, 15

*Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) ................................. 1

*Taylor v. Union Pacific Railroad Co.* 2010 U.S. District LEXIS 96802, at \*12-12, 24-26 (S.D. Ill. Sept. 16, 2010) ............................................................................ 9

i

*Theer v. Philip Carey Co.*, 133 N.J. 610, 627 (N.J. 1993)....................................... 16

*Thomas v. CMI Terex Corp.*, 2009 U.S. Dist. LEXIS 86623, at *40 (D.N.J. Sept. 21, 2009) (Simandle, J.)........................................................................... 4

*Whitlock v. Pepsi Ams.*, 527 Fed. App'x 660, 661-662 (9th Cir. 2013) ................... 6

*Winnicki v. Bennigan's, et al.*, 2006 U.S. Dist. LEXIS 5568 (D.N.J. Feb. 9, 2006) 5

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 294 (3d Cir. 2012)........................ 1

## ARGUMENT

"The Rules of Evidence embody a strong and undeniable preference for admitting any evidence which has the potential for assisting the trier of fact." *Kannankeril v. Terminix Int'l Inc.*, 128 F.3d 802, 806 (3d Cir. 1997) (citing *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 780 (3d Cir. 1996)); *see also* Fed. R. Evid. 402 ("Relevant evidence is admissible."). If expert evidence is admissible, the trier of fact will determine the proper weight to give it. *Maloney v. Microsoft Corp.*, 2011 U.S. Dist. LEXIS 127870, at *6-7 (D.N.J. Nov. 4, 2011).

In considering pre-trial challenges to expert testimony, Rule 702 has "three major requirements: (1) the proffered witness must be an expert, *i.e.*, must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008).[1] "A district court's inquiry under Rule 702 is 'a flexible one' and must be guided by the facts of the case." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 294 (3d Cir. 2012).

### I.    Dr. Laumbach did not rely on the NTSB's report.

Defendants falsely claim that Dr. Laumbach "*relied* upon the NTSB Accident Report and Factual Report as the underlying basis for *all* of his opinions in this case." Defs. Br. at 6 (emphasis added). Although Dr. Laumbach reviewed the NTSB's Accident Report, he did not "rely" on it to support his substantive

---

[1] Defendants do not challenge Dr. Laumbach's qualifications.

1

opinions. On the contrary, he relied on a mountain of exposure-levels evidence cited in his report, including the Air Quality Consultation of the New Jersey Department of Health and the Air Modeling Report of Dr. Georgopoulos, both of which confirm that the levels were, in fact, very high.

During his deposition, Dr. Laumbach referenced the NTSB, NJ DOH, the EPA, ALOHA modeling, and Dr. Georgopoulos collectively merely to note the universal agreement of credible sources that exposure levels were very high. His casual reference to the NTSB is inconsequential to the opinions he will offer at trial. Defendants' argument for exclusion under 49 U.S.C. § 1154(b) is thus a red herring and should be summarily rejected.

**II.    Dr. Laumbach used well-established and generally accepted methodology to opine on general causation.**

**A.    Dr. Laumbach's general causation opinion easily survives under *Kannankeril v. Terminix Int'l*, 128 F.3d 802 (3d Cir. 1997).**

In *Kannankeril*, the plaintiff claimed he had a cognitive impairment caused by exposure to pesticides applied by Terminix. The trial court struck the expert's causation testimony on grounds that there was no air-testing sufficient to support the expert's opinion about the plaintiff's exposure and that the expert's opinion on causation was unreliable and unsupported by fact, the same arguments made by Defendants here. The Third Circuit reversed. In discussing the exposure, the Third Circuit rejected the notion that the plaintiff's expert had to rely on ambient

2

air tests (which were not conducted until 9 months after the application of

pesticides), and found it sufficient for the expert to look at Terminix's application

records showing when, how much and where pesticide had been applied.

*Kannankeril*, 128 F.3d at 808-809.  Critical to the instant motion, the Third Circuit

in *Kannankeril* held that "***all factual evidence*** of the presence of the chemicals in

the residence should be relevant in forming an expert opinion of causation." *Id.* at

809 (emphasis added).  The Third Circuit's holding cements the principle that

*Daubert* reliability determinations must be made upon consideration of the full

evidentiary record, which will dictate whether or not certain exclusionary

principles are apt.

In this case, although there are no precise measurements of Plaintiffs'

exposure, it is undisputed that at least 23,000 gallons of vinyl chloride were

released into the environment and that this amount of vinyl chloride would fill up a

cloud over 27,000 cubic meters in size of 100% Vinyl Chloride.  This is more than

analogous to the "application records of how much pesticide was applied" in the

*Kannankeril* case.  If that were not enough, there is substantial evidence that

Plaintiffs were present in this fog for several hours.  And then there is Dr.

Georgopoulos's model and the NJ DOH report, both of which document extensive

levels of exposure and demonstrate that Plaintiffs' locations on November 30,

2012 subjected them to those high levels.[2]

In *Kannankeril,* the expert's methodology was indistinguishable from that employed by Dr. Laumbach here: "The temporal relationship and nature of his complaints led me to conclude that with reasonable medical certainty the cause of Dr. Kannankeril's central nervous system manifestations of toxicity is exposure to Dursban." *Kannankeril, supra,* 128 F.3d at 805. The Third Circuit concluded that because the plaintiff's expert had based his opinion on the plaintiff's medical records and reports of the volume of pesticide applied and his general experience, general medical knowledge, standard text books, and standard references, the experts "opinion on causation has a factual basis and supporting scientific theory."

There is a legion of case-holdings in line with Dr. Laumbach's methodology – that an acute exposure closely followed by symptoms known to result from that exposure provides good grounds for an expert's opinion on causation. *See, e.g., Thomas v. CMI Terex Corp.,* 2009 U.S. Dist. LEXIS 86623, at *40 (D.N.J. Sept. 21, 2009) (Simandle, J.) ("The question of causation can be resolved by a doctor without even medical testing, where the temporal proximity between an accident

---

[2] Because this extensive exposure evidence supports Dr. Laumbach's opinions, there is no need to discuss Defendants' pointless attack on the ALOHA model. *See* Defs. Br. at 14-16. In addition, we respond to the attack on Dr. Georgopoulos's air model in our opposition to Defendants' motion to exclude his testimony. It suffices to say here that "when direct measurements cannot be made, exposure can be measured by mathematical modeling, in which one uses a variety of physical factors to estimate the transport of the pollutant from the source to the receptor." Reference Manual on Scientific Evidence, p. 424 (2d ed. 2000).

and the subsequent injury make the accident the most probable cause of the injury.") (and collecting cases). In *Winnicki v. Bennigan's, et al.*, 2006 U.S. Dist. LEXIS 5568 (D.N.J. Feb. 9, 2006) (Greenaway, Jr.), for example, the court evaluated expert testimony in a case in which the plaintiff ate a Caesar salad the night before he became sick with acute gastrointestinal dysfunction, which led to kidney failure and death. Although the expert could never determine exactly what was wrong with the salad, he opined that the salad was the cause of the condition using a differential diagnosis and temporal relationship. The court denied the defendant's motion to exclude the expert, citing Third Circuit precedent (*e.g.*, *Kannankeril*) accepting "medical testimony that relies heavily on a temporal relationship between and illness and a causal event." *Id.* at *46.

**B.    Causation can be established in the absence of a precise measurement, particularly where, as here, there is abundant evidence of substantial exposure.**

The only distinction between the defense expert's (Dr. Greenberg) methodology and that of Dr. Laumbach is that Dr. Greenberg would require idiosyncratic measurement of exposure to conclude that there is a completed exposure pathway. But that was not required by the New Jersey DOH, nor is it required by the pertinent case law.[3] As the Third Circuit explained in *Heller v.*

---

[3] Of course, record evidence already shows that, according to the New Jersey DOH, "[i]n Paulsboro there *was* a completed exposure pathway to Vinyl Chloride in the hours and days following the derailment . . . ." Laumbach Dec. at ¶ 7

5

*Shaw Indus., Inc.*, 167 F.3d 146, 157 (3d Cir. 1999), "even absent hard evidence of the level of exposure to the chemical in question, a medical expert could offer an opinion that the chemical caused plaintiff's illness." As another court has explained, in rejecting a railroad's *Daubert* challenge:

> We disagree with CSX that in order to validate the testimony of the medical experts, Moody was required to prove the precise dosage of solvents to which he was exposed and the precise level required to have a harmful effect on human beings. * * *
> He presented testimony concerning how often he used the offending solvents and the duration of his exposure. He further explained the physical symptoms that he suffered while working with the solvents. While not quantitatively specific, the expert testimony supports the conclusion that Moody's exposure, under the circumstances described, and his length of the exposure, are sufficient to cause his toxic encephalopathy.

*CSX Transp., Inc. v. Moody*, 2007 Ky. App. LEXIS 208, at *18-19 (Ky. Ct. App. July 13, 2007); *see also Whitlock v. Pepsi Ams.*, 527 Fed. App'x 660, 661-662 (9th Cir. 2013) ("Plaintiffs' *probable* ingestion of TCE-contaminated groundwater," coupled with the fact "that the alleged TCE and chromium exposure levels were 'within [a] reasonable range of that known [from several studies] to induce' the alleged injuries" was sufficient for expert testimony to satisfy *Daubert*; "Whether [that testimony] proves causation is not a question of admissibility.") (emphasis added); *Louderback v. Orkin Exterminating Company*, 26 F. Supp. 2d 1298, 1306-07 (D. Kan. Oct. 14, 1998) (as long as expert considered facts of plaintiff's

---

(quoting NJ DOH Air Quality Health Consultation, p. 6) (emphasis modified).

exposure, the temporal relationship between exposure and disease, the plaintiff's medical records and history of disease, then an expert's opinion on causation is considered reliable and clearly "has a factual basis and supporting scientific theory" even when there is no specific evidence of exposures in excess of the ACGIH threshold level or the EPA reference dose); *Harris v. Peridot*, 313 N.J. Super 257, 298 (N.J. Super. Ct. - App. Div. 1998) (holding that an expert could reasonably consider the fact that the injuries sustained are consistent with a high level of exposure on "both sides of the equation", i.e. as additional evidence supporting the conclusion that the exposure was substantial).

### C.   The Bradford Hill factors are not a *per se* requirement, and do not apply in cases focusing on acute exposure.

While Defendants focus almost exclusively on the Bradford Hill methodology, it does not govern a case of acute exposure causing acute injury. As noted, *supra*, courts recognize that a strong temporal relationship and immediate symptomology can support a conclusion of causation. *See, e.g., In re Stand 'N Seal Prods. Liab. Litig.*, 623 F. Supp. 2d. 1355, 1371-72 (N.D. Ga 2009) (causation opinion that exposure caused chemical pneumonitis survived *Daubert* challenge because strong temporal relationship between exposure and acute onset of respiratory symptoms, despite lack of dose/response data); *In re Ephedra Prods. Liab. Litig.*, 2007 U.S. Dist. LEXIS 74914, at *7 (S.D.N.Y. Oct. 5, 2007), *vacated and remanded on other grounds by Giordano v. Market Am., Inc.*, 289 Fed. App'x

467, 469 (2d Cir. 2008) ("The close temporal proximity between Ms. Stafford's stroke and his use of ephedra, coupled with the general-causation evidence about ephedra's rapidly acting biological effects (in contrast to asbestos), permit a jury to infer that the dose he ingested was sufficient to be considered a substantial factor in causing his stroke."); *see also Cavallo v. Star Enter.*, 892 F. Supp. 756, 774 (E.D. Va. 1995) ("[T]here may be instances where the temporal connection between exposure to a given chemical and subsequent injury is so compelling as to dispense with the need for reliance on standard methods of toxicology."); *accord Nat'l Bank of Commerce v. Dow Chemical Co.*, 965 F. Supp. 1490, 1525 (E.D. Ark. 1996).

Sir Bradford Hill himself recognized that his viewpoints could be irrelevant in the case of acute exposure to indisputably toxic chemicals. *See Milward v. Acuity Specialty Prods. Group*, 639 F.3d 11, 17 (1st Cir. 2011) ("None of my nine viewpoints can bring indisputable evidence for or against the cause-and-effect hypothesis and none can be required as a sine qua non.") (quoting Sir Austin Bradford Hill); Federal Judicial Center, Reference Manual on Scientific Evidence 600 (3d ed. 2011) ("There is no formula or algorithm that can be used to assess whether a causal inference is appropriate based on these guidelines. One or more factors may be absent even when a true causal relationship exists."). Dr. Laumbach, for his part, acknowledged the Bradford Hill viewpoints and provided a

sound basis for his alternate but consistent methodology.[4]

**D.      Vinyl chloride odor thresholds provide an acceptable basis for assessing exposure .**

Defendants' argument that "[o]dor threshold is not a valid and reliable technique for determining" chemical exposure, Defs. Br. at 12 (citing only their own expert) is false.[5] Courts routinely recognize that odor threshold is admissible as evidence of exposure when actual measurements are not available. *See, e.g., Taylor v. Union Pacific Railroad Co.* 2010 U.S. District LEXIS 96802, at *12-12, 24-26 (S.D. Ill. Sept. 16, 2010) (holding that experts could conclude the exposure to sulfuric acid in excess of OSHA limits occurred because the odor threshold was at least the OSHA limit and multiple workers could smell the odor); *BP Amoco v. Flint Hills Res.*, 2009 U.S. Dist. LEXIS 131282, at *16 (N.D. Ill. June 3, 2009) (odor threshold testimony deemed non-speculative and admissible); *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 614 (D.N.J. 2002) (same); *Roney v. Gencorp*, 2009 US Dist. LEXIS 85816 (S.D.W.V.) (denying *Daubert* challenge of expert who relied on odor threshold to estimate vinyl

---

[4]  Defendants' invocation of the latinism *"post hoc, ergo propter hoc,"* is unavailing. Dr. Laumbach does not base his opinion that Plaintiffs' exposure to vinyl chloride was substantial solely as a result of their symptomology; he bases it on evidence that Plaintiffs were situated in an area pummeled by mass quantities of vinyl chloride gas.

[5]  It is also disingenuous insofar as at least one of the Defendants has taken the exact opposite position in prior litigation. *Cf. Sunnycalb v. Csx Transp., Inc.*, 926 F. Supp. 2d 988, 998 (S.D. Ohio 2013) ("CSX argues that Dr. Green should have been allowed to testify about the odor threshold of 'chlorine gas' . . . .").

chloride exposure); *Lewis v. Airco*, Dkt # A-3509-08T3, 2011 NJ Super. Unpub.
LEXIS 1914, at *20 (N.J. Super. Ct. - App. Div. July 15, 2011) (recognizing odor
threshold as relevant to estimate exposure to vinyl chloride).

   While there may be a potential deficiency in using odor threshold with
respect to a single, unique 'smeller,' it is clear that the exposure levels here ***were***
high, because a sizable portion of the surveyed population reported smelling and
tasting unusual odors on the day of the derailment. *See* Cedar Dec. Ex. X, NJ
DOH Health Consultation, p. 8.

### E.   Dr. Laumbach's review of the New Jersey DOH survey does not diminish the reliability of any of his opinions.

   The DOH survey results are plainly admissible as public reports under Fed.
R. Evid. 803(8), and any challenge to the methodology used by the NJ DOH goes
only to the *weight* the survey evidence should be ascribed. *Cf. In re Nautilus
Motor Tanker Co.*, 85 F.3d 105, 113 (3d Cir. 1996) ("[P]ublic reports are presumed
admissible in the first instance and the party opposing their introduction bears the
burden of coming forward with enough 'negative factors' to persuade a court that a
report should not be admitted."); *Ellis v. Int'l Playtex, Inc.*, 745 F.2d 292, 303 (4th
Cir. 1984) ("Playtex's concern about the methodology of the studies should have
been addressed to the relative weight accorded the evidence and not its
admissibility."). Defendants speculate that the survey evidence was "biased," but
that is hardly a sound basis for excluding a public survey. *Cf. Ellis*, 745 F.2d at

303 ("[A]llegations of bias are purely speculative. All epidemiological studies that might implicate a manufactured product are conducted with the possibility of litigation on the horizon.").

Moreover, Defendants mischaracterize the evidence by saying the survey was "self administered" when, in fact, there were two surveys, and the door-to-door survey variety had results very similar to the mailed survey and was not self administered.  The overall pattern strongly shows symptoms were much more prevalent in people within 3,500 feet of the derailment than those further than 3,500 feet and certainly further than 4,500 feet. *Id.*

> **F.    The absence of studies or literature assessing identical high-level, non-occupational acute exposure to vinyl chloride monomer does not at all render Dr. Laumbach's general causation opinion inadmissible.**

There is no requirement "that a medical expert must always cite published studies on general causation in order to reliably conclude that a particular object caused a particular illness." *Heller v. Shaw Indus.*, 167 F.3d 146, 155 (3d Cir. 1999); *accord Kudabeck v. Kroger Co.*, 338 F.3d 856, 862 (8th Cir. 2003).  That precedent—which by itself should permit the Court to skip this portion of Defendants' argument—was applied in *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171 (6th Cir. 2009), where the Sixth Circuit reversed exclusion of plaintiff's medical expert, Dr. Moreno.  The court stated:

Based on his medical knowledge, Dr. Moreno compiled a list of

11

possible causes for the injury . . . . Lowe's strongest argument is that no published material confirms that inhalation of the chemical in Aqua EZ can cause anosmia. But 'there is no requirement that a medical expert must always cite published studies on general causation in order to reliably conclude that a particular object caused a particular illness.' Dr. Moreno did not arbitrarily 'rule in' Aqua EZ as a potential cause, but instead concluded from the MSDS Sheet and his own knowledge of medicine and chemistry that the chemical it contains can cause damage to the nasal and sinus mucosa upon inhalation.

*Id.* at 180-181 (internal citation omitted).

Evidence of a chemical's properties and known effects can be reliably applied to novel settings in the absence of medical literature directly on point. Notwithstanding this, Dr. Laumbach has supplied a massive amount of medical literature to support his conclusions, which can be seen in his reports and Declaration.

**III.    Dr. Laumbach reliably demonstrated that vinyl chloride exposure can be linked to increased risk of cancer.**

**A.    Increased Risk of Cancer Justifying Medical Monitoring**

Dr. Laumbach's opinion that the massive short-term exposure to vinyl chloride justifies medical monitoring because of increased cancer risk is supported by a substantial body of scientific evidence:

1. OSHA requires medical monitoring for workers exposed to vinyl chloride and specifically requires any employee who is exposed to a "massive release of vinyl chloride" as a result of a catastrophic mishap "shall be afforded appropriate medical surveillance." 29 CFR §1910.1017(b)(5) and §1910.1017(k)(3).

12

2. The National Academy of Sciences has calculated a 1 in 10,000 cancer risk associated with the following short term exposures to vinyl chloride: 1 in 10,000 for a 30 minute exposure of 2,990 ppm or a one hour exposure of 670 ppm; or 1 in 10,000 for a 30 minute exposure of 1,180 ppm or a one hour exposure of 350 ppm.

3. In a study of cancer induction following single and multiple exposures to vinyl chloride, a single exposure to a high dose was found to cause cancer in mice, leading the author to conclude "one dose is sufficient if the dose is high enough." *Cancer Induction Following Single and Multiple Exposures to a Constant Amount of Vinyl Chloride Monomer,* R. M. Hehir, Environmental Health Perspectives Vol. 41 pgs. 63-72, 1981[6].

4. Using an EPA algorithm for assessing excess cancer risk, Dr. Greenberg admitted that a 60 minute exposure at 4,800 ppm would result in an excess cancer risk of 1 in 11,170. At 90 minutes the incidence would be 50% higher or about 1 in 7,000.[7]

Even more concerning is the recent study of chromosomal aberration in

---

[6] Dr. Laumbach's opinion cannot be excluded simply because he relied on animal studies. *Cf. In re Paoli R.R. Yard Pcb Litig.,* 35 F.3d 717, 743 (3d Cir. 1994)

[7] Dr. Greenberg's initial calculation using the EPA algorithm was one excess cancer in 333 Million, but he later admitted that this was mistaken by a factor of 1,000 and the actual increased cancer risk is one in 333,000. He based this upon an average exposure of 372 ppb, or 0.968 mg/m$^3$ over an 18 day period. *See* Cuker Dec. at Exhibit H (Greenberg 6/16/15 Dep.), p.p. 105:5-109:7. Because Dr. Greenberg's cancer risk assessment did not include any readings taken before the afternoon of November 30, *see id.* at 114:11-22, he was asked to assume that in lieu of the exposures he calculated over the 18 days, there was a single exposure of 4,800 ppm for an hour and asked to calculate an increased cancer risk on that. Using the same EPA algorithm, he concluded the increased cancer risk would be 29.81 times greater than the 1 in 333,000 cancer risk he had calculated earlier, which results in an excess cancer risk of 1 in 11,170. *Id.* at 114:23-122:25. Dr. Greenberg then admitted that if the exposure assumed was 4,800 ppm for 90 minutes, the cancer risk would go up by 50%, which would in turn result in an excess cancer risk of about 1/7,062, well in excess of the 1/10,000 standard universally regarded as an excess risk of concern. *Id.* at 123:13-18.

persons exposed to a vinyl chloride train wreck in Germany.  In that case, the

atmospheric concentration of vinyl chloride was not measured until 15 hours after

the event, at which time it was 1 – 8 ppm, certainly no higher than what was found

in Paulsboro.  That study, which controlled for demographic variables and smoking

showed those exposed to vinyl chloride had a statistically significantly increase in

the mean frequency of aberrant cells.  Dr. Laumbach has cited other articles

showing "that a single exposure is effective as multiple exposures in producing

chromosome damage" and that there is a significant correlation between

chromosomal aberrations and the incidence of cancer.  *See* Laumbach Report.

Accordingly, there is a strong scientific basis to show that increased chromosomal

aberrations would be expected to increase cancer risk.  Therefore, for all of these

reasons Dr. Laumbach's opinions on disease causation are amply supported in

record and should not be excluded.[8]

## IV.    Dr. Laumbach Properly Accounted for Alternate Causes

The reliability of differential diagnosis has been approved in this circuit.

*Heller, supra*, 167 F.3d at 154-155 (3rd Cir 1999); *Paoli III*, 35 F.3d 717, 742, n.8

(3rd Cir. 1994).  "To properly perform a differential diagnosis, an expert must

perform two steps: (1) 'Rule in' all possible causes of [injury] and (2) 'Rule out'

---

[8] Defendants' attack on Dr. Laumbach's opinions regarding sleep disorder has no place in this case, as Dr. Laumbach did not include these conditions within the differential diagnosis of Mr. Morris.

causes through a process of elimination whereby the last remaining potential cause is deemed the most likely cause of [injury]." *Feit v. Great W. Life & Annuity Ins. Co.*, 271 Fed. App'x 246, 254 (3d Cir. 2008). Furthermore, expert testimony on causation is not inadmissible "simply because it fails to account for some particular condition or fact which the adversary considers relevant." *Creanga v. Jardal*, 185 N.J. 345, 360 (2005).

Defendants claim that "Dr. Laumbach fails to address plausible alternative causes in his report." Def. Br. at 26. Shortly thereafter, however, Defendants concede that Dr. Laumbach "generally acknowledges the previous existence and other possible causes of Plaintiff's maladies" and that he rejects those as exclusive causes of his symptomology. *Id.* So Defendants move on to briefly critique the *method* by which Dr. Laumbach excludes potential other causes as nothing more than "his own say-so." *Id.*. But Defendants then recognize that Dr. Laumbach in fact rejected "alternative causes . . . based primarily on temporality." *Id.* Defendants' challenge to Dr. Laumbach's differential diagnosis thus goes nowhere. *See also Heller, supra*, 167 F.3d at 154 ("Both a differential diagnosis and a temporal analysis, properly performed, would generally meet the requirements of *Daubert* and *Paoli*.").

## IV. Defendants remaining arguments can be dismissed out of hand.

Plaintiffs were indisputably exposed to high levels of a known human

carcinogen as a result of the derailment.  Because, as set forth, *supra*, Dr. Laumbach's opinions on long-term risks associated with acute vinyl chloride exposure are well supported in the medical literature, his opinions—far from speculative, *cf.* Defs. Br. at 27—are admissible and can be used as the basis for Morris's medical monitoring claim.  *Cf. Theer v. Philip Carey Co.*, 133 N.J. 610, 627 (N.J. 1993) ("[P]laintiffs who have suffered increased risk of cancer when directly exposed to a defective or hazardous product like asbestos, when they have already suffered a manifest injury or condition caused by that exposure, and whose risk of cancer is attributable to the exposure.").[9]

Finally, in support of Defendants' contention that Dr. Laumbach's testimony should be excluded under Fed. R. Evid. 403 they merely parrot the rule and state: "the probative value of Dr. Laumbach's opinions is clearly outweighed by [the Rule 403] concerns."  Defs. Br. at 27.  The argument is thus undeserving of review by this Court.  *Cf. Nagle v. Alspach,* 8 F.3d 141, 143 (3d Cir. 1993) (declining appellate review of issue mentioned just "casually in one sentence.").

## CONCLUSION

For all of the reasons given above, Defendants' motion to exclude the testimony of Dr. Laumbach in this case should be denied.

DATED:      July 15, 2015

---

[9] The appropriateness of medical monitoring relief under New Jersey law is the subject of separate motions by Defendants.

16

Respectfully submitted:

/s/    *Matthew Weng*
Matthew Weng, Esq.
*Counsel for Plaintiffs*